**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER DIBBERN                                    Case No.   12-15632

              Plaintiff,

v.                                                          Hon.  Sean F. Cox

The UNIVERSITY OF MICHIGAN,
a Domestic Nonprofit Corporation,
The BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, a public
constitutional body corporate,
MARY SUE COLEMAN,
President of The University of Michigan,
an individual acting in her official capacity,
RACHEL S. GOLDMAN, in her individual
and official capacity, TRESA POLLOCK,
in her individual and official capacity, and
PETER GREEN in his individual and official capacity.

              Defendants.
_____

David M. Blanchard (P67190)
Jennifer B. Salvatore (P66640)
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.
Attorneys for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dblanchard@nachtlaw.com
jsalvatore@nachtlaw.com

_____

**FIRST AMENDED COMPLAINT AND RELIANCE ON ORIGINAL DEMAND**
**FOR JURY TRIAL**

**Statement of the Case**

1.      The University of Michigan has completely failed in meeting its obligations under Title IX by willfully and knowingly allowing a sexually hostile educational environment to continue. The environment within the graduate program at the College of Engineering has been openly hostile to female students within the College.

2.      Plaintiff Jennifer Dibbern was a Graduate Student in Materials Science Engineering, a survivor of the sexual harassment and a hostile environment that festered in that department, and a victim of retaliation by University officials for daring to speak up and advocate for better educational conditions.

3.      Jennifer Dibbern, throughout the last five years of her graduate student career has experienced not only the most egregious forms of sexual harassment, gender-based bullying, and sexually hostile educational environment, but also a willful ignorance and disregard of the problem from the University of Michigan officials she reached out to.  These included not only her advisor and Department chairs, but even the University ombudsman and "Office of Institutional Equity" – the very office charged with ensuring University Title IX compliance.

4.      In the face of the University's failure to respond, Ms. Dibbern worked to organize a voice for graduate students to move the University forward on the issues of educational environment and working conditions.  For her speech and activity in the above areas, Dibbern was met with only more institutional retaliation.

5.      Ms. Dibbern ultimately was kicked out of her program and thereby denied the professional path to which she had committed her entire academic life. The retaliation continued and culminated in an attack on her academic choices and an invasion of her privacy rights.

These acts by the University and the details described below violated state and federal law and deprived Ms. Dibbern of the basic protections afforded to her by the United States Constitution.

### Jurisdiction and Venue

6.      This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

7.      Venue is proper in the Eastern District of Michigan pursuant to pursuant to 28 U.S.C. §1391, because at all times material and relevant, Defendants transacted and continue to transact business in this District.

### The Parties

8.       Plaintiff Jennifer Dibbern was a Graduate Student at the University of Michigan in the Department of Material Science and Engineering.  Ms. Dibbern graduated with an undergraduate degree from the Massachusetts's Institute of Technology in 2007 before enrolling in the Materials Science and Engineering ("MSE") program at the University of Michigan in Fall 2007.  Ms. Dibbern was dismissed from the University of Michigan Graduate Program in December of 2011 after reporting incidents of sexual and gender based harassment in the College of Engineering and advocating at every level to correct and remedy a sexually hostile environment in the University's College of Engineering.  Dibbern's actions included direct reporting to advisors and other faculty within the department, working with the University's Sexual Assault Prevention and Awareness Center to advocate for training within the department, and seeking organizations and collective bargaining to address the sexually hostile environment within the College of Engineering and the lack of federally mandated procedures and training.

9.      The University of Michigan is a public research university located in the State of Michigan. Through the Office of Institutional Equity ("OIE), and the Office of Student Conflict

Resolution ("OSCR"), the University of Michigan has a stated goal of promoting federal and state laws regarding nondiscrimination and affirmative action, such as Title IX.

10.     Rachel S. Goldman is a faculty member at the University of Michigan in the Materials Science and Engineering Department.  Ms. Goldman served as the Graduate Program Chair of the MSE Department, she is and was a Michigan Resident at all times relevant to this complaint.

11.     Tresa Pollock is a faculty member at the University of California-Santa Barbara in the Materials Department.  Ms. Pollock was on faculty at the University of Michigan in the Materials Science and Engineering Department and a resident of Michigan for all times relevant to this complaint.  Ms. Pollock served as Plaintiff's Department Advisor in the Materials Science and Engineering Department.

12.     Peter Green is the Chair of the Materials Science and Engineering Department. Mr. Green is and was a Michigan resident at all times relevant to this complaint.

<u>**Relevant Facts**</u>

13.     At all times relevant to this complaint, the University of Michigan conducted no meaningful training on sexual or gender-based harassment for graduate students in the Materials Science and Engineering Program and for most other graduate programs. Nor was such training mandated for faculty members in the Materials Science and Engineering Program or for most other graduate programs at the University.  The Department of Education's Office of Civil Rights (OCR) recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement

4

unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.[1]

14.     The United States, through the Department of Education ("DOE"), administers the Federal Student Aid ("FSA") program.     In order to participate in federal financial aid programs, an institution of higher education must promise to comply with Title IX, FERPA, and Title VI.

15.     Jennifer Dibbern wrote a sexual harassment training proposal and attempted to introduce sexual harassment training within the College of Engineering, prompted by the student-on-student sexual and gender-based harassment she experienced from graduate students within her Department.[2]

16.     Dibbern was assisted in her efforts by staff at the University's Sexual Assault and Prevention Awareness Center (SAPAC) and led an effort to institute mandatory sexual harassment training for all University graduate students. However, Complainant Jennifer Dibbern's efforts to establish sexual harassment training within the College of Engineering were frustrated and cut short due to ongoing retaliation by Department faculty, culminating in summary dismissal from her PhD program without due process.

17.     At all times relevant to this complaint, the University of Michigan's sexual assault and harassment reporting procedures failed to meet baseline obligations of compliance with Title IX.

---

[1] *See* DOE, Dear Colleague Letter, April 4, 2011, at 4.
[2] "Sexual Harassment and Graduate Student Instructors: College of Engineering Proposal," Dec. 3, 2010.

18.     At all relevant times and at least up until August of 2011, The University referred Reports of Sexual Harassment to the Office of Student Conflict resolution in a procedure that violated the minimum due process rights of victims, discouraged reporting of campus sexual assaults,  and failed to provide any effective avenue for correction of institutional failures.  Prior to 2011, the University of Michigan's Office of Student Conflict Resolution (OSCR) had a policy in place wherein victims of sexual harassment and assault would have to confront their assailants in a traumatizing cross examination process.

19.     Like many other victims, Ms. Dibbern was encouraged to address the culture of sexual assault and harassment through OSCR as a peer-to-peer issue.  The OSCR resolution process for reporting harassment on campus not only violated Title IX requirements, but actively discouraged victims from coming forward, effectively fostering a hostile educational environment.

20.     According to OSCR's  "Complaint Resolution Process," which was available to all students, including Ms. Dibbern, one of the final steps toward resolving an incident of sexual harassment was "arbitration," where the victim of harassment must face his/her assailants (See Ex A, The Complaint Resolution Process). Through arbitration, the alleged harasser would have the opportunity to question the victim in front of a student and faculty panel.  Such a panel would effectively re-traumatize Ms. Dibbern and force her to confront the very same assailants that not only made jokes at Ms. Dibbern's expense, but also threatened to rape her and use physical violence against her.

21.     After learning that she would have to face her assailants should she make a complaint to the Office of Student Conflict Resolution, Ms. Dibbern did not feel safe coming

forward with an official complaint.  Instead, she requested that the incident(s) be recorded and that the University be made aware of the hostile environment in the Materials Science and Engineering Department at the University of Michigan.

22.     The "conflict resolution process" mentioned above is contrary to the requirements of Title IX.  "Appropriate steps to end harassment may include separating the accused harasser and the target…or taking disciplinary action against the harasser."

23.     The OSCR resolution process in place at the time did not properly enforce Title IX regulations.  In fact, the OSCR process forced the victim to physically confront the harasser and be subjected to questioning.  Such procedure is counterintuitive to promoting a safe educational environment and contradicted the OCR's emphasis to not "penalize the student who was harassed" (Dear Colleague Letter, October 26, 2010).

24.     Short of the procedure to confront individual harassers, the school at no time presented any options to address the permissive culture of sexual hostility toward female students in the College of Engineering.

25.     Regardless of the formal or informal "conflict resolution" process,  a school that knows or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.  Furthermore, effective remedies and enforcement means that once a school determines that sexual harassment creating a hostile environment has occurred, it must take immediate action to eliminate the hostile environment.  Even while an investigation is ongoing, actions to separate the victim and the alleged perpetrators are often appropriate.

26.     The University Of Michigan College Of Engineering, as a Federal Loan Recipient and Title IV of the Civil Rights Act of 1964 participant, is required to comply with the federal law, including Title IX, the Family Educational Rights and Privacy Act ("FERPA"), and the Clery Act. As a mandatory part of the Program Participation Agreement with the Department of Education (a necessary part of eligibility to participate in Federal Student Loan programs, including Pell Grants, FAFSA, and others) the University regularly and routinely certifies and promises compliance with Title IX and the FERPA.[3]

27.     FERPA is a federal law that protects the privacy of student education records.[4] The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act) requires all colleges and universities that participate in federal financial aid programs to keep and disclose information about crime on or near their campuses.[5] Title IX protects students from sexual harassment perpetrated by other students in a school's education programs and activities and from the hostile educational environment such conduct may create.[6]

28.     Title IX prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in the April 4, 2011 Dear Colleague letter also apply to gender-based harassment.[7] These

---

[3] *See. e.g.* College of Engineering 2011 Program Participation Agreement.
[4] 20 U.S.C. § 1232g; 34 CFR Part 99.
[5] 20 U.S.C. § 1092(f); 34 CFR 668.46. Compliance is monitored by the United States Department of Education, which can impose civil penalties, up to $27,500 per violation, against institutions for each infraction and can suspend institutions from participating in federal student financial aid programs.
[6] *See* DOE, Dear Colleague Letter, April 4, 2011, at 3.
[7] *Id.* at 4, n. 9.

obligations include training on sexual and gender-based harassment. "[T]raining for administrators, teachers and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond."[8]

29.    Because Title IX requires the University to take immediate action to eliminate harassment, prevent its recurrence and address its effects,[9] the University must "ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment known how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence."[10]

30.    Taken together, the University's failure to meet Title IX obligations has created and fostered a sexually hostile environment in graduate student programs, including in the College of Engineering.

31.    Ms. Dibbern's experience is not isolated or unique.   The University's full institutional failure to act had already created a hostile environment by the time of Ms. Dibbern's arrival in the engineering department.    By the time she arrived at the University she was confronted with an environment where:

---

[8] *See* DOE, "Title IX: Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," January 2001, at 19.

[9] *See* DOE, Dear Colleague Letter, April 4, 2011, at 4. This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-12.

[10] *See* DOE, Dear Colleague Letter, April 4, 2011, at 4.

a.    Graduate students and faculty advisors were profoundly lacking in sexual assault and harassment training, and in other Title IX obligations;

b.    Sexual assault and harassment within graduate programs were dealt with as student conflict issues to be resolved by individual misconduct hearings or through voluntary mediation;

c.    A permissive culture where faculty was free to suppress or even joke about sexual assault and harassment allegations and even to retaliate against complainants and label them too "thin skinned;"

d.    No action was taken to eliminate harassment unless a formal report was made, and action was then limited to acting on isolated crimes rather than addressing the institutional environment that fosters such behavior.

32.    Ms. Dibbern sought every possible avenue to remedy what she saw as an institution-wide failure. She sought advice and help of advisors, she contacted administration officials, she advocated for sexual assault and harassment training programs, and she became active in organizing Graduate Student Research Assistants as a way to get the voices of reform heard.

33.    Moreover, because of the systematic failure, Ms. Dibbern was left with self-help remedies to avoid the hostile environment, including self-segregation from study groups and core classes in order to avoid harassment and stalking.   In the end, her efforts to protect herself from this environment and to improve the institutional processes met with rejection, retaliation, and eventual sudden termination from her graduate program.

### Jennifer Dibbern's Experience

34.     Ms. Jennifer Dibbern ("Ms. Dibbern") graduated with an undergraduate degree from the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts in 2007 and with a grade point average of 4.6 out of 5.0. Following her graduation from MIT, Ms. Dibbern enrolled in a Ph.D. program in Materials Science and Engineering ("MSE") at the University of Michigan, in Ann Arbor, Michigan.  Ms. Dibbern received a Rackham merit fellowship and her participation in the Ph.D. program was fully funded.  Ms. Dibbern's entering Ph.D. class included about five women out of about 25 students.

35.     On Ms. Dibbern's first day as a Ph.D. student within the Materials Science and Engineering program she attended her first class and invited to lunch some classmates with whom she'd be working, so to get to know them better. Immediately after introducing herself at the lunch table, Ms. Dibbern was subjected to comments indicative of the gender-based harassment and hostile environment she would live day in and day out as she worked towards completion of her Ph.D.

36.     Subjected to student-on-student harassment, Ms. Dibbern was told by her student colleagues: "real women aren't engineers," "engineering women are different—they're not normal . . .  they aren't like real girls. Not normal at all. Even if they are around, no one considers them women," among others.

37.     One student challenged Ms. Dibbern's place within the Ph.D. program and whether she deserved to have been admitted to MIT. The student stated during lunch:

      a.    "You had it easy because you're a woman in science. You have to admit it. You're less qualified but still able to get in just because you're a girl.

b.    No, you have to admit it—people make things easier even for MIT—I mean, [Male Student] deserved to go to MIT, as a white male he has nothing helping him and he has to be even more qualified—he's got nothing helping him get in. You add diversity to the class. Plus, guys would want to help you study, cut you breaks. Don't get me wrong—I don't mind as a guy in science, more variety . . .  hot girls to study with who'd need me to help them pass, in exchange, you know, as long as they look cute."

c.    A second student stated: "Let's be honest, the girls in engineering aren't *real* girls—no guy would look at them that way so we need more real girls to study with, date—something to look at in class. Real girls. There's something wrong with the engineering girls."

38.    After that day, the men she met at lunch, and other male Ph.D. program students, regularly taunted Ms. Dibbern at group study sessions, ridiculed her when she produced correct answers to problem sets, and spoke over her when she tried to speak. At the study group, the Student Harassers assigned Ms. Dibbern the name "parts on the inside." When Ms. Dibbern spoke up in the study group, a student stated: "I can't hear you—what? All I hear is 'my parts are on the inside, my parts are on the inside, my parts are on the inside." "Parts on the inside" became a running joke and was used by all of the Student Harassers repeatedly, and especially during group study sessions in order to ignore or negate anything Ms. Dibbern said to the group.

39.    Ms. Dibbern attended MSE core classes and Engineering Department events with the Student Harassers as a part of her program. The Student Harassers regularly told Ms. Dibbern

12

that they masturbated with her in mind and would plan to call her at climax. When Ms. Dibbern left classes in which she was enrolled with these students, one or more of the students would intentionally catch her attention, fashion his hand in the shape of a telephone next to his ear, and state, "Call you later, Jenn."

40.     After Ms. Dibbern reported the harassment to her engineering department advisor, the University took no action and the harassment escalated to sexual assault.

41.     Ms. Dibbern reported the sexual and gender-based harassment by other students to her Department Advisor, Prof. Tresa Pollock, as early as November 2007 but her reports were dismissed. Prof. Pollock responded that boys can be "like that" and told Ms. Dibbern to stay focused on work.

42.     In direct contravention of Title IX's requirements, neither the Department nor the University responded to Ms. Dibbern's report of student-on-student sexual and gender-based harassment. Title IX requires schools to "respond to student-on-student sexual harassment" even if it "initially occurred off school grounds."[11]

43.     A school that "knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation."[12] The school also should tell victim that "Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs."[13]

---

[11] See DOE, "Dear Colleague Letter," April 4, 2011, at 3; DOE, Dear Colleague Letter, October 26, 2010, at 2.
[12] Id. at 4.
[13] See DOE, "Dear Colleague Letter," April 4, 2011, at 5.

44.     The Student Harassers continued to taunt and harass Ms. Dibbern into the Winter 2008 semester.[14] Additionally, after Ms. Dibbern refused to make herself sexually available to

---

[14] Ms. Dibbern documented in her personal journal harassing comments which occurred prior to February 24, 2008. These comments included: (1) "I'll bet you've been f***ed so much. You're so dirty. A little late for you to worry about that isn't it? You'll never be clean, you slut"; (2) "That was a really dumb thing to say, just so you know. Really dumb. But then what do you say that isn't?"; (3) "You are a walking cliche. Everything you do is because you are a woman. Just learn and admit it."; (4) "Be a good girl and get me a drink. Now."; (5) "Well, that's because your parts are on the inside."; (6) "You know that comic? The XKCD one where it says, 'Girls suck at math'? Funny how true that is, right? How'd you get in here again?"; (7) "Well, we do always talk over you but that is because you'd never have anything important to say--your parts are on the inside."; (8) "You talk and all I hear is blah, blah, blah my parts are on the inside, my parts are on the inside, my parts are on the inside."; (9) "You know you were let into MIT because you're a woman. I applied several times and got rejected because less qualified--come on, be honest--less qualified women like you were let in to meet their quota."; (10) "Real women aren't engineers."; (11) "Engineering women are different—they're not normal. They aren't like real girls. Not normal at all. Even if they are around, no one considers them women."; (12) "We need more cute girls in engineering to study with and more options for dates. It'd be great because if we let them in—you know real girls who were honestly, probably not smart enough to hack it—it wouldn't matter if they couldn't cut it. If we let them in and helped them study, skim by in classes, maybe there would be girls in engineering who were pretty."; (13) "That hat is stupid. Why would you wear something that stupid? Do you think it is fashionable because your parts are on the inside? But you're not a real woman. You just look dumb."; (14) "Well, now that you don't have a boyfriend, who is going to keep you in line? If you don't have a boyfriend, someone has to take over responsibility for you."; (15) "Do you want to come over and clean my house? I don't care. Do it anyway."; (16) "Suck up . . . "Or did you just *suck* to get a better grade."

Additionally, her harassers sent emails to the study group and directly to Ms. Dibbern which questioned women's place in the sciences or circulated articles suggesting that women are behind in earning degrees in the physical sciences. Other emails included comments suggesting sexual or violent behavior toward Ms. Dibbern. For example, in an email on March 28, 2008, from one student about a carpool to the party discussed *infra*, the student wrote that after picking up some students at one apartment building, the carpool could next "swing by and grab Jen. Er, grab in a nice way though."

one student, the student, who had not previously done so, encouraged and incited harassment. Only if Ms. Dibbern agreed to go on a date with the student, would he temporarily cease his own participation and encouragement of other students' harassment of Ms. Dibbern and offer Ms. Dibbern some protection.

45.     The continued sexual and gender-based harassment and threatening conduct escalated to violence when, in late March 2008, Ms. Dibbern accompanied a group of students to a tea shop. While standing inside the tea shop, one of the students insisted that Ms. Dibbern give him her drink when she received her order before him. When Ms. Dibbern refused, the student slapped Ms. Dibbern's face. When she still refused, the student slapped Ms. Dibbern again. No other students stopped the student or interjected.

46.     In April 2008, the same student who slapped Ms. Dibbern threatened to rape her. On the night prior to a final exam, Ms. Dibbern was studying in the Materials Science and Engineering lounge in the Herbert H. Dow building. Two other students were also present in the lounge studying for final exams.  Ms. Dibbern sat near the back of the room, furthest from the lounge door.  The threats went to the level of describing in detail how the rape could occur, and students discussed which one would go first.  The students also reminded her that they knew where she lived and where her lab was, and suggested that she would "pretend she didn't like it." Immediately after the incident, Ms. Dibbern also called her parents who immediately called the Sexual Assault Prevention and Awareness ("SAPAC") crisis line.

47.     Ms. Dibbern Reported the Attempted Rape to University Counseling and Psychological Services ("CAPS") and to Her Engineering Department Advisor.

15

48.     Ms. Dibbern met the next day with a counselor at the University Counseling and Psychological Services ("CAPS"). The counselor advised Ms. Dibbern to move to a new apartment so the Student Harassers would no longer know where she lived. CAPS also provided Ms. Dibbern a letter that allowed her to move the date of her two exams in the courses taught by Professor Amit Ghosh and by Professor Max Stein. Before moving the dates of her exams, Ms. Dibbern was earning the grade of "A" in both courses. CAPS also advised Ms. Dibbern to take a brief leave of absence and to return to her parents' home in Iowa, which she did.

*49.*     Once back from leave, Ms. Dibbern, in explaining why she took time off, reported the conduct she experienced to her advisor, Prof. Pollock. Ms. Dibbern explained that the men had threatened to physically harm her and to take advantage of her against her will. In mid-explanation, Prof. Pollock interrupted Ms. Dibbern to say: "These things sometimes happen. We have to get over it and get back to lab. Don't let this ever happen again. It's important that we be in lab. We don't always get along with everyone."

50.     Title IX dictates that a school is responsible for addressing harassment incidents about which it knows or reasonably should have known.[15] A school has notice of harassment if a responsible employee knows, or in the exercise of reasonable care should have known, about the harassment.[16] A school also has the duty to "take prompt and effective steps reasonably calculated to end the harassment, hostile environment and its effects, and prevent the harassment

---

[15] *See* DOE, Dear Colleague Letter, Oct. 26, 2010.
[16] *Id*. at 2, n. 9.

from recurring."[17] Additionally, the U.S. Department of Education, Office of Civil Rights, recommends that schools implement preventive education programs which train faculty.[18]

51.     "As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred."[19]

52.     Prof. Pollock either had no training or willfully chose to ignore Ms. Dibbern's report and believed it permissible that she suffered additional and continued incidents of harassment.

53.     The incidents of harassment, sexually abusive language, and even further threats of rape continued in the program.

54.     Because Ms. Dibbern had delayed her final exams because of the night where her colleagues threatened to rape her, Ms. Dibbern needed to reschedule make-up examinations.  Ms. Dibbern rescheduled her missed exam in Professor Stein's course and earned the grade of "A" on the exam. Ms. Dibbern attempted to reschedule her exam in Professor Ghosh's course but had great difficulty in reaching him. When Ms. Dibbern finally reached the professor he told her that her "personal emergency" was "clearly a lie" and demanded that she sit for the examination the next day.

---

[17] *Id*. at 2-3.

[18] *Id*. at 14.

[19] *See* DOE, "Dear Colleague Letter," April 4, 2011, at 16.

55.     Further, the conditions under which Ms. Dibbern took her make-up exam were starkly different from typical examination conditions in the Department. She was not permitted to take the examination on the honor code, was told to arrive at an administrative office to take her exam at 6 AM, was refused notice of the exam's coverage, and was interrupted several times each hour by Prof. Ghosh who stated that he must check up because "students these days tend to cheat." (Additionally, the exam covered material of a higher level than addressed in the course.)

56.     After the August 2008 exam, Prof. Ghosh refused to grade the August 2008 exam and entered a final grade in the course in December 2008.  In doing so, Ms. Dibbern was unable to apply in time for the application deadlines to other schools' graduate programs, which she had hoped to do in order to escape her harassers.

57.     In a separate series of incidents, another engineering graduate student stalked and assaulted Ms. Dibbern beginning in the summer of 2008.  He confessed that he was in love with her. Ms. Dibbern had a boyfriend and explained as much. Following this event, the student refused to believe Ms. Dibbern did not return his feelings, and he began to call Ms. Dibbern late at night, to wait for her after classes, and to follow her. In October 2008, Ms. Dibbern asked for space. In November 2008, when she found the student waiting for her, Ms. Dibbern insisted that she needed to return home to hurriedly prepare for a meeting, and so she started jogging home. The student jogged behind her.

58.     In December 2008, the student called Ms. Dibbern and asked her to dinner. Ms. Dibbern said no. Later that night, Ms. Dibbern saw the student waiting for her outside of the lab. Ms. Dibbern observed the student walking in circles in a shaded spot away from the lighted doorway. Ms. Dibbern went inside the building and the student followed her up the stairs to her

18

office. The student had a key card that accessed the building. The student confronted Ms. Dibbern in her lab.

59.     Ms. Dibbern feared that her stalker had been talking to her other harassers and was a part of their plan to rape her. Ms. Dibbern asked the student to leave. He would not, and the student then forcibly pulled Ms. Dibbern against his body, squeezing her to the point that it caused her pain. Ms. Dibbern insisted that he stop and pushed him away three times before he left.

60.     In January 2009, Ms. Dibbern called the University of Michigan Office Of Institutional Equity in order to learn more about possible recourse and the process required for reporting her harassment. Ms. Dibbern spoke anonymously. She soon realized that she was speaking over the phone with the Associate Vice Provost for Academic and Faculty Affairs and Senior Director, Anthony Walesby, who also serves as the University's Title IX Coordinator.

61.     In this call, Ms. Dibbern explained the attempted sexual assault, the persistent sexual harassment, that her professor had told her to 'get over it and get back to lab,' and that she feared for her safety because she must walk from her lab at night, after hours, and her stalker had access to the lab.

62.     In response, Mr. Walesby asked Ms. Dibbern if she had any email documentation because "if it is not in email, there's nothing we can do about it" and he needed "concrete proof." Mr. Walesby made comments including: "you know how it is," "people assume women false report this kind of stuff," and impressed upon Ms. Dibbern that the burden of proof is on the student and that OIE needs an iron-clad case in order to respond seriously.

63.     Further, Mr. Walesby stated even if an investigation were conducted, Ms. Dibbern would not be able to know what action was taken against the perpetrators. Mr. Walesby explained that he had no knowledge of anyone ever being suspended or asked to leave the University for this type of behavior. Mr. Walesby told Ms. Dibbern that if professors were disciplined, they would likely receive one week without pay. Mr. Walesby likened the punishment to a "one week unpaid vacation."

64.     Such a statement is contrary to the directives of the U.S. Department of Education's April 2011 Dear Colleague Letter. A victim who files a complaint must be notified, in writing, about the outcome of both the complaint and any appeal and if wrongdoing is found, the sanction imposed on the perpetrator. FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction direction relates to the harassed student.[20]

---

[20] *See* DOE, "Dear Colleague Letter," April 4, 2011, at 13. As noted in the April 2011 Dear Colleague letter:

> This information is particularly important because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

65.     Additionally, Mr. Walesby told Ms. Dibbern that she would have to confront the perpetrators at mediation. Again, this advice is contrary to Title IX directives. While grievance procedures may include informal mechanisms, such as mediation, the Office of Civil Rights has advised recipients that it is "improper for a student who complains of harassment to be *required* to work out the problem directly with the alleged perpetrator."[21] In cases involving allegations of sexual assault, "mediation is not appropriate even on a voluntary basis."[22]

66.     Further, Mr. Walesby stated that he knows "women don't false report and they take this stuff seriously but we can't protect you from all types of retaliation." Mr. Walesby then said "the truth is, there are some women who are overly sensitive" . . . "and who can't take a joke and feel offended." "We know that [women] don't false report but some women can't take a joke."

67.     After all of these statements from Mr. Walesby, Ms. Dibbern felt she had heard all she needed to know, felt she had no real or effective recourse, and ended the call.

68.     At this point in time, Ms. Dibbern was terrified. She felt unsafe. Her stalker knew where she lived, so Ms. Dibbern moved to a new apartment for a second time. Ms. Dibbern's stalker held a card with which he could swipe into her lab building and he knew her lab schedule. Ms. Dibbern told her Department Advisor, Prof. Pollock, that she no longer wanted to be in the lab late at night and wanted to change her lab schedule. Prof. Pollock refused Ms. Dibbern's request, stating "I need the results."

---

*See* DOE, "Dear Colleague Letter," April 4, 2011, at 13.
[21] *See* DOE, "Dear Colleague Letter," April 4, 2011, at 8.
[22] *Id.*

69.     Ms. Dibbern had confided in a female student in the Engineering Department about the stalker's actions.  She was also in contact with the stalker. Over time, she began to observe similar behavior by the stalker that Ms. Dibbern had observed early in their acquaintance, such as the stalker running after and following Ms. Dibbern when she insisted she leave his presence.

70.     In February 2009, Ms. Dibbern contacted the University's Department of Public Safety (DPS) to report her stalker. Later in February 2009, Ms. Dibbern's female friend, another graduate student in the Engineering Department, contacted Ms. Dibbern because, she said, she was worried for Ms. Dibbern due to the stalker's actions toward herself. The female friend would take calls from the stalker, wherein he would describe his poor health and other desperate feelings if he could not be with Ms. Dibbern. The stalker would follow her after class and meetings. The stalker's intent in following this friend was to gain access to Ms. Dibbern via the friend. However, the friend was concerned for her safety.

71.     On December 23, 2009, Ms. Dibbern received an email notice from her department advisor, Prof. Pollock, terminating Ms. Dibbern's appointment for the next semester – after the appointment had been processed. Prof. Pollock cited the following as reasons for "lack of commitment" to her degree thus justifying Ms. Dibbern's dismissal: (1) the two week leave Ms. Dibbern took in April 2008 (immediately following the attempted rape); (2) her incompletes in coursework (as a result of rescheduling following the attempted rape); (3) coursework outside of MSE (arranged so to avoid her sexual harassers); (4) a 10 hour per week research job in the School of Natural Resources and Environment (appointment with Professor Edward Parson who also teaches at the University of Michigan Law School; Ms. Dibbern met

Prof. Parson while taking a law course outside of her department so to avoid her sexual harassers). All stated reasons related to Ms. Dibbern's harassment by students within the Department. Ms. Dibbern had elected some coursework outside of the MSE department so to avoid taking courses with her harassers. This practice was permitted under Department policy.

72.     Ms. Dibbern had to elect different courses on her own, because her Department did not take any action to protect her from the perpetrators. The U.S. Department of Education recognizes such actions as crucial remedial measures which may be necessary in a hostile educational environment because continued contact with harassers may traumatize the victim.[23] Yet, Ms. Dibbern was punished for arranging such an alternative on her own and by the very advisor to whom she had reported her harassers' behaviors.

73.     Ms. Dibbern reported sexual harassment to the Engineering Department Chair and to Officials at the Rackham Graduate School and Center for the Education of Women; University faculty and employees failed yet again to take any effective action.

74.     In January 2010, Ms. Dibbern disclosed the sexual harassment she experienced within the Engineering Department to Professor Rachel Goldman, in her capacity as graduate program chair of the MSE department. Renee Hilgendorf, the graduate coordinator for the Engineering Department was present at this meeting.  In a separate meeting, Ms. Dibbern disclosed the harassment to the Director of the Rackham Office of Graduate Student Success and current ombudsman, and the Center for the Education of Women as she made efforts to find out how she could remain at the University, continue her research and complete her Ph.D., in spite of Prof. Pollock's decision.

---

[23] *See* DOE, "Dear Colleague Letter," April 4, 2011, at 13.

75.     Ms. Dibbern sought emergency funds from Rackham in order to continue her research as a graduate student. At first the administration there seemed willing to provide her with an application for emergency funds. However, once Ms. Dibbern disclosed her experiences of harassment within the MSE program, Rackham told her to wait, to try to find a new advisor and did not permit her to apply for emergency funding. As a result, Ms. Dibbern had no stipend and no health care coverage due to the loss of funding and the uncertainty about her student status at the University.

76.     Despite Ms. Dibbern's reports of the harassment and the threatened sexual assault to multiple graduate school employees and officials, these University of Michigan employees and faculty members failed to understand what to do with Ms. Dibbern's report or how to offer her assistance with what she was experiencing from other students within the Engineering Department.  Officials at the University of Michigan Rackham Graduate School merely directed Ms. Dibbern back to her Department when she was in need of help in a bad situation which resulted from her desire to be safe within the Ph.D. program.   As the U.S. Department of Education indicates, "schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."[24]

77.     Eventually, in February 2010, Prof. Goldman took Ms. Dibbern into her research group. In April 2010, Prof. Goldman requested that Ms. Dibbern take a job within her research group to work with a specific analysis instrument, the STM. This position was fully funded. Ms. Dibbern did well with her research and academic performance and entered the Winter Term 2011

---

[24] *See* DOE, Dear Colleague Letter, April 4, 2011, at 4.

with a plan to complete her preliminary examination in early Fall 2011. Prof. Goldman expressed full confidence in Ms. Dibbern and her academic work.

78.    Later, Professor Goldman retaliated against Ms. Dibbern and even demanded that Ms. Dibbern cease involvement with the Sexual Assault Prevention and Awareness Center (SAPAC)

79.    On April 11, 2011, Ms. Dibbern received an unexpected phone call from Professor Goldman. Prof. Goldman had just left a Student Relations Advisory Council meeting where Title IX requirements were discussed following the publicity of investigations at other universities by the U.S. Department of Education. Prof. Goldman asked Ms. Dibbern if she had heard of Title IX and the investigations at "Harvard and Yale?" Prof. Goldman said. "OCR was investigating the—I guess you'd call them perpetrators" . . . "I might have to report you whether you want me to or not."

80.    Within the next days, Prof. Goldman reprimanded Ms. Dibbern for her "tone" in an email written to lab partners. Prof. Goldman also questioned Ms. Dibbern's commitment to the graduate program and the amount of time that Ms. Dibbern spent in lab. Prof. Goldman instructed Ms. Dibbern to stop being involved in non-academic activities, stating specifically: "I know you have that SAPAC thing." Ms. Dibbern had started volunteering with SAPAC in the fall of 2010 because Ms. Dibbern felt that if she couldn't make herself safe within her Department, she could work to help make other women safe. Ms. Dibbern also worked with SAPAC to implement sexual harassment training for graduate students within the College of Engineering.

81.     Ms. Dibbern, fearful of losing an advisor and funding for the second time in her graduate career, immediately quit SAPAC and ceased her efforts to implement sexual harassment training within the Engineering Department. Ms. Dibbern, who often wore her SAPAC sweatshirt in the department, so to feel empowered in the face of harassment, put away the sweatshirt and removed all SAPAC buttons from her backpack and other bags so that Prof. Goldman would not suspect any involvement. Ms. Dibbern felt she needed to make her activism and involvement invisible so not to jeopardize her funding. Ms. Dibbern wanted to graduate and was just months away from her scheduled preliminary exam and less than two years from earning her Ph.D. Ms. Dibbern also immediately ceased her involvement in implementing sexual harassment training within the College of Engineering.

82.     Still desiring to implement sexual harassment training with the Engineering Department, Ms. Dibbern turned to the Graduate Employees Organization ("GEO") because she realized that the GEO could perhaps negotiate for such training for graduate students as a part of a contract. Ms. Dibbern realized that if the training were a required provision of a contract, the University would have an obligation to provide such training. Ms. Dibbern was excited by the prospect of codifying the training. At this point, Ms. Dibbern increased her involvement with the GEO and the research assistant organizing campaign.

83.     Rather than recognizing a serious problem, Engineering Department faculty openly joked about a prospective student's complaints of student-on-student sexual harassment at Engineering Department Graduate Student recruitment activities.

84.     In late April 2011, Ms. Dibbern attended an awards ceremony where she received a teaching award. At the ceremony, Ms. Dibbern sat at a table with professors from the MSE

Department, including Professor Rachel Goldman, her advisor, and Professor Jinsang Kim and Professor Steven Yalisove.

85.     Prior to this dinner, a prospective student who visited the MSE Department denied the offer to join the program and cited the reason for her not attending the University of Michigan to be the seemingly unwanted and harassing behavior directed at female students by male students at a graduate student party she attended over the prospective students weekend. The letter which this student wrote explaining her reason not to commit to UM was pinned by members of the recruiting committee onto a wall in a communal workspace within the Department, and it was mocked by students.

86.     At the dinner, Professor Yalisove brought up the letter and asked Professor Goldman if she had seen it and then expressed his opinion that such allegations were unbelievable, stating in front of Ms. Dibbern, "Isn't that ridiculous?" "How could she have written that about our Department?" and calling the allegations "ludicrous." Professor Yalisove also stated that this student "is gonna learn" and that another school will have to "teach her how to behave." Professor Yalisove declared "nobody does stuff like that here" and "I can't believe she expects us to take stuff like that seriously."

87.     No professor at the table protested or stopped Professor Yalisove from commenting about the letter.

88.     Professor Goldman revoked Ms. Dibbern's funding; contrary to department policy and decided she does not believe Ms. Dibbern's was sexually harassed.

89.     On August 30, 2011, Prof. Goldman called Ms. Dibbern into her office. At that meeting, Ms. Dibbern had in hand an abstract of her publication. Prof. Goldman refused to

review it. Instead, Prof. Goldman informed Ms. Dibbern that she would no longer fund Ms. Dibbern's research beyond the fall term and would no longer serve as her advisor.

90.     In that conversation, Prof. Goldman told Ms. Dibbern: "When you first came to me, when I took you on, I tried to give you a chance because of what you said, but I don't believe you."

91.     Ms. Dibbern understood Prof. Goldman to be talking about when Ms. Dibbern first came to Prof. Goldman and explained the sexual harassment she experienced and the report she had made to Prof. Pollock and the reason why the incompletes existed on her record and why she chose to take her courses in a different order.

92.     On September 16, 2011, Ms. Dibbern received an email from Prof. Goldman informing her that she was cancelling Ms. Dibbern's funding immediately and asserted that Ms. Dibbern must withdraw from the term. An immediate revocation of funding without warning, and for a student who was performing her duties, is contrary to Materials Science and Engineering policy, which explicitly states that a student cannot be refused funding unless the student were fundamentally negligent in performing work and abandoned the job.[25]

93.     Further, the policy states that faculty reserves the right to review cases and to determine if further support is warranted "in rare circumstances" where the student will "cease to

_____

[25] Under Appendix A: Rights and Responsibilities of Graduate student, of the *Materials Science and Engineering Research Guide*, a graduate student "has the right to a written warning that the work performance is not acceptable at least two months before any action is taken, and has the right to a one-month notice before project funding is withheld. . . . If a student is dismissed during a semester for which they are enrolled, the advisor will be responsible for outstanding financial obligations such as tuition and associated fees, medical benefits, etc., until the end of that semester."

28

discharge in any meaningful way the research responsibilities he/she assumed with the acceptance of a research assistantship."

94.     Ms. Dibbern immediately sought advice from the Rackham Graduate School and met with Darlene Ray-Johnson—to whom Ms. Dibbern had also previously reported her experience of sexual and gender-based harassment. Within days of this meeting, Ms. Dibbern received an email from Ms. Ray-Johnson stating that her only option was to withdraw.

95.     Later in September, Ms. Dibbern met in person with Defendant Peter Green, the Materials Science and Engineering Department Chair. At that meeting, Prof. Green asserted that Prof. Goldman "has records" and then asked Ms. Dibbern about her first year in the program, the reason for incomplete grades in 2008, and her relationship with her first advisor, Prof. Tresa Pollock.  Instead of addressing Ms. Dibbern's current work product and research, Prof. Green focused on the very same issues for which Prof. Pollock had cited the discontinuation of her funding in 2008 – all reasons related to her hostile education environment.

96.     In October 2011, Ms. Dibbern notified Professor Green that she had not withdrawn and did not plan on doing so because she wished to look for a new advisor and to complete her degree at the University of Michigan. Prof. Green confirmed that the Department would fund Ms. Dibbern through the end of the term by taking the funds from Prof. Goldman's account used to fund her and move them to a Department account.

97.     Then the Engineering Department dismissed Ms. Dibbern from the graduate program without even minimum pretense of due process.

98.     In December 2011, Ms. Dibbern asked for a meeting with Prof. Green because she was registered for research units under Prof. Goldman which needed to be graded. In an

29

email dated October 13, 2011, Prof. Goldman told Ms. Dibbern that she could transfer the units to her new advisor to grade or otherwise have Prof. Green grade them. When Prof. Green met with Ms. Dibbern, he refused to grade her units and refused to read the email, which Ms. Dibbern had a hard copy to show him. Instead, Prof. Green told Ms. Dibbern to speak to someone at Rackham about the issue.

99.     Ms. Dibbern next contacted officials at the Rackham Graduate School and spoke with Darlene Ray-Johnson. However, when Ms. Dibbern spoke with Ms. Ray-Johnson she seemed to have already been informed about the issue and directed Ms. Dibbern back to the College of Engineering.

100.    Ms. Dibbern then contacted Elizabeth Wagner who works within the office of the Dean of the College of Engineering to coordinate a meeting about the grading of her research units. The meeting was set for December 16, 2011.

101.    Prof. Peter Green, Renee Hilgendorf, Angie Farrehi, a Student Advocacy Manager for the College of Engineering, and Elizabeth Wagner were present at the meeting on December 16. At the meeting, there was no discussion about who would grade her research units. Instead, Prof. Green read from a letter informing Ms. Dibbern that she was being "discontinued." She was then told she was being offered a Master's degree in Materials Science and Engineering. She was told there was no opportunity for a hearing or appeal of the decision.

102.    During this meeting, Ms. Dibbern referenced her conversation with Ms. Ray-Johnson (and emails to Ms. Wagner scheduling the meeting) to express her shock that the meeting did not concern the grading of her research units. In response, Ms. Wagner stated that she always understood the meeting to be about discontinuation from the program. After the

30

meeting, Ms. Dibbern followed up with Ms. Ray-Johnson and met in person to discuss the filing of a formal grievance. At that time, Ms. Dibbern was informed by Ms. Ray-Johnson that it was never the intention of that meeting to discuss registration questions, and that a discontinuation grievance is governed by different rules.

103.    In retaliation for her activities and vocal criticism, Ms. Dibbern's academic reputation was maligned in the Newspaper.

104.    In response to an assertion by the Graduate Employee's Organization that Professor Goldman's withdrawal of funding and firing of Ms. Dibbern as her Graduate Student Research Assistant was motivated in part by Ms. Dibbern's involvement with GEO, a graduate student research assistant named Eric Zech who worked alongside Ms. Dibbern in Professor Goldman's lab wrote an accusatory op-ed piece published in *The Michigan Daily* which cited facts only Professor Goldman would know with respect to Ms. Dibbern's academic performance.[26]

105.    Zech stated in the op-ed that Ms. Dibbern was involved in activities besides GEO, namely "the University's Sexual Assault Prevention and Awareness Center."[27] Zech also alleged that Ms. Dibbern did not work in Prof. Goldman's lab through the end of December 2011, which is untrue. Ms. Dibbern worked in Prof. Goldman's lab until Prof. Goldman locked Ms. Dibbern out of her lab in October 2011. Additionally, Zech stated that "Dibbern didn't achieve Ph.D.

---

[26] Eric Zech, "Letter to the Editor: Jennifer Dibbern's claims are factually inaccurate," The Michigan Daily, Feb. 9, 2012.
[27] *Id.*

31

candidacy, even after being a student for more than four years. (Achieving Ph.D. candidacy typically takes two years.)"

106.    On information and belief Zech's op-ed was sanctioned by Professor Goldman and perhaps others within the College of Engineering.   The op-ed included educational information only known to faculty and its disclosure was in violation of federal educational privacy law.

107.    Ms. Dibbern's first advisor withdrew funding from Ms. Dibbern in retaliation for her vocal opposition and citing reasons directly related to Ms. Dibbern's experience of the hostile educational environment within the College of Engineering. Any "delay" in Ms. Dibbern's candidacy was not related to her academic performance but rather directly related to the hostile educational environment.

108.    On February 13, 2012, Ms. Dibbern met with University of Michigan Provost Philip Hanlon concerning her experience within the College of Engineering. Ms. Dibbern provided a timeline of the gender-based and sexual harassment and events she suffered as a female graduate student.

109.    At this meeting, Ms. Dibbern explained to Provost Hanlon the harassment she experienced on her first day as a graduate student at the Engineering Department, the two assaults, and the attempted rape by students within the Department. Ms. Dibbern reported her contact with the Office of Institutional Equity and Anthony Walesby. Ms. Dibbern also reported the retaliation she experienced with the Department and her ultimate dismissal from the graduate program.

32

110.    In March 2012, University officials offered Ms. Dibbern an OCR hearing - only after learning that Ms. Dibbern was represented by counsel, after she had been removed from her program or study without due process, and after years of experiencing a sexually hostile environment at the University.

111.    The University of Michigan has completely failed in meeting its obligations under Title IX with regard to Title IX by willfully and knowingly allowing a sexually hostile educational environment to continue. The environment within the graduate program of the College of Engineering has been openly hostile to female students within the College, with the knowledge of administration leaders within the Engineering Department and beyond.

112.    Jennifer Dibbern throughout her five years of her graduate student experienced not only the most egregious forms of sexual harassment and gender-based bullying, but also the willful ignorance and disregard to the problem from the University of Michigan officials she reached out to, from her advisor and Department chairs, to the University ombudsman and "Office of Institutional Equity" – the very office charged with ensuring University Title IX compliance.

113.    The failure to respond to Ms. Dibbern's harassment was not mere oversight or incompetence but willful and intentional ignorance to the harassment suffered by and raised not only by Ms. Dibbern but by other female students within the Department. Having exhausted and been rejected by every level of administration, Ms. Dibbern became increasingly motivated to organize a voice for graduate students at the University – first through the Graduate Employees' Organization (GEO) and later through organizing efforts for Graduate Student Research Assistants. In the end, Ms. Dibbern was only rebuffed and rejected.

114.    Ms. Dibbern lost everything, and was ultimately kicked out of her program and rejected in the profession to which she had committed her entire academic life. The rejection has most recently culminated in an attack on her academic choices as she struggled for years to complete a program without subjecting herself to continued harassment and struggled to organize her colleagues to express a voice to change the culture within her department. It has ended with public pillory and attack by the Chair of the College of Engineering, including FERPA violations and outrageous accusations about her academic performance.

115.    What happened to Ms. Dibbern should never have happened and must not be allowed to happen to any other student. Unfortunately, the University has proved itself unable through existing mechanisms to prevent this kind of hostile environment or to live up to its legal and contractual obligations.   Continued certification and promises to the Department of Education in the face of the permissive culture outlined below was and is a misrepresentation of fact that cannot be overlooked by the University of Michigan.  Ms. Dibbern's voice should never have been rejected or met with the resistance Ms. Dibbern experienced.

## COUNT I
## Title IX, Sex Discrimination and Sexually Hostile Educational Environment
### (Against the University and Board of Regents)

116.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-115 above.

117.    The University of Michigan, College of Engineering through its actions and inactions fostered and condoned a sexually hostile educational environment that victimized and damaged Plaintiff.

118.    University Officials at the highest levels knew or should have known of the hostile environment within the College of Engineering but did nothing - when action was required by law.

119.    The University's Board of Regents, individually and collectively are responsible for setting and approving public policy at the University, while the President is responsible for administering those policies.  At all relevant times, the University's policies, including complaint procedures, training and reporting, and response procedures were in violation of Title IX.

120.    The University's failure to act, failure to provide federally mandated procedures and protections, created a sexually hostile educational environment for Dibbern.

121.    The harassment and hostile environment which Defendant's fostered and condoned operated to denied and/or limit Plaintiff's ability to participate in or benefit from The University's educational programs.

122.    The University officials responded to reports of sexual harassment with referrals to inadequate "conflict resolution procedures" and suggestions that the victim toughen up.

123.    The University left Plaintiff to her own skills to avoid further victimization, often at the expense of giving of educational classes, programs and experiences.

124.    Despite these increased burdens on Plaintiff, the University held her to a higher standard than her male peers.  Women, including Plaintiff, were treated different in the College of Engineering than their male peers.

125.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

<u>**COUNT II**</u>
**<u>Title IX: Retaliation for Reporting, Opposing, and Attempting to
Remedy a Sexually Hostile Environment In the College of Engineering
(Against the University and Board of Regents)</u>**

126.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-125 above.

127.    Plaintiff faced numerous forms of retaliation though out her academic experience at the University based on her reporting, opposing, and attempting to remedy Title IX violations in the College of Engineering, including but not limited to:

    a.    Reporting to advisors, teaching faculty, and others inside and outside the department;

    b.    Reporting stalking to the University Department of Campus Safety;

    c.    Engaging in collective action to advocate for graduate student training on sexual assault and sexual harassment; and

    d.    Wearing SAPAC clothing and pins and actively supporting the work of SAPAC to the Engineering Faculty and Students.

128.    She was met with suspicions, given different tests, denied academic opportunities and educational rights, including but not limited to:

    a.    Being dropped by her first academic advisor on or about December 23, 2009 and consequently set back years in her program of study;

    b.    Being dropped by her second Academic advisor in 2012 and subsequently summarily terminated from the program without due process;

    c.    Being publicly denigrated by other graduate students who re acting, based on information and belief, at the aid and encouragement of engineering faculty; and

36

d.      Having educational information publicly disclosed and shared in a violation of federal law, common law privacy rights, and with the direct and foreseeable purpose of inflicting emotional distress.

129.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

### COUNT III
### Equal Protection: 42 U.S.C. § 1983
### (Against All Defendants)

130.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-129 above.

131.    Plaintiff is a female and a former graduate student and employee of the University, a state institution bound by the Constitution to provide equal protection of the laws.

132.    The conduct of students and faculty condoned and fostered by the University was intentional and was sufficiently severe or pervasive as to interfere unreasonably in Plaintiffs' educational activities.

133.    Defendants and/or their agents acted under color of state law and according to policies and procedures under their control.

134.    The individual Defendants acting in their official capacities are not entitled to governmental immunity or qualified immunity.

135.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

## COUNT IV
### Due Process Violations: 42 USC 1983
### (Against All Defendants)

136.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-1355 above.

137.    Plaintiff had a constitutionally protected property right in her PhD program and continued education.

138.    Plaintiff's reputation and future career also constitute a constitutionally recognized property interest.

139.    Plaintiff's summary dismissal from the College of Engineering Graduate program was arbitrary and capricious, motivated by bad faith, and had the effect of depriving Plaintiff of her rights to continued education her reputation and her career.

140.    Plaintiff's rejection by faculty advisors was arbitrary and capricious, motivated by bad faith, and had the effect of depriving Plaintiff of her rights to continued education her reputation and her career.

141.    Defendants and/or their agents acted under color of state law and according to policies and procedures under their control.

142.    Defendants made false charges and allegations about Ms. Dibbern's academic ability and left her with no other mechanism to clear her name but this litigation.

143.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

<u>**COUNT V**</u>
<u>**First Amendment Freedom of Speech Retaliation: 42 USC 1983**</u>
<u>**(Against All Defendants)**</u>

144.     Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-144 above.

145.     Plaintiff engaged in protected speech in the form of reports of sexual assault and harassment to her faculty, advisors and others acting on behalf of the university,

146.     Actions taken by faculty advisors were taken on behalf of the University and with the intent and motivation to retaliate against Plaintiff for exercising her constitutionally protected rights to free speech.

147.     Defendants and/or their agents acted under color of state law and according to policies and procedures under their control.

148.     Retaliatory actions were motivated in all or in part by Plaintiff's speech to address and remedy systematic failures to comply with state and federal law, including but not limited to, Plaintiff's  actions to report and address individual harassment, Plaintiff's actions to organize graduate student instructors and graduate student research assistants to negotiate collectively on the terms and conditions of employment,  and Plaintiff's advocacy to promote training and other policy changes designed to bring the University within compliance with state and federal law.

149.     Plaintiff faced numerous forms of retaliation though out her academic experience at the University based on her reporting, opposing, and attempting to remedy Title IX violations in the College of Engineering, including but not limited to:

a.      Reporting to advisors, teaching faculty, and others inside and outside the department;

b.      Reporting stalking to the University Department of Campus Safety;

39

    c.        Engaging in collective action to advocate for graduate student training on sexual assault and sexual harassment; and

    d.        Wearing SAPAC clothing and pins and actively supporting the work of SAPAC to the Engineering Faculty and Students.

150.    She was met with suspicions, given different tests, denied academic opportunities and educational rights, including but not limited to:

    a.        Being dropped by her first academic advisor on or about December 23, 2009 and consequently set back years in her program of study;

    b.        Being dropped by her second Academic advisor in 2012;

    c.        Being summarily terminated from the program without due process; and

    d.        Being publicly denigrated by other graduate students who were acting, based on information and belief, at the aid and encouragement of engineering faculty; and

    e.        Having educational information publicly disclosed and shared in a violation of federal law, common law privacy rights, and with the direct and foreseeable purpose of inflicting emotional distress.

151.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

## COUNT VI
### Michigan State Law Elliott-Larson Civil Rights Act:
### Sex Discrimination/Disparate Treatment/Hostile Environment
### (Against All Defendants)

152.    Plaintiff hereby re-alleges and incorporates by references paragraphs 1-151 above.

153.    Plaintiff was and is a covered individual protected from discrimination by Michigan Civil rights law.

154.    The University of Michigan, College of Engineering through its actions and inactions fostered and condoned a sexually hostile educational environment that victimized and damaged Plaintiff.

155.    University Officials at the highest levels knew or should have known of the hostile environment within the College of Engineering but did nothing and allowed it to continue - when action was required by law.

156.    The University's Board of Regents, individually and collectively are responsible for setting and approving public policy at the University, while the President is responsible for administering those policies.  At all relevant times, the University's policies, including complaint procedures, training and reporting, and response procedures were in violation of Michigan civil rights law.

157.    The University's failure to act and failure to provide federally mandated procedures and protections created a sexually hostile educational environment for Dibbern.

158.    The harassment and hostile environment which Defendant's fostered and condoned operated to denied and/or limited Plaintiff's ability to participate in or benefit from The University's educational programs.

41

159.    The University officials responded to reports of sexual harassment with referrals to inadequate "conflict resolution procedures" and suggestions that the victim toughen up.

160.    The University left Plaintiff to her own skills to avoid further victimization, often at the expense of giving of educational classes, programs and experiences.

161.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

## COUNT VII
## ELCRA Sex Discrimination/Disparate Impact –
## (Against All Defendants)

162.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-161 above.

163.    Plaintiff was and is a covered individual protected from discrimination by Michigan Civil rights law.

164.    The University of Michigan, College of Engineering through its actions and inactions fostered and condoned a sexually hostile educational environment that victimized and damaged Plaintiff.

165.    University Officials at the highest levels knew or should have known of the hostile environment within the College of Engineering but did nothing - when action was required by law.

166.    The University's Board of Regents, individually and collectively are responsible for setting and approving public policy at the University, while the President is responsible for administering those policies.  At all relevant times, the University's policies, including complaint

procedures, training and reporting, and response procedures were in violation of Michigan civil rights law.

167.    The University's maintenance of non-compliant policies that fail to minimum mandated procedures and protections, has a disparate impact on female students created a sexually hostile educational environment for Dibbern.

168.    The harassment and hostile environment which Defendant's fostered and condoned operated to denied and/or limited Plaintiff's ability to participate in or benefit from The University's educational programs.

169.    The University officials responded to reports of sexual harassment with referrals to inadequate "conflict resolution procedures" and suggestions that the victim toughen up.

170.    The University left Plaintiff to her own skills to avoid further victimization, often at the expense of giving up educational classes, programs and experiences.

171.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

**COUNT VIII**
**ELCRA Retaliation**
**(Against All Defendants)**

172.    Plaintiff hereby realleges and incorporate by reference paragraphs 1-171 above.

173.    Plaintiff faced numerous forms of retaliation throughout her academic experience at the University based on her reporting, opposing, and attempting to remedy violations of state anti-discrimination law in the College of Engineering, including but not limited to:

    a.    Reporting to advisors, teaching faculty, and others inside and outside the department;

    b.    Reporting stalking to the University Department of Campus Safety;

    c.    Engaging in collective action to advocate for graduate student training on sexual assault and sexual harassment; and

    d.    Wearing SAPAC clothing and pins and actively supporting the work of SAPAC to the Engineering Faculty and Students.

174.    She was met with suspicions, given different tests, denied academic opportunities and educational rights, including but not limited to:

    a.    Being dropped by her first academic advisor on or about December 23, 2009 and consequently set back years in her program of study;

    b.    Being dropped by her second Academic advisor in 2012 and subsequently summarily terminated from the program without due process;

    c.    Being publicly denigrated by other graduate students who reacting, based on information and belief, at the aid and encouragement of engineering faculty; and

    d.    Having educational information publicly disclosed and shared in a violation of federal law, common law privacy rights, and with the direct and foreseeable purpose of inflicting emotional distress.

175.    Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

44

## COUNT IX
## Invasion of Privacy
## (Against the Individual Defendants)

176.     Plaintiff hereby re-alleges and incorporates by reference paragraphs 1-175 above.

177.     Defendants acting by and through their agents, faculty and students publicly released private educational and personal information protected by federal and state law.

178.     Defendants published, condoned publishing, and/or facilitated publication of private information regarding Plaintiff's academic record.

179.     In doing so, Defendants by and through their agents did so with intentional disregard to Plaintiffs privacy and with bad faith for the purposes of maligning Plaintiff's professional and academic reputation.

180.     Defendants' actions were motivated by intent to deny and did deny Plaintiff equal protection under the law.

181.     Defendants were not acting within the scope of their authority, were not discharging a governmental function and were, at a minimum, grossly negligent, in the provision of intimate details of Plaintiff's life.

182.     Wherefore, Plaintiff has been injured as a result of Defendants actions in that she has suffered economic loss, damage to her professional reputation, loss of professional opportunity, emotional distress, and damage to her health.

## RELIEF REQUESTED

WHEREFORE,  Plaintiff Jennifer Dibbern prays for relief from this honorable Court in the form of reimbursement for lost economic opportunity and damages, reimbursement of educational expenses, past and future medical treatment, non-economic damages, including

compensation for emotional distress and outrage, injunctive and prospective relief in the form remedial actions to guarantee an equal educational environment for female graduate students, and secure compliance with federal laws, declaratory judgment, exemplary damages, liquidated damages, punitive damages, attorney's fees and all other such relief as the Court and a jury of her peers deems just and proper, along with a post-judgment award of actual fees and costs incurred.

Respectfully submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

/s/ David M. Blanchard
David M. Blanchard (P67190)
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
Dated: January 25, 2013                             dblanchard@nachtlaw.com

46

## **RELIANCE ON ORIGINAL DEMAND FOR JURY TRIAL**

Now Comes Plaintiff, Jennifer Dibbern, by and though her attorneys, Nacht, Roumel, Salvatore, Blanchard & Walker, P.C. and hereby relies on her original demand for a trial by jury in the above-captioned matter.

Respectfully submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

/s/ David M. Blanchard
David M. Blanchard (P67190)
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
Dated: January 25, 2013              dblanchard@nachtlaw.com

47