UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jennifer Dibbern,

      Plaintiff,

v.                                                             Case No. 12-15632

University of Michigan, et. al.,                    Honorable Sean F. Cox

      Defendants.

_____/

**OPINION AND ORDER**

      This case is, at its core, a sexual harassment case. Plaintiff Jennifer Dibbern ("Plaintiff" or "Dibbern") alleges that, while she was a graduate student at the University of Michigan ("U-M"), she was subjected to severe and pervasive sexual harassment and discrimination by her male peers, as well as by university faculty and employees, that deprived her of the full benefit of the educational experience. Plaintiff also alleges that the University and its faculty retaliated against her in various ways, including by dismissing her from her graduate program, in response to her reports of sexual harassment and discrimination in the Engineering department.

      Defendants deny all of Plaintiff's allegations. Defendants further contend that all counts against Defendant Goldman and Green as individuals should be dismissed because they were not properly served in their individual capacities.

      This matter is before this Court on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) (Doc. #25), and Plaintiff's Motion to Extend Time to Serve Summons and Complaint on Defendants Green and

1

Goldman (Doc. #32).  These motions have been fully briefed by the parties.  For the reasons set forth

herein, this Court DENIES Defendants' Motion to Dismiss Counts I, II, III, V, VI, VII, and VIII of

Plaintiff's Second Amended Complaint at Law, and GRANTS Plaintiff's Motion to Extend Time

to Serve Summons and Complaint on Defendants Green and Goldman.

## FACTUAL ALLEGATIONS

Plaintiff Jennifer Dibbern joined the University of Michigan's Department of Material

Science and Engineering in the fall of 2007.  Plaintiff's entering Ph.D. class included five women

out of a total of approximately 25 students.  (Pl.'s Compl. at ¶ 34).

Immediately, Plaintiff was subjected to sexual harassment at the hands of her engineering

PhD colleagues, who were mostly male.  Specifically, Plaintiff was told by her student colleagues:

• "Real women aren't engineers."

• "Engineering women are different – they're not normal . . . they aren't like real girls. Not normal at all. Even if they are around, no one considers them women."

• [On Plaintiff's having been admitted to MIT]: "You had it easy because you're a woman in science.  You have to admit it.  You're less qualified but still able to get in just because you're a girl."

• "Let's be honest, the girls in engineering aren't real girls – no guy would look at them that way so we need more real girls to study with, date – something to look at in class.  Real girls. There's something wrong with the engineering girls."

(Pl.'s Compl. at ¶¶ 36-37).

Plaintiff's colleagues regularly told her that they masturbated with her in mind and planned

to call her at climax.  (Pl.'s Compl. at ¶ 39).

Plaintiff notified her Department Advisor, Defendant Tresa Pollock ("Pollock") about the

harassment and inappropriate sexual comments as early as November 2007.  (Pl.'s Compl. at ¶ 41).

2

Pollock told Plaintiff that "boys can be like that" and also told Plaintiff to stay focused on her work. (Pl.'s Compl. at ¶ 41). Plaintiff maintains that Pollock offered no help and took no action to alleviate the harassment Plaintiff was experiencing.

Into the winter semester of 2008, Plaintiff continued to suffer harassment and taunting at the hands of her colleagues. (Pl.'s Compl. at ¶ 44)(For a detailed list of more sexually harassing comments made to Plaintiff, *see* Pl.'s Compl. at p. 12, fn 14). Plaintiff claims that the inappropriate comments turned to violence when, while at a tea shop in March 2008, a fellow student slapped her in the face twice when she refused to give the student her drink. (Pl.'s Compl. at ¶ 45). In April 2008, while studying in the engineering lounge, the same student who slapped Plaintiff at the tea shop threatened to rape Plaintiff, and went into detail about "how the rape would occur." (Pl.'s Compl. at ¶ 46). Plaintiff notified her parents, who then notified the University Sexual Assault Prevention and Awareness ("SAPAC") crisis line. (Pl.'s Compl. at ¶ 46).

Plaintiff reported the rape threat to the university's Counseling and Psychological Services ("CAPS"). CAPS provided Plaintiff with a letter allowing her to reschedule two of her final exams. (Pl.'s Compl. at ¶ 48). Plaintiff also reported the incident to Pollock, who said "these things sometimes happen. We have to get over it and get back to the lab. Don't let this ever happen again. It's important that we be in lab. We don't always get along with everyone." (Pl.'s Compl. at ¶ 49).

Plaintiff claims the harassment continued when a fellow engineering student began stalking her in the summer of 2008. This student called Plaintiff late at night and waited for her after classes. Plaintiff maintains the stalking continued well into the fall of 2008. (Pl.'s Compl. at ¶ 57). In December 2008, the student confronted Plaintiff in her lab and would not leave. The student "forcibly pulled [Plaintiff] against his body, squeezing her to the point that it caused her pain." (Pl.'s

3

Compl. at ¶ 58).  Plaintiff did not immediately report this incident to campus police or other law enforcement, waiting until February 2009 to report her stalker.  (Pl.'s Compl. at ¶ 70).

In January 2009, Plaintiff reported to the University of Institutional Equity the harassment, discrimination and stalking she was experiencing.  During this phone call, she spoke with Associate Vice Provost for Academic and Faculty Affairs Anthony Walesby, who is also the university's Title IX coordinator.  (Pl.'s Compl. at ¶ 60).  Walesby responded that he needed "concrete proof" and commented that "people assume women false report this kind of stuff."  (Pl.'s Compl. at ¶ 62).  Walesby also told Plaintiff that "the truth is, there are some women who are overly sensitive . . . and who can't take a joke and feel offended."  (Pl.'s Compl. at ¶ 66).  Plaintiff felt that Mr. Walesby was ineffective and offered her no means of recourse.  (Pl.'s Compl. at ¶ 67).

On December 23, 2009, Defendant Pollock informed Plaintiff that she was "terminating [Plaintiff's] appointment" for the following semester due to Plaintiff's "lack of commitment" to her degree.  (Pl.'s Compl. at ¶ 71).  Pollock claimed Plaintiff lacked commitment to her degree due to Plaintiff's two-week leave in April 2008 (after Plaintiff was threatened with rape), incomplete grades in coursework, and her retention of a research job in a different department.  (Pl.'s Compl. at ¶ 71).

In January 2010, Plaintiff again notified the University about the sexual harassment she experienced by making reports to other University departments and offices, including to Rackham Graduate School officials and the Center for the Education of Women.  (Pl.'s Compl. at ¶ 73). Also at that time, Plaintiff sought emergency funds from Rackham Graduate School so that she could continue her research despite her appointment being terminated by Pollock.  However, Plaintiff claims that after she "disclosed [to Rackham] her experiences of harassment within the [engineering] program, Rackham . . . did not permit her to apply for emergency funding." (Pl.'s Compl. at ¶ 75).

4

In January 2010, Plaintiff also disclosed the sexual harassment she experienced in the engineering department to Defendant Professor Rachel Goldman ("Goldman"). (Pl.'s Compl. at ¶ 74). In February 2010, Goldman took Plaintiff into her research group. Plaintiff alleges that she progressed successfully with this research as well as her academics. (Pl.'s Compl. at ¶ 77).

Yet, the harassment continued. Plaintiff claims that another male researcher in Goldman's group would "constantly touch, hug, tickle, poke, prod, and give "respirator kisses" to [Plaintiff] without her consent." (Pl.'s Compl. at ¶ 80). Plaintiff also claims this student made inappropriate comments about Plaintiff's appearance, including what she was wearing, and made jokes and references about other female students, what they were wearing, and commented on whether he thought they were attractive. (Pl.'s Compl. at ¶ 81).

In April 2011, Goldman called Plaintiff, notified her that she had just left a Student Relations Advisory Council meeting,  (Pl.'s Compl. at ¶ 83), and asked Plaintiff if she had heard of Title IX and related investigations at Harvard and Yale.  Goldman then said, "OCR was investigating the – I guess you'd call them perpetrators . . . I might have to report you whether you want me to or not." (Pl.'s Compl. at ¶ 83).

Also around that time in spring 2011, Goldman began questioning Plaintiff's commitment to the graduate program and the amount of time Plaintiff spent in the lab, noting, "I know you have that SAPAC thing." (Pl.'s Compl. at ¶ 84). Plaintiff maintains she became active in SAPAC as a means of making herself and other women feel safer at the university. (Pl.'s Compl. at ¶ 84). For fear of losing Goldman as an advisor, Plaintiff immediately quit SAPAC and ceased her efforts to implement sexual harassment training within the College of Engineering. (Pl.'s Compl. at ¶ 85). Plaintiff did, however, increase her involvement with the Graduate Employees Organization.

5

Plaintiff claims that, in April 2011, a prospective female graduate engineering student denied an offer to join the department because of the unwanted and harassing behavior toward female students that she saw while visiting the university. (Pl.'s Compl. at ¶ 89). Plaintiff also alleges that, at an awards dinner, one engineering professor expressed his disbelief of that student's story and called her allegations "ludicrous." (Pl.'s Compl. at ¶ 90).

On August 30, 2011, Goldman notified Plaintiff that she had revoked Plaintiff's funding and would no longer serve as Plaintiff's advisor. At that time, Goldman told Plaintiff "[w]hen you first came to me, when I took you on, I tried to give you a chance because of what you said, but I don't believe you." (Pl.'s Compl. at ¶ 96-97). Plaintiff sought help from Rackham Graduate School employee Darlene Ray-Johnson, who informed Plaintiff that she must withdraw from the term. (Pl.'s Compl. at ¶ 101).

In December 2011, Plaintiff met with Materials Science and Engineering Department Chair Peter Green ("Green"), at which time Defendant Green informed Plaintiff that she was being "discontinued" from her program and was being offered a Master's Degree in Materials Science and Engineering. (Pl.'s Compl. at ¶ 108). Plaintiff was informed that there would be no opportunity to appeal this decision. (Pl.'s Compl. at ¶ 108).

Finally, Plaintiff complains that her reputation was "maligned" in U-M's newspaper, the Michigan Daily. (Pl.'s Compl. at ¶ 110). Graduate student assistant Eric Zech, with whom Plaintiff had worked under Defendant Goldman, wrote an "accusatory op-ed piece which cited only facts that Professor Goldman would know with respect to [Plaintiff's] academic performance." (Pl.'s Compl. at ¶ 111). Plaintiff alleges that this article was sanctioned by Professor Goldman. (Pl.'s Compl. at ¶ 113).

6

On February 13, 2012, Plaintiff met with University of Michigan Provost Philip Hanlon "concerning her experience within the College of Engineering", the sexual and gender-based harassment she suffered as a female graduate student. (Pl.'s Compl. at ¶ 115). In March 2012, University officials offered Plaintiff an OCR hearing; this was only after Plaintiff had retained legal counsel. (Pl.'s Compl. at ¶ 115).

Plaintiff maintains that she was wrongfully dismissed from her PhD program after years of experiencing sexual and gender-based harassment, about which she complained to numerous University officials and faculty, and in response to which the University took absolutely no helpful action. (Pl.'s Compl. at ¶ 118-119).

Plaintiff filed her original Complaint on December 21, 2012. (Doc. #1). Plaintiff subsequently filed her First Amended Complaint on January 25, 2013. (Doc. #8). Defendants moved to dismiss that complaint, (Doc. #12), but Plaintiff and Defendants stipulated a dismissal of that motion and this Court granted Plaintiff leave to file a Second Amended Complaint, (Doc. #22), which Plaintiff filed on June 7, 2013. (Doc. #23). Plaintiff's Second Amended Complaint alleges the following counts:

- Count I: Title IX Sex Discrimination and Sexually Hostile Educational Environment, against U-M and U-M Board of Regents;

- Count II: Title IX Retaliation for Reporting, Opposing, and Attempting to Remedy a Sexually Hostile Environment in the College of Engineering, against U-M and U-M Board of Regents;

- Count III: Equal Protection - 42 U.S.C. § 1983, against the Individual Defendants in their Individual and Official Capacities;

- Count IV: Due Process Violations - 42 U.S.C. § 1983, against the Individual Defendants in their Individual and Official Capacities;

7

- Count V: First Amendment Freedom of Speech Retaliation - 42 U.S.C. § 1983, against the Individual Defendants in their Individual and Official Capacities;

- Count VI: Michigan Elliot-Larson Civil Rights Act ("ELCRA") - Sex Discrimination/Disparate Treatment/Hostile Environment, against All Defendants;

- Count VII: ELCRA - Sex Discrimination/Disparate Impact, against All Defendants;

- Count VIII: ELCRA Retaliation, against all Defendants, and

- Count IX: Invasion of Privacy, against all Individual Defendants.

Defendants now move to dismiss Counts I, II, III, V, VI, VII and VIII of Plaintiff's Second Amended Complaint at Law. Count IV (due process) and Count IX (invasion of privacy) are not challenged here. Defendants Goldman and Green also move to dismiss all counts against them in their individual capacities on the basis that they have not yet been properly served.

## STANDARD OF REVIEW

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, this Court must construe the complaint in the light most favorable to the plaintiff and must accept all the factual allegations contained in the complaint as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). In order to survive a Rule 12(b)(6) motion to dismiss, Plaintiff's complaint need contain only "enough facts to state a claim for relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ANALYSIS

## I.    Should This Court Dismiss The Counts Against Defendants Goldman and Green In

**Their Individual Capacities For Insufficient Service of Process?**

Defendants Goldman and Green argue that all counts against them in their individual capacities should be dismissed because, although they were served in their *official* capacity, they have not been properly served in their *individual* capacities. (Defs.' Br. at 19). Defendants' counsel, Megan Norris, accepted service for all individual Defendants in their official capacities only. (Defs.' Br. at 19, fn 10). Plaintiff attempted personal service of the First Amended Complaint on Defendants Goldman and Green through the Office of General Counsel at the University of Michigan. (*See* Certificates of Service for Defs. Goldman and Green, Doc. #7 and Doc. #14). Personal service on an individual is not effectuated by service upon a defendant's place of work or business, however, and Plaintiff conceded at oral argument that Goldman and Green have not been properly personally served. *See Thompson v. Kerr*, 555 F.Supp.1090, 1093 (S.D. Ohio 1982); *see also* Dibbern Hrg. Trans. at 18:8-13. Defendants also point out that "serving individuals in their official capacities does not suffice to bring them before the court in their individual capacities." *Ecclesiastical Order of the Ism of Am v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1998).

Plaintiff claims Defendants waived the defense of insufficient service of process by not raising it in their first responsive pleading or motion. (Pl.'s Resp. at 19); (*see also* Pl.'s Resp. at Ex. H). Alternatively, in their Motion to Extend Time, Plaintiff requests additional time to effectuate personal service on Defendants Goldman and Green because Plaintiff claims she has shown good cause for the failure. (Pl.'s Mo. at 3). Defendants responded at oral argument that they have not waived this defense because this is the first time that individual capacity Defendants Goldman and Green have moved this Court for relief.

Federal Rule of Civil Procedure 4(e) sets forth the ways in which an individual may be served

9

with process:

> An individual . . . may be served in a judicial district of the United States by:
>
> > (1)    following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
> >
> > (2)    doing any of the following:
> >
> > > (A)    delivering a copy of the summons and of the complaint to the individual personally;
> > >
> > > (B)    leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> > >
> > > (C)    delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e).

> Federal Rule of Civil Procedure 4(m) provides that
>
> [i]f a Defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time. *But if the plaintiff shows good cause for the failure, the court must extend the time for service* for an appropriate period.

Fed. R. Civ. P. 4(m)(emphasis added).

This Court finds that Plaintiff has shown good cause for the delay in serving Defendants Goldman and Green. Plaintiff did, indeed, attempt to personally serve these Defendants in a timely fashion, although such service was a nullity due to Plaintiff's erroneous belief that she could personally serve Defendants through the U-M's general counsel. Further, Defendants' counsel seems to agree that Plaintiff's error was likely made in good faith. *See* Dibbern Trans. at 24-25 (wherein Defendants' counsel Megan Norris states that "Mr. Blanchard is an honest man and a fine man" and

"I think [Mr. Blanchard] probably thought [Defendants Goldman and Green] had [been personally served] when he asserted that to me."

Therefore, pursuant to the Federal Rules of Civil Procedure that govern this action, this Court DENIES Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(5) and GRANTS Plaintiff's Motion to Extend Time to Serve Summons and Complaint Upon Defendants Goldman and Green in their Individual Capacities. This Court further orders that Plaintiff effectuate personal service on Defendants Goldman and Green within sixty (60) days of the issuance of this Opinion and Order.

## II. Should This Court Dismiss Any Of The Counts In Plaintiffs' Second Amended Complaint Pursuant To Federal Rule Of Civil Procedure 12(b)(6)?

Defendants have moved this Court to dismiss Counts I, II, III, V, VI, VII, and VIII of Plaintiff's Second Amended Complaint for various reasons. This Court will address each count, and the arguments pertinent thereto, individually.

### Count I: Title IX sexual discrimination & sexually hostile educational environment, against U-M and Regents of U-M

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." 20 U.S.C. § 1681(a). The parties do not dispute that Title IX applies to U-M.

Generally, to establish liability under Title IX, a recipient of federal funds must: 1) have discriminated based on gender; 2) have notice or knowledge of the discrimination, and 3) the response to the discrimination "must amount to deliberate indifference to discrimination." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290 (1989).

11

Deliberate indifference to known acts of harassment may amount to an intentional violation of Title IX, capable of supporting a private damages action, when the harasser is a student rather than a teacher. *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 643 (1999). The *Davis* court established three prima facie elements for a Title IX claim based specifically on student-to-student harassment:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
>
> (2) the funding recipient had actual knowledge of the sexual harassment, and
>
> (3) the funding recipient was deliberately indifferent to the harassment.

*Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir.1999)(summarizing *Davis's* holding). The [federal fund] recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. *Davis*, 526 U.S. at 648.

### A.    Are Plaintiff's Title IX claims time-barred?

First, Defendants argue that most of Plaintiff's claims are time-barred. Defendants point out that, for the purpose of Section 1983, Title IX, and equal protection claims, federal courts apply the state statute of limitations applicable to personal injury actions. *Lillard v. Shelby County Board of Ed.*, 76 F.3d 716, 729 (6th Cir. 1996). In Michigan, the statute of limitations on personal injury actions is three years. *Id.* Given that Plaintiff filed her original complaint on December, 21, 2012, Defendants argue that Plaintiff cannot rely on *any* events that took place prior to December 21, 2009. (*See* Doc. #1). Defendants urge that, "where there is no actionable event within the statute of limitations, claims cannot survive." (*See* Defs.' Br. at 8-10).

Plaintiff argues that the continuing violations doctrine renders her Title IX claims timely.

In support, Plaintiff cites a Title VII case[1], which states that "a hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice' . . . . providing that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)(internal citations omitted).

Defendants attempt to rebut this claim by pointing to different language in *Morgan*, where the United States Supreme Court stated that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. Defendants attack Plaintiff's claim by arguing that Plaintiff did not allege any act of sexual harassment against her within the limitations period, i.e. after December 21, 2009.

First, this assertion is simply not accurate. Plaintiff details a series of episodes that took place during the winter 2010 term, well within the statute of limitations period, wherein her male lab partner would "constantly touch, hug, tickle, poke, prod . . . [Plaintiff], without her consent." (Pl.'s Compl. at ¶ 80). "In addition, this student regularly made comments about Ms. Dibbern's appearance, including what she was wearing and not wearing." (Pl.'s Compl. at ¶ 81). This pattern of conduct by Ms. Dibbern's colleague, assumed to be factually true for the purposes of this motion, occurred within the three year limitations period and appears to be consistent with the hostile environment that Plaintiff claims to have experienced at U-M starting in 2007.

Plaintiff also claims that U-M committed acts of deliberate indifference within the statute of

---

[1]"A Title IX hostile education environment claim is governed by traditional Title VII hostile environment jurisprudence." *Papelino v. Albany College of Pharmacy,* 633 F.3d 81, 89 (2d Cir. 2011).

limitations period.  Here, Plaintiff has alleged that she reported sexual harassment to Defendant Goldman, the Director of the Rackham Office of Graduate Student Success and current ombudsman, and the Center for the Education of Women in January 2010.  (Pl.'s Compl. at ¶ 74).  Yet, she maintains that the "University of Michigan employees and faculty members failed to understand what to do with Ms. Dibbern's report or how to offer her assistance" and, instead, "merely directed Ms. Dibbern back to her Department."  (Pl.'s Compl. at ¶ 76).  Moreover, Plaintiff alleges that she suffered additional acts of harassment after making reports to University faculty and employees. (Pl.'s Compl. at ¶ 80).

This Court agrees with Plaintiff's contention that, in determining whether Plaintiff has plead a plausible Title IX hostile environment claim, the continued deliberate indifference of the University within the limitations period permits this Court to consider events that, although they took place outside the limitations period, are helpful in establishing liability.  *See Morgan*, 536 U.S. at 117.  Many of Plaintiff's allegations of harassment and abuse took place prior to December 21, 2009, although, as mentioned, the harassment allegedly continued well into the statutory period.  Plaintiff has alleged at least one timely act of sexual harassment that occurred within the limitations period that is similar to earlier acts of harassment and discrimination.  Plaintiff also alleges that the University never took any action in response to her numerous reports of sexual harassment, including in regards to complaints within the limitations period.  This Court finds that Plaintiff's Title IX claim is not time barred.

### B.    Title IX and "Mandated Sexual/Gender-Based Harassment Training"

Defendants also assert that "[t]o the extent Plaintiff implies Title IX and ELCRA require the University to conduct trainings on sexual/gender based harassment, they hold no such mandate."

14

(Defs.' Br. at 13).   Plaintiff responds that this argument is "irrelevant at this stage of the proceedings" because Plaintiff "makes no direct claim purely based on a lack of training or improper policies," and only references lack of training and improper policies as "evidence of hostile environment and gender discrimination violations."  (Pl.'s Resp. at 16).

Plaintiff does not state a cause of action that depends on the mandatory or advisory nature of the Department of Education's suggestions.   Thus, this issue need not be resolved for purposes of this motion and is relevant only insofar as it supports Plaintiff's allegations of U-M's "deliberate indifference" to known sexual harassment.  Based on the foregoing, this Court DENIES Defendant's Motion to Dismiss Count I of Plaintiff's Second Amended Complaint.

**Count II: Title IX Retaliation v. U-M, Regents of U-M**

Title IX retaliation claims are analyzed under the same legal framework as Title VII retaliation claims.  *Nelson v. Christian Brothers University*, 226 Fed. App'x. 448, 454 (6th Cir. 2007)("Generally, courts have looked to Title VII, 42 U.S.C. §§ 2000e, as an analog for the legal standards in both Title IX discrimination and retaliation claims.").

Plaintiff has the burden of proving a prima facie case of retaliation, including that 1) plaintiff engaged in protected activity; 2) defendant knew plaintiff engaged in protected activity; 3) plaintiff was subjected to a materially adverse action, and 4) a causal connection exists between the protected activity and adverse action.  *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001).

Again, Defendants primarily attack this count by arguing that it is time barred.  Defendants assert that the only protected activities Plaintiff performed are the November 2007 and Summer 2009 complaints of sexual harassment to Defendant Pollock, which fall outside of the limitations period, and that Plaintiff has not plead any facts showing these complaints were causally connected to any

15

future adverse action.  (Def.'s Br. at 16).

Plaintiff maintains that she engaged in protected activity after 2009 – namely, that she reported sexual harassment to advisors, teaching faculty and other university officials both inside and outside the engineering department, that she became heavily involved with the University Sexual Assault Prevention and Awareness Center ("SAPAC"), that she drafted a sexual assault training policy, that she advocated for sexual assault and sexual harassment training for graduate students through the graduate employee union, and complained about stalking by a male engineering colleague.[2]  (Pl.'s Resp. at 5).

Plaintiff further responds that her retaliation claims are timely because they are based on adverse actions taken against her within the limitations period.  (Pl.'s Resp. at 4).  Plaintiff alleges that the following retaliatory acts were taken against her: 1) Professor Pollock terminated Plaintiff's research appointment on December 23, 2009; 2) Rackham School for Graduate Studies denied her emergency funding in January 2010; 3) Professor Goldman periodically discriminated against her in 2010-2011; 4) Professor Goldman revoked Plaintiff's funding and demanded that Plaintiff withdraw from her program, and 5) Department Chair Green and Rackham Graduate School officials discontinued Plaintiff from the materials science PhD program.  (Pl.'s Resp. at 5).

_____

[2]Defendants argue that this report of stalking does not constitute a "protected activity" because, in making the complaint to Campus Safety, Plaintiff did not allege specific discriminatory acts.  (Defs.' Br. at 17).  In support, Defendants cite to one of this Court's prior decisions, *Porubsky v. Macomb Comm. College*, 2012 WL 2803765 at *10-11 (E.D. Mich. July 10, 2012) (Cox, J.)(where Plaintiff's Title IX retaliation claim failed because, when he notified Defendant that he was "being treated differently than other students," he never actually stated that he was being discriminated on based upon his gender.) *Id.*  Plaintiff never addresses this argument in her response brief.  However, even if this Court rejects Plaintiff's stalking complaint as a protected activity, she still alleges other protected activities that can satisfy the first prong of the *Wade* test, such as reports of sexual harassment made to faculty members.

A claim accrues on the date when the plaintiff knew, or through reasonable diligence should have known, of an injury giving rise to her cause of action. *Collard v. Kentucky Bd. Of Nursing,* 896 F.2d 179, 184 (6th Cir. 1990). In the context of a retaliation claim, a plaintiff alleges injury by the retaliatory act itself. A plaintiff does not have an actionable retaliation claim until he or she suffers a "materially adverse action" that is causally connected to his or her protected activity. *See Wade*, 259 F.3d at 463 (setting forth the elements of a Title IX retaliation claim).

Here, Plaintiff did not have a viable Title IX retaliation claim against any Defendant until the first alleged retaliatory act took place, i.e. Defendant Pollock's termination of Plaintiff's research appointment on December 23, 2009. This occurred within the statute of limitations period, which dates back to December 21, 2009. In fact, all of Plaintiff's allegedly retaliatory acts occurred within the three year statute of limitations period. Whether or not the protected activity took place within the statute of limitations period does not appear to be relevant to the issue of timeliness of a retaliation claim. Therefore, Plaintiff's Title IX retaliation claim is not time barred on this basis.

Defendants further argue that even if Plaintiff did engage in a protected activity during the limitations period, she either cannot show a causal connection between that activity and any retaliatory action, or too much time passed between the activity and the retaliation so as to completely negate causation. (Defs.' Br. at 17).

"Temporal proximity alone cannot establish a causal connection. However, temporal proximity always plays a role in establishing a causal connection; its significance depends on the context." *Fuhr v. Hazel Park School District,* 710 F.3d 668, 676 (6th Cir. 2013). The court went on to discuss the temporal element in detail:

Where an adverse employment action occurs very close in time after an employer

17

learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Fuhr, supra, citing Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008) (internal citation omitted).

In *Fuhr*, the court held that a time gap of at least two years was "fatal to an attempt to establish causal connection . . . ." 710 F.3d at 676, *citing Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (holding that an adverse "[a]ction taken (as here) 20 months later suggests, by itself, no causality at all"); *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007)(noting that the plaintiff was unable to "point to any authority holding that a causal connection exists where there has been a gap of multiple years . . . between the protected activity and the adverse employment action").

Plaintiff alleged that she reported harassment to Pollock in November 2007 and Summer 2008 - but Pollock did not terminate her appointment until late December 2009. (*See* Pl.'s Compl. at ¶¶ 41, 49, and ¶¶ 71, 72). More than one year, and possibly two years, had passed between the protected activity (Plaintiff's report of harassment to Pollock) and the first alleged retaliatory act (Pollock's termination of Plaintiff's research appointment). The Sixth Circuit in *Fuhr* has recently held that an excessively lengthy gap in time can destroy the possibility of causation. Other courts in this circuit have held that "where some time has elapsed between when the employer learns of the protected activity and the adverse employment action, the employee must produce other evidence, in addition to the temporal proximity, in order to establish causation." *Condiff v. Hart Cty. Sch.*

18

*Dist.*, 770 F.Supp.2d 876, 884 (W.D. Ky. 2011)(*citing Leidner v. Napolitano*, 2010 WL 5300533 at *22 (E.D.Ky. 2010)).

To establish causation in a Title IX retaliation case, the time gap between the protected activity and the retaliatory act cannot be years in length. When the temporal proximity is less than that, however, a plaintiff can introduce evidence of other circumstances that create the inference of retaliatory motive.

Plaintiff alleges that, in addition to the overt acts of retaliation taken against her, Defendant Pollock's retaliatory motive is evidenced by the comments she made in response to Plaintiff's reports of sexual harassment. (*See* Pl.'s Compl. at ¶ 49)(In response to a sexual harassment complaint, Pollock allegedly said to Plaintiff "these things sometimes happen. We have to get over it and get back to the lab. Don't let this ever happen again. It's important that we be in lab. We don't always get along with everyone.").

Plaintiff also argues that Goldman's retaliatory motive is also evidenced by comments and actions toward her. Prior to becoming Goldman's advisee, Plaintiff complained to Goldman about sexual harassment by her peers in the Engineering Department. (Pl.'s Compl. at ¶ 74). Plaintiff alleges that in April 2011, Goldman instructed Plaintiff to stop being involved with non-academic activities, stating "I know you have that SAPAC thing." (Pl.'s Compl. at ¶ 83-84). Plaintiff also alleged that Goldman attended a Student Relations Advisory council meeting where Title IX requirements were discussed, and afterwards called Plaintiff to ask her whether she heard about Title IX investigations at other universities. Defendant Goldman also allegedly said "OCR was investigating the — I guess you'd call them perpetrators . . . I might have to report you whether you want me to or not." (Pl.'s Compl. at ¶ 83). Plaintiff alleges that Defendant Goldman retaliated

19

against her when Goldman terminated Plaintiff's appointment in August 2011, despite Plaintiff "successfully progressing in her program." (Pl.'s Resp. at 7).

Plaintiff has plead a plausible claim of Title IX retaliation against Defendants. The facts as alleged, and taken as true for purposes of this motion, support the claim that Goldman and/or Pollock retaliated against Plaintiff based on her claims of sexual harassment and discrimination within the Engineering department at U-M.

Therefore, this Court DENIES Defendants' Motion to Dismiss Count II of Plaintiff's Second Amended Complaint.

### Count III: Equal Protection, Section 1983 claims against Coleman, Pollock, Goldman and Green in their Individual Capacities and Official Capacities

To bring a claim under 42 U.S.C. § 1983 for denial of equal protection, a plaintiff must prove the existence of purposeful discrimination. *See Batson v. Kentucky*, 476 U.S. 79, 93 (1986). A plaintiff must demonstrate that they "receiv[ed] different treatment from that received by other individuals similarly situated." *Kuhar v. Greensburg–Salem School Dist.*, 616 F.2d 676, 677 n. 1 (3d Cir.1980). To prove sexual discrimination, a plaintiff must also show that any disparate treatment was based upon her gender. *Bohen v. City of East Chicago*, 799 F.2d 1180, 1186–87 (7th Cir.1986).

Defendants argue that Plaintiff's equal protection claim should be dismissed because it is time barred, and because Plaintiff has not met her pleading burden of establishing a plausible claim for relief. Specifically, Defendants argue that Plaintiff has provided no facts supporting this count, other than the conclusory statement that "[w]omen, including Plaintiff, were treated different in the College of Engineering than her male peers." (Defs.' Br. at 11, n.5). Defendants also reiterate their

argument that "the continuing violations doctrine does not apply to discrete acts outside the limitations period." (Defs.' Br. at 11, n.5)

Plaintiff responds that her equal protection claim is "supported by dozens of pages of detailed factual allegations that [plaintiff] was viewed differently and held to different standards than her male peers." (Pl.'s Resp. at 19). At oral argument, Plaintiff stated that some of these supporting factual allegations could be found in paragraphs 86 through 109 of her Complaint.

Plaintiff's claim is not time-barred because she has alleged that she suffered acts of purposeful gender-based discrimination within the limitations period. (Pl.'s Resp. at 5). Further, this Court finds that Plaintiff's factual allegations, when all inferences are taken in a light most favorable to the her, support a plausible equal protection claim under Section 1983. Therefore, this Court DENIES Defendant's Motion to Dismiss Count III of Plaintiff's Second Amended Complaint.

**Count V: First Amendment Free Speech Retaliation, Section 1983 claims against Coleman, Pollock, Goldman and Green in their Individual Capacities and Official Capacities**

"In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Zwick v. Regents of University of Mich.*, 2008 WL 1902031 at *9, *citing Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 511 (1969).

To plead a prima facie case of free speech retaliation, Plaintiff must show that (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Paige v. Coyner*, 614 F.3d 273,

277 (6th Cir. 2010), *citing Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998).

Defendants argue this claim is time barred because all actionable events occurred prior to December 21, 2009.  For the reasons set forth under the analysis for Count II, Plaintiff's retaliation claims are not time-barred, as all alleged acts of retaliation against Plaintiff occurred within the limitations period.

Defendants also argue that even if Plaintiff engaged in protected activity, she fails to show any causal connection between her protected activity and an adverse action.  Plaintiff must provide facts linking the speech in question to the Defendants' retaliatory action against her.  *Zwick*, 2008 WL 1902031 at *9.  As mentioned in the discussion of Count II, a multi year gap between the protected activity and the retaliatory conduct may totally negate a claim of causation.  *See Fuhr*, 710 F.3d at 676.

Plaintiff undoubtedly engaged in protected speech activities - namely, all of the reports of sexual harassment and discrimination made to Pollock, Goldman, and other University faculty and employees, as well as her involvement in SAPAC.  The second element of free speech retaliation, whether the "defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity" is not in dispute here.

In regards to the third element, Plaintiff has come forth with facts sufficient to support her theory that the retaliatory acts taken against her were motivated, "at least in part, as a response to" the exercise of her free speech right.  *See Zwick*, 2008 WL 1902031 at *9; *see also* Discussion of factual allegations involving Defendants Pollock and Goldman, *supra* at 19-20.  Therefore, this Court DENIES Defendants' Motion to Dismiss Count V of Plaintiff's Second Amended Complaint.

**Count VI: ELCRA sex discrimination/disparate treatment/hostile environment against all Defendants**

ELCRA "demands that '[a]n educational institution shall not . . . discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex.'" *Zwick*, 2008 WL 1902031 at *10, *citing* M.C.L. § 37.2402.

Plaintiff's Count VI is, by and large, the Michigan state law corollary to Plaintiff's Title IX hostile environment claim. Plaintiff advances the same theory, Defendants make the same arguments for dismissal, and Plaintiff raises the same counter-arguments as found in the discussion of Plaintiff's Title IX hostile environment claim found in Count I. Therefore, for the reasons set forth therein, this Court DENIES Defendants' Motion to Dismiss Count VI of Plaintiff's Second Amended Complaint at Law.

**Count VII: ELCRA sex discrimination/disparate impact against all Defendants**

"The disparate impact discrimination theory evolved from Title VII of the Civil Rights Act and has been incorporated into the Michigan Civil Rights Act." *Jones v. Pepsi–Cola Metro. Bottling Co., Inc.*, 871 F.Supp. 305, 308 n. 4 (E.D.Mich.1994) (citing *Squire v. Gen. Motors Corp.*, 436 N.W.2d 739, 741–42 (Mich.Ct.App.1989)). Thus, when "analyzing claims under Elliott–Larson, Michigan courts apply federal substantive law developed in Title VII cases." *Jones*, 871 F.Supp. at 308 n. 4 (citing *Squire*, 436 N.W.2d at 741–42); *see also Ayers v. Multiband Field Svcs., Inc.*, 2013 WL 5244918 at *3 (E.D. Mich. 2013).

To establish a prima facie case of disparate impact discrimination under ELCRA, a plaintiff must show that she was a member of a protected class and that "a facially neutral employment

23

practice burden[ed] a protected class of persons more harshly than others." *Roberson v Occupational Health Centers of America, Inc.*, 220 Mich.App 322, 329-330 (1996).

Plaintiff alleges that "Defendants' dispute resolution policy has the impact of discouraging reporting and allowing perpetrators to enjoy the benefits of the university while the victims are silenced." This argument is premised on the notion that "[w]omen are much more frequent victims of sexual harassment and assault . . . ." (Pl.'s Resp. at 18).

Defendants argue that Plaintiff's disparate impact claim fails because her pleading is generic and conclusory, and is therefore not entitled to any presumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Defendants further attack Plaintiff's reliance on the Department of Education's "Dear Colleague" letter, which suggests, but does not mandate, that universities like Defendant U-M implement certain training and procedures to prevent sexual harassment and violence. (*See* Pl.'s Resp. at Ex. 11).

Plaintiff directs this Court to paragraphs 17 through 25 in support of her disparate impact claim. There, Plaintiff alleges that the conflict resolution process at the University of Michigan was contrary to the requirements of Title IX, and that it provided women with no way to "address the permissive culture of sexual hostility toward female students in the College of Engineering." (Pl.'s Compl. at ¶ 24). Plaintiff argues that this policy disproportionately impacts women at U-M.

This Court finds that these paragraphs contain factual allegations which, when all inferences are taken in a light most favorable to the Plaintiff, support a plausible claim for relief under ELCRA. Therefore, this Court DENIES Defendant's Motion to Dismiss Count VII of Plaintiff's Second Amended Complaint.

24

**Count VIII: ELCRA retaliation against all Defendants**

"Michigan courts also apply the Title VII framework" to ELCRA retaliation claims as well as Title IX retaliation claims. *Garg v. Macomb Cty. Comm. Mental Health Services*, 472 Mich. 263, 284 (2005).

To establish a prima facie case of retaliation in violation of ELCRA, a plaintiff must show: (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. *DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich.App. 432, 436 (1997).

"To establish causation for claims of retaliation under ELCRA, the plaintiff must show that [her] participation in activity protected by the ELCRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Rymal v. Baergen*, 262 Mich.App. 274, 303 (2004).

Defendants argue that Plaintiff's ELCRA retaliation claim fails for the same reasons as the Title IX retaliation claim. (*See* Count II, *supra* p. 15-20). Defendants argue that Plaintiff did not engage in any "protected conduct" within the statute of limitations, and even if she did, she does not allege that any retaliatory act is causally connected to any timely protected activity.

Defendants claim that Michigan courts do not recognize the continuing violations doctrine for claims brought under ELCRA. (Defs.' Br. at 9)(*citing Garg v. Macomb Cty. Comm. Mental Health Services*, 472 Mich. 263, 284 (2005)). In *Garg*, the plaintiff filed a grievance against her employer in June 1987 and was subsequently denied promotions because of it. Plaintiff filed a complaint against her employer in July 1995, alleging that the employer violated ELCRA by

25

retaliating against her commission of a protected activity.

There, defendant successfully argued that plaintiff could not sue her former employer based on any promotion denials that occurred earlier than three years before the filing of the complaint[3], even though plaintiff argued that promotion denials after July 1992 were "continuing violations" of the earlier retaliatory acts. The *Garg* court rejected that theory, overturning a prior state court case on point[4], and held that "a person must file a claim under the Civil Rights Act within three years of the date his or her cause of action accrues, as required by § 5805(10).10. That is, "three years" means three years. An employee is not permitted to bring a lawsuit for employment acts that accrue beyond this period, because the Legislature has determined that such claims should not be permitted." *Id.* at 285.

Plaintiff responds that Defendants' interpretation of *Garg* overstates its holding. Whether or not Defendant correctly interprets *Garg*, the present case is distinguishable and, thus, *Garg* inapplicable. In *Garg*, the plaintiff filed suit based on retaliatory acts that were, on their face, barred by the statute of limitations. Here, Plaintiff bases her claim of ELCRA retaliation based on retaliatory acts that occurred within the statute of limitations period, beginning with Defendant Pollock's termination of Plaintiff's research appointment on December 23, 2009. In sum, *Garg* does not render Plaintiff's claims untimely. Therefore, based on the foregoing, this Court DENIES Defendants' Motion to Dismiss Count VIII of Plaintiff's Second Amended Complaint.

_____

[3]The statute of limitations on ELCRA claims in Michigan is three years, which is the statute of limitations applicable to personal injury actions in Michigan.

[4] The *Garg* court overruled Sumner *v. Goodyear Tire & Rubber Co.,* 427 Mich. 505, 398 N.W.2d 368 (1986).

26

### CONCLUSION & ORDER

For the reasons set forth above, this Court DENIES Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) (Doc. #25), and GRANTS Plaintiff's Motion to Extend Time to Serve Summons and Complaint on Defendants Green and Goldman (Doc. #32).  Plaintiff has sixty (60) days from the issuance of this Order to effectuate personal service on Defendants Goldman and Green.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  November 18, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 18, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

27