UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JENNIFER DIBBERN,

              Plaintiff,

v.

THE UNIVERSITY OF MICHIGAN,
a domestic nonprofit corporation,
THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, a public
constitutional body corporate, MARY SUE
COLEMAN, President of The University of
Michigan, an individual acting in her official
capacity, RACHEL S. GOLDMAN, in her
individual and official capacity, TRESA
POLLOCK, in her individual and official
capacity, and PETER GREEN, in his individual
and official capacity,
`
              Defendants.

Case No.  12-cv-15632

Hon. Sean F. Cox

---

| DAVID M. BLANCHARD (P67190) | MEGAN P. NORRIS (P39318) |
|---|---|
| BLANCHARD WALKER PLLC | BRIAN M. SCHWARTZ (P69018) |
| Attorney for Plaintiff | MILLER, CANFIELD, PADDOCK |
| 221 N. Main Street, Suite 300 | AND STONE, PLC |
| Ann Arbor, MI 48104 | Attorneys for Defendants |
| (734) 929-4313 | 150 West Jefferson, Suite 2500 |
| blanchard@bwlawonline.com | Detroit, Michigan  48226 |
| | (313) 963-6420 |
| | norris@millercanfield.com |

---

**PLAINTIFF'S COUNTER-STATEMENT OF DISPUTED FACTS**

1.      Admitted.

2.      Admitted that Dibbern received a copy of the MSE Resource Guide on September 10, 2009, nearly two years after enrollment. (137).[1]

3.      Admitted.

4.      Admitted.

5.      Denied. Dibbern acknowledges that is the typical trajectory of a Ph.D. student but not all students followed that path as there is "varying time to candidacy in the department and it can depend on your advisor." (160).   Prof. Rachel Goldman[2] acknowledges the average length of time to acquire a Ph.D. is five years, but it can sometimes take up to seven, particularly if a student must

---

[1] Consistent with Defendants' briefing practice, citations containing page numbers only are used to Plaintiff Jennifer Dibbern's deposition (attached in full as Plaintiff's Exhibit 1).

[2] Prof. Rachel Goldman was the graduate chair of the MSE department from 2008-2012. (Ex. 2, Goldman Deposition at 33).  She served as Dibbern's advisor from Winter 2010 to Fall 2011.  She also served as one of six faculty members (university-wide) elected by the Faculty Senate Assembly to SACUA. (Ex. 2, Goldman at 75-77). **According to the University's own materials: "**The Senate Advisory Committee on University Affairs (SACUA) is the executive arm of the University Senate and of the Senate Assembly. SACUA meets weekly and consists of nine members of the Senate Assembly elected by the Assembly for three-year terms. On behalf of the Assembly, SACUA advises and consults with the President, Provost, and the Executive Officers of the University on matters of University policy. SACUA also coordinates and initiates governance activities and serves as an instrument for implementing the actions of the University Senate and the Senate Assembly." (SACUA Description, available at http://facultysenate.umich.edu/sacua/, last visited Nov. 29, 2015).

switch schools or advisors. (Ex. 2, Goldman at 153-154).   It took Goldman seven years to earn a Master's and Ph.D. (*Id.* at 48).[3]

6.     Admitted to the extent that the exams were never ultimately scheduled, but Dibbern developed plans and timelines with two separate advisors in two separate research areas, but was fired by both before those plans could be executed. (Ex. 3, Affidavit of Jennifer Dibbern at 2).   Additionally, Dibbern went through a "major, major, major shift" when she switched research areas two years into her Ph.D. studies. (Ex. 4, Green Deposition at 36).   Had she not essentially had to start her research program over, she would have been more successful in a shorter time frame. (*Id.* at 36-37; Ex. 2, Goldman at 37). When Dibbern switched advisors in February 2010, she had completed all of the requirements to become a Ph.D. candidate, but instead of taking preliminary exams based on her previous work, Dibbern was expected to do new research. (Ex. 2, Goldman at 117-119).

7.     Admitted to the extent that Plaintiff cannot identify another MSE student who meets this exact same criteria.   She is likewise unaware of any other MSE student who suffered similar setbacks due to sexual harassment and the need to change advisors due to the same circumstances as she experienced.   Defendants acknowledge that it is normal for MSE students take varying lengths of time to

---

[3] Goldman herself experienced challenges completing her Masters and Ph.D in a typical timeframe. (Ex. 2, Goldman at 47-75).   To do so she spent three and half years at Cornell University, where she had expected to earn a Ph.D. but ultimately only earned a Master's and never even became a Ph.D. candidate, and then another three and a half years at University of California, where she earned her Ph.D. (*Id.*)

complete their preliminary examinations based on individual circumstances. (Ex 2, Goldman at 152-154; Ex. 4, Green at 35-36).

8.     Admitted.

9.     Admitted.

10.    Admitted that Dibbern was the only one working on her specific project, but most employees in Pollock's lab conducted research on or related to super alloys. (Ex. 3, Dibbern Aff. at 3).

11.    Admitted that she worked there, but Dibbern recalls that the doors to the lab and offices were regularly propped open during the day. (Ex. 3, Dibbern Aff. at 4).

12.    Admitted.

13.    Denied. Dibbern had numerous conversations where details of her harassment were discussed in detail.  She first reported harassment to her own advisor in MSE and COE less than three months after starting at Michigan. (189-190).  As the harassment progressively worsened and after she experienced a rape threat from classmates, Dibbern reported it to the University's Sexual Assault Prevention and Awareness Center (SAPAC). (Ex. 5, SAPAC records).  Later, during a meeting with Renee Hilgendorf, the MSE graduate program coordinator and Prof. Goldman, Dibbern told them both, in detail, of the ongoing harassment she had suffered (289-290). Additionally, Dibbern provided details of how she was

harassed, the rape threats she suffered, and what Pollock had said to make Dibbern uncomfortable continuing the conversation with her. (*Id.*)   Later, Dibbern authorized Rachel, her therapist at CAPS, to speak with the Dean of Students Office about her case. (Ex. 6, CAPS Records).

14.    Admitted that Dibbern had a conversation with Pollock on this day and that she took notes in her journal about the conversation.   Regarding Defendants' footnote 3, Dibbern's notes of the conversation are not, nor were they intended to be, full records or transcripts.  Plaintiff's motivation for asking Pollock about women's organizations was to find resources for women who believed that they were being harassed or abused because she assumed  "that as a faculty member she would be aware of them would be able to guide [her] to the most appropriate places or at least make a reference."  (192-198).  "Professor Pollock was one of those places I went to look for connections to resources for places which I could take my complaint of sexual harassment." (192). In her journal, she wrote that Pollock responded during their conversation on Nov. 7, 2007 that, "Boys in engineering can be like that sometimes" and that she should "just stay focused on work."  Dibbern further recalled in her deposition that in response to Dibbern's concerns about harassment, Prof. Pollock said "boys will be boys" and "this is sometimes how it goes in these fields." (*Id.*; See also Ex. 6, CAPS Records).  In response to Plaintiff's specific question about where she could go for

help, Pollock offered that she sat on a commission on women at the University and that there might be a student seat available. (*Id.*)

15.    Denied.   Dibbern has always claimed raising harassment in her November 2007 conversation with Pollock, and has said that she did not provide further examples, that day or in subsequent conversations,  about the nature of the harassment she was experiencing because of the generally "difficult nature" of the subject area.

16.    Denied.  Dibbern had limited access to Pollock during this time frame as Pollock was rarely present in the lab or her office.  Dibbern did, in fact, follow up on her November conversation with Pollock to get additional information about the university's commission on women. (198-199). When she did, Dibbern referenced the earlier November conversation and was met with "coldness" from Pollock and the general impression that Pollock had no interest engaging in a conversation related to Dibbern's harassment concerns. (*Id.*)    Dibbern later met with Pollock on May 18, 2008. (*Id.*)

17.    Denied.  Dibbern did provide her stalker's name, Norman Meznarich, to the Department of Public Safety in early 2009. (200).  Further Dibbern does not agree that these individuals should be called "pre-limitations alleged harassers" and will instead refer to them as the "harassers."

18.    Admit except to the classification of these individuals as "pre-limitations alleged harassers."

19.    Denied.  Dibbern was aware that at least two of her harassers used the common lab space or a private office in the basement of Gerstacker. (Ex. 3, Dibbern Aff. at 5).  Denied as to the classification of these individuals as "pre-limitations alleged harassers."

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.    Denied.  Crutchfield recognized during their initial counseling session following the rape threat that Dibbern's most immediate need was to not have be in the same room for her harassers during exams. (Ex. 6, CAPS Records).

24.    Admitted.

25.    Admitted.

26.    Admitted.

27.    Admitted.

28.     Admitted, except for the implication that "a few weeks" provides.  At the urging of CAPS and SAPAC, who advised her she was at risk during this time frame because of the harassers' high likelihood of following through on their rape threats, Dibbern left the campus environment for two weeks. (Ex. 3, Dibbern Aff. at 6).

29.     Admitted.

30.     Admitted.  Dibbern also met with an advocate from SAPAC when she returned to campus who advised Dibbern that the first step in the University's process was to place victims in a face-to-face mediation with their attackers or harassers. (Ex. 3, Dibbern Aff. at 7).  Additionally, the advocate urged Dibbern to talk to her advisor before proceeding and take the critical first step of finding an ally within the Engineering Department because of the likelihood of social and professional retaliation. (Ex. 5, SAPAC Records).

31.     Denied.  While Dibbern may have received materials describing the Office of Student Conflict Resolution, she is not familiar with it as she was told it wouldn't necessarily apply to her and was advised by SAPAC that the proper office to contact was OIE. (Ex. 3, Dibbern Aff. at 8).

32.     Admitted.

33.     Denied. According to the MSE Resource Guide, "All course selections must be approved by the faculty research advisor or the graduate

advisor," so Pollock was aware of all Dibbern's course selections. (Ex. 7, MSE Resource Guide Excerpted at 37).   Additionally, MSE guidelines require "all students must take two courses (cognates) outside the MSE dept." (*Id.*).   The Resource Guide goes on to say that for both the Master of Science in Engineering and the Ph.D., students "must take ***at least*** 2 cognate courses."   (*Id.* at 38).

34.    Admitted that Dibbern received this message.

35.    Admitted that Dibbern responded to Pollock's May 15, 2008 message.

36.    Denied.    Dibbern's testimony is far from inconsistent.    This description is an attempt to combine numerous discussions over many months into a single conversation.   At the May 19, 2008 meeting, Dibbern followed the advice of CAPS and SAPAC and once again told Pollock about her ongoing harassment and the types of comments her harassers were making but was cut off before she could discuss the rape threats. (Ex. 3, Dibbern Aff. at 9).

Eight months later, in January 2009, Dibbern and Pollock again discussed the ongoing harassment Dibbern was suffering when Dibbern requested an alternative work schedule for fear of being left alone in the lab at night because of her predators. (*Id.*)

37.    Admitted to that extent Plaintiff communicated with Ghosh about the exam in August.   At the suggestion of a counselor at CAPS and following her University-recommended leave following the rape threats, Dibbern rescheduled

9

two exams in Spring 2008: an electronic materials course with Prof. Shtein and a mechanics of materials class with Prof. Ghosh. (204). Dibbern reached out to both professors in May to reschedule. (*Id.*) While Prof. Shtein was accommodating and Dibbern was able to take the rescheduled exam (and earn an A) in late May, Prof. Ghosh was not. Dibbern was told by Ghosh in May to wait to reschedule the exam until later. Despite reaching out numerous times in the following months, Ghosh did not contact Dibbern until August 2008. (Ex. 8, Ghosh Emails). When he did, Ghosh told Dibbern that she would not take the same exam as her peers had and would not confirm what the exam was about. (*Id.*)

38.   Admitted that Dibbern was unable to take the exam at two times proposed by Prof. Ghosh. (*Id.*).

39.   Admitted.

40.   Admitted.

41.   Admitted to the extent Dibbern sought a mutually available time for a meeting. Before the semester progressed any further, Dibbern had to adjust her course schedule to avoid her harassers. (Ex. 3, Dibbern Aff. at 10).

42.   Admitted.

43.   Admitted.

44.   Admit. Meznarich would call Dibbern incessantly, would show up at her work uninvited, would leave gifts on her desk, and then one night, in mid-

December 2008, followed Dibbern into the lab one night and assaulted her. (237, 360).  Regarding Defendants' footnote 7, while no one from MSE told Dibbern not to file a police report, Anthony Walesby, Associate Vice Provost for Academic and Faculty Affairs and Senior Director of OIE, told her that while she might be able to have an exam supervised or have a class changed to avoid her stalker, there were often more "significant and impactful repercussions that were felt by people who made reports" and that such retaliation could not be prevented. (361).

45.    Admitted.

46.    Admitted that Dibbern was fearful for DPS to contact Meznarich. Dibbern remained concerned about retaliation, particularly after a colleague of both hers and her harassers expressed concern for her safety.  Dibbern feared that DPS's first step of knocking on a predator's door and warning him would provoke anger in him and harasser friends so that they would lash out at her in retaliation. (367). Because of these concerns, she was instructed to reach out to OIE, who advised her that she could not be protected from retaliation. (413-418) ("I felt like it had been made clear to me that I would be retaliated against if I stepped forward, and so I wanted to make sure I knew what I was getting into" at 418).

47.    Admitted.   Because of Pollock's reaction to Dibbern's earlier disclosure, Dibbern did not think Pollock would be supportive. (244).

48.    Admitted that Dibbern spoke with Margery Pillsbury from DPS. Deny that harassment did not occur during class as her harassers would often say they would "call her" as a way to say they would be thinking about her later while masturbating. (283).  This occurred before, during, and after class. (*Id.*).

49.    Denied that Dibbern did not want Meznarich prosecuted.  Instead, her concern was that she was not retaliated against if he was prosecuted. (413-418). In addition, Dibbern believed Meznarich to be close friends with her harassers. While his participation in the harassment had not been direct, he was sometimes present and never acted to stop the situations. (363).

50.    Admitted.  Additionally, Pillsbury had to follow up with her own supervisor to learn more about how the University processes would work. (Ex. 9, Pillsbury Deposition at 11).

51.    Admitted.

52.    Admitted.

53.    Admitted.

54.    Admitted. Dibbern's actions and conversations at this time were motivated primarily by fear and specifically by fear of retaliation.  Before committing to any definite course of action, Dibbern wanted to understand all the avenues she could pursue so she could choose the one least likely to jeopardize her safety. (414). Up until 2011, the University investigated reports of sexual

misconduct using a complaint-driven model which "required the complainant to bring a clear and convincing standard of evidence" which was recognized as difficult for people who had been traumatized. (Ex. 10, Vander Velde Deposition at 24). It is thought that in that system victims would often consult with their support networks and advocates and decide not to even pursue an investigation. (*Id.*).

55.     Admitted.  After exploring all options, Dibbern found no prompt and equitable solution to keep her from her stalker or feeling safe from retribution. (363). Her decision was based on her "ultimate goal to be safe" and that she was "concerned for [her] safety and just wanted to be left alone. (367).   Ultimately, Dibbern felt that none of the official University avenues could provide her with protection, which motivated her to try prevent other women from having to suffer the same experiences as she had. (Ex. 3, Dibbern Aff. at 11).  To do so, Dibbern began volunteering with SAPAC in the fall of 2010. (262).

56.     Denied.  While there were no specific incidents with Meznarich after January 2009, Dibbern still had to endure encountering him on a regular basis (235).

57.     Admitted.

58.     Admitted.

59.     Admitted.

60.    Admitted.

61.    Denied that Dibbern did not focus on her research in the Fall 2009 term.  Admit the remaining portions of the statement.

62.    Admitted that Dibbern received e-mails from Pollock.

63.    Admitted that Dibbern also explained to Pollock that she had been particularly busy during this two-week time frame at the end of the semester because of course finals.

64.    Admitted that Dibbern received this message.

65.    Admitted that Dibbern applied for a temporary 10 hour/week position in the law school, but it was temporary. (Ex. 11, Dibbern Email December 22, 2009).

66.    Admitted.

67.    Admitted that Pollock informed Dibbern that her funding was being pulled for the winter 2010 semester.   Upon receiving the message, Dibbern immediately reached out to Prof. Pollock in an attempt to clear up any misunderstanding and offered to withdrew her application for the law school position. (*Id.*)  Because the position was temporary and would take less time than previous approved positions she had held to earn extra money while enrolled in the MSE, Dibbern wrongly assumed she could accept the work without conflict. (*Id.*)  It should be noted that Pollock's notice to Dibbern was in violation of MSE policy

that faculty must give graduate students two months notice that their performance is not satisfactory and one month notice if funding is being withheld. (Ex. 12, Hilgendorf Deposition at 36; Ex. 7, MSE Resource Guide Excerpted at 50). Pollock's treatment of Dibbern was not consistent with graduate students rights. (*Id.*)

68.    Admitted that Dibbern received this message.

69.    Admitted.

70.    Admitted.

71.    Admitted.

72.    Admitted except for the statement in footnote 10, which is denied.

73.    Admitted.

74.    Admitted.

75.    Admitted.

76.    Denied.   While it's unclear what "incident" is being referred to, Dibbern discussed her ongoing harassment within the College of Engineering with Goldman and Hilgendorf in-depth. (289-290).  She told them there were students in the department who had harassed her since the start of the program, that they had threatened to rape her, and that she had been assaulted in her own office by a stalker. (*Id.*)  Dibbern discussed how - despite coming forward to Pollock for help, working with CAPS and SAPAC, and physically moving domicile – she continued

to feel unsafe. (*Id.*)   Dibbern provided enough detail about at least one of her harassers during the meeting that Hilgendorf acknowledged that she could identify him. (Ex. 3, Dibbern Aff. at 12).

77.   Denied.   Dibbern did contact those resources she felt safe contacting (289-290) ("They asked what I wanted, and I said that I didn't feel safe and that I wanted to feel safe.")

78.   Admitted that they gave her information, but Dibbern already been in contact with Rackham Graduate School prior to her meeting with Goldman and Hilgendorf. (280).   Prior to the 2009 holiday break, Dibbern reached out to Lynn Dumas Shivers at Rackham and then met with Ms. Shivers in January 2010. (*Id.*)  After Dibbern told Shivers about the ongoing harassment and the lack of support she received when coming forward to Pollock, Shivers asked Dibbern to describe her situation to Ray-Johnson, Shivers' supervisor. (*Id*).   Subsequently, Dibbern met with Ray-Johnson and Shivers together and described to them how her harassers would tell her before, during, and after class that they would call her while they were masturbating. (283).   Dibbern described to them how, when she sought help from her advisor Pollock, Pollock told her to get over it, that their relationship subsequently changed, and that even when Dibbern requested a different lab schedule out of fear, Pollock disregarded her concerns and told her to "just get the data." (283-284).   They discussed how this influenced Dibbern's

decision not to relocate to California with Pollock and how her ongoing safety concerns and desire to avoid her harassers was making the search for a new advisor difficult. (*Id.*)

79.    Admitted that she did not discuss further harassment, but she did communicate her efforts to prevent others from being harassed with her advisor Goldman and others. (262-263).   Through SAPAC and GEO, Dibbern proposed and designed a mandatory, comprehensive sexual harassment training program to be given to every graduate student during orientation. (445-446).   Specifically, Dibbern wanted to change the culture within the School of Engineering by raising awareness of issues related to the hostile environment in the school and what she saw as institutional cracks that victims of abuse could fall into. (Ex. 5, SAPAC Records; Ex. 6 CAPS records).

80.    Admitted.

81.    Denied. Dibbern worked in labs on both Central and North Campus. (346-347).

82.    Denied.  Dibbern knew that at least two of her harassers were at least occasionally present in the same lab space as her on Central Campus. (377).

83.    Denied. Dibbern experienced sexual harassment throughout 2010 in the form of respirator kisses, where one of the harassers would force his face close

to hers or grab her head to force their faces together. (349-350).   Deny the classification of these individuals as "pre-limitations alleged harassers."

84.   Admitted that Warren harassed her.  Deny the "pre-limitations alleged harassers" classification.

85.   Admitted.

86.   Denied.  Dibbern does not know whether Prof. Goldman witnessed Warren's harassment in the form of respirator kisses, but is aware of an incident during a group meeting, where Goldman was present, when Warren attempted to snuggle his head into Dibbern's shoulder.  (350-351).

87.   Denied.   Warren admitted he was friends with Dibbern's other harassers, she observed them spending time together, and observed him as a silent observer to her previous harassment. (344-345).

88.   Denied.

89.   Admitted to the extent the petition needed to be filed.  From the start of their relationship, Goldman knew Dibbern would not be on a traditional PhD trajectory because she essentially needed to start over in a new research program. (Ex. 2, Goldman at 37).  In addition, it is generally acknowledged that Goldman's research area was significantly different from Pollock's and that the drastic shift not only required Dibbern to start over, but was a major setback. (Ex. 4, Green at 36-37).

90.    Admitted to the extent she did not take her preliminary exams in spring 2011.

91.    Denied.  There was no post-doctoral student in Goldman's lab after the fall 2010 semester. (Ex. 3, Dibbern Aff. at 15). During this same time frame, Goldman was part of an award selection process for the 2011 College of Engineering Outstanding Student Instructor award, which Dibbern received. (433-434).  Dibbern also received another award around this time from the Department of Material Science and Engineering for being the best overall instructor (435). Goldman herself presented Dibbern with one of these awards on April 6, 2011. (436-438; Ex. 2, Goldman at 155).

By this time, Dibbern had also begun working with Holly Rider-Milkovich, the Director of SAPAC, to develop a more comprehensive sexual harassment training for graduate students. (Ex. 13, Rider-Milkovich Deposition at 14-18).  A meeting was held with administrators at the College of Engineering where Dibbern presented and discussed her proposal for the training program, which was never ultimately implemented. (*Id.* at 24-26).  In an effort to get more support for her proposal, Dibbern also turned to the GEO in the summer of 2010. (271) ("It was discussed with me that there was a potential for us to incorporate that language in a contract for [GSRA's] and all grad students.")

92.     Admitted to the extent that Dibbern received this e-mail.  Prior to its

receipt, Dibbern explained to Goldman:

> Professor Goldman,
>
> I am not surprised at all that some frustration may have come though in my response.  Over the past two weeks, I worked 20 hour days to repair the broken pumps.  I was sick throughout the weekend (probably from working so many hours) and was only contacted about the ongoing work on Sunday though I reach out Saturday evening to see how everything was going after Eric's email.  When called for help, though I was still sick, I came into lab expecting to help with the work but instead found myself being told to take it over.  I did take over the procedure and was there for ten hours to complete the work.

(Ex. 14, Dibbern Email April 12, 2011). Dibbern previously advised her colleagues

and Goldman of her illness on the previous Friday. (Ex. 3, Dibbern Aff. at 13).

Goldman criticized neither Eric nor Emily for leaving the lab before the project

was finished (Ex. 14, Dibbern Email April 12, 2011).  The nomination and election

process for GEO Officers was occurring at the same time this exchange was

occurring. (Ex. 3, Dibbern Aff. at 14).   On April 14, Dibbern ran for, and was

elected treasurer of GEO. (*Id.*)  In addition, Dibbern admits that she received the

information discussed in Defendants' footnote 17, but only because Dibbern

reached out to Holly because of a phone call Dibbern received from Goldman

around this same time about faculty reporting obligations under Title IX. (339-

440).   Dibbern felt threatened that Goldman would report her harassment

experiences despite Dibbern's fear of retaliation. (*Id.*)

93.     Denied. Dibbern worked with Goldman on abstract drafts from June 2011 forward. (379).

94.     Admitted to the extent that an abstract was not submitted in June 2011.  Dibbern had an abstract prepared for Goldman's review in June 2011, but because Goldman wanted to continue to make revisions to it, Dibbern was instructed to submit it for a later deadline. (378).    Previously the former post-doctoral student who mentored Dibbern told Goldman she thought the abstract looked good and was ready to submit. (Ex. 3, Dibbern Aff. at 15).  The next major exchange about submitting an abstract didn't occur until two months later, between August 13 and 30, 2011. (Ex. 2, Goldman at 205-206).

95.     Admitted Dibbern received this email.  By this time the unionization campaign was heating up at the University.   The University Board of Regents voted, 6-2, on May 19, 2011, to recognize GSRA's as employees and determine for themselves whether or not they wanted to form a union. (Ex. 15, 5/19/2011 Board of Regents Minutes,  http://www.regents.umich.edu/meetings/06-11/2011-06-I-1.pdf, last accessed Nov. 29, 2015).  Throughout, the summer of  2011, SACUA members, including Rachel Goldman were actively involved in Developing faculty wide advocacy in opposition to the GSRA organizing campaign.  (*See eg.* Ex. 16, SACUA Email Correspondence, discussing opposition techniques and the legal limits of opposition messaging and Ex. 17, Email forward to Barald and SACUA)

21

("The university administration and academic leadership are opposed to the unionization of GSRAs").

Despite Goldman's assertions that she had any real interest in the unionization effort. (Ex. 2, Goldman dep at 165-166), the College of Engineering had a deep interest in whether or not research assistants unionized as nearly 50% of the GSRA's at the University of Michigan were Engineering students. (Ex. 16, SACUA Email Correspondence) ("This is especially important in Engineering, which is home to about 50% of the GSRA's on the entire campus.")[4].   By July 2011, the GEO had also identified Golman and Kate Barald, chair of SACUA and a professor in the Engineering Department, as hostile to the union organizing campaign. (Ex. 18, Cooper Deposition at 186-191).

96.    Admit that these activities were discussed.   By the time this conversation occurred, Dibbern had not volunteered with SAPAC since the winter 2011 semester. (374); (Ex. 13, Rider-Milkovich at 27-28).   In the same conversation Dibbern offered to scale back her involvement in the ETC (384). Because they explicitly discussed both SAPAC and GEO and Goldman explicitly avoided any discussion of GEO, Dibbern was left feeling confused. (*Id.*)   In addition, Rachel Goldman knew about Dibbern's role in GEO, the Teaching

---

[4] No minutes are publicly available for any SACUA meeting in June, July or August of 2011, although the minutes of regular meetings are kept and recorded for those months in other academic years (http://facultysenate.umich.edu/sacua/meeting-minutes/, last visited November 29, 2015).

Assistants' Union, and had direct conversations with Dibbern about how the Research Assistant's organizing campaign would destroy research work at the University. (Ex. 18, Cooper at 67); (Ex. 3, Dibbern Aff. at 20, 22).

97.    Admitted that other students were involved in non-research activities and deny that she cannot be compared to other students.  Goldman's other research group members were involved in numerous activities:  Eric Zech[5] played in a travel soccer league that demanded practice or games 5-6 days a week. (Ex. 19, Zech Deposition at 43, #69); other group members Suneol, Adam, and Emily all played in a band together. (*Id.*)  Goldman never told Zech, nor is he aware of her ever telling others in the group, to scale back activities. (*Id.* at 69). In addition, none of the other students in Goldman's lab were involved in the union. (Ex. 3, Dibbern Aff. at 16).

98.    Denied. Goldman, in fact, told Dibbern to stop participating in both SAPAC and the union. (Ex. 18, Cooper at 68-69; see also Ex. 3, Dibbern Aff. at 25).  When Goldman found out that Dibbern was actually involved in the research assistants ("GSRA") organizing campaign, Goldman demanded that Dibbern cease these activities and her activities with SAPAC. (*Id.*) ("So then Professor Goldman sat her down and said, "You need to quit being involved with this union stuff and

---

[5] Eric Zech is another Graduate Research Assistant who worked in Prof. Goldman's research lab. Dibbern actually trained Zech over a number of months but he later authored a letter in the Michigan Daily at the suggestion of anti-union faculty members (Ex. 20, Zech/SACUA Correspondence) ("I think the best possible respondents are students (the students who are/were in Rachel's group).")

you need to quit SAPAC.")  Goldman reiterated these demands in an August 8, 2011 email.  (Ex. 21, Goldman Email August 8, 2011).  ("What did you do today" … "Again I ask, what did you do today"… "I realize you have many other things going on but an increased [sic] in your focus on research is urgently needed.  This will probably require you to decrease your involvement in non-research related activities.")  August 8, 2011 was also a particularly important date for the GSRA organizing campaign, as a hearing regarding the status of the campaign had been scheduled at the Michigan Employment Relations Committee ("MERC"); the State Agency charged with oversight and administrative decision-making over public employee Unions). (Ex. 2, Goldman at 140).

99.    Admitted that Dibbern received the e-mail.

100.    Admitted that Dibbern received the e-mail.

101.    Admitted that Dibbern was not in the lab with Zech frequently, in fact, it was designed that way.  Dibbern trained Zech on STM, the machine they were both working on. (Ex. 22, Zech Op-Ed in Michigan Daily).  In addition, the two worked at different labs for a period of time and eventually started working to share an instrument so they both didn't need to be there at the same time (Ex. 3, Dibbern Aff. at 18).

102.    Admitted that Dibbern and Zech had exchanges about their schedules.

103.    Admitted that Dibbern received this e-mail.

104.   Admitted.  Regarding Defendant's footnote 21: admitted that Dibbern was in New York in August 2011 for a graduate employee union conference. Dibbern denies that she did not respond to Goldman's emails.   Dibbern additionally recalls that she specifically requested time off from Goldman in order to take the trip.  (Ex. 3, Dibbern Aff. at 17).

105.   Admitted that Dibbern received this e-mail.

106.   Denied.  Dibbern additionally denies the allegations in Defendants' footnote 22.

107.   Admitted that Dibbern received this email but deny that it was consistent with School policy or the terms and conditions of a GSRA appointment. (Ex. 7, MSE Resource Guide Excerpted at 50).

108.   Admitted that Dibbern received this e-mail.  Again, this decision was in violation of the 30-day MSE notice requirement. (*Id.*)  Despite this escalating series of communications over a very short time frame and Goldman's August 30 communication pulling her funding, Goldman requested that Dibbern continue to work in her lab group. (Ex. 4, Green at 70-71).  Goldman did not consult the Peter Green, MSE Department chair, before making the decision to cut Dibbern off, or before communicating it to her. (*Id.* at 65).  Green ultimately had misgivings about how Goldman handled Dibbern's termination. (*Id.* at 69-74).  In addition, Green recognizes the impossible situation Goldman was putting Dibbern in by cutting her

off so abruptly. (*Id.* at 74, "But with Professor Goldman deciding that she didn't want to work with Jennifer anymore and she wanted her to drop the class, that really was it for that class, there's no way she can get a grade for it unless she gave her like a failing grade…Rachel….just wanted her to drop it so she didn't have to deal with it.")

109.   Denied that Dibbern did not take any steps to pursue her academic career.  Admit that she began a part-time job with AFT in September 2011 after her only funding stream was revoked a month earlier.

110.   Admitted that Dibbern received this email.  Even Green was baffled as to Goldman's demands that Dibbern continue to work without any support, financial or otherwise. (Ex. 4, Green at 108-109) ("In a more peculiar situation that she realizes. The situation is compounded by the fact that Rachel [Goldman] still asks Jennifer to work in the lab, but doesn't want to support her on a GSI;" "So I'm thinking, well, if you're not going to pay her eventually and your plan is to stop paying her, why would you expect her in the lab?")

111.   Admitted that Dibbern received this e-mail.

112.   Admitted that Dibbern received this email. Regardless of whether Dibbern received it or not, most of the information contained in the September 22 e-mail was not correct. (Ex. 4, Green at 81, "Q: So a fair amount of this information from Professor Goldman here in this September 22nd e-mail is not

correct, right?  A: At least yeah, I don't know what she was – I don't know what was going through her mind.")

113.   Admitted that this meeting occurred.  At this point, despite Goldman's communication, Dibbern was still, and had always been, in good standing academically. (Ex. 4, Green at 88).

114.   Admitted.

115.   Admitted.  Green acknowledges the difficult situation Goldman put Dibbern in. (Ex. 4, Green at 78, "Usually when a professor asks a student to leave the group it usually happens somewhere during the semester and there's an informal discussion that it's as simple as find a new advisor or they will tell them I'll just keep funding you until the end of the semester.")  He additionally acknowledged that what Goldman told Dibbern – that she needed to drop her classes, look for a new advisor, and take a leave of absence – was wrong. (*Id.* at 79).

116.   Admitted.

117.   Admitted that Dibbern received this e-mail.

118.   Admitted.

119.   Admitted.

120.   Admitted.

121.   Admitted that Dibbern was told this, but even Green recognizes that essentially, on September 27, Dibbern was told that her tuition support was being revoked and that she should dis-enroll. (Ex. 4, Green at 97).  In addition, Goldman informed Dibbern on September 27 that her [Goldman's] decision is final. (*Id.* at 174).

122.   Admitted.

123.   Admitted.

124.   Denied that Dibbern did not seek a new advisor or research group. Admit that Dibbern accepted a full time union organizing position in.  According to Green, by this time the decision may have already been made to dismiss Dibbern. (Ex. 4, Green at 177-178).

125.   Admitted but according to the department chair, Green, there is a department philosophy that a graduate student in between advisors for that semester would always get support. (Ex. 4, Green at 85).

126.   Admitted that Dibbern met with Green in response to an e-mail instruction she received from Prof. Goldman telling her that if she did not find another advisor that Green would grade her research units (303). Green denied knowing about the letter and refused to look at the printed copy Dibbern brought with her. (*Id.*)  Dibbern had not dropped the course prior to this point because she had questions and concerns about the implications of dropping the course and  no

one from the Department had been in contact with her. (304).   Dibbern met previously with Green in September 2011 to discuss her options after Dr. Goldman fired her. (299-302).   During that meeting he had promised to reach out to Goldman because of some concerns he had. (*Id.*)   From October 14, 2011 to November 9, 2011 there were no requests that Dibbern meet with anyone at MSE. (Ex. 4, Green at 178).

127.   Admitted that Green denied Dibbern's request to be graded so that she could receive credit for her class.

128.   Denied.  The decision had already been made on December 1, 2011. Green was not part of the meeting nor was he part of the decision to terminate. (Ex. 4, Green at 159) ("I didn't make the decision and I wasn't at a meeting where the decision was made"); (see also *Id.* at 185, 188).  He denies even knowing when the decision was made. (*Id.* at 178). E-mails with Academic HR indicate the notification to "discontinue" Dibbern was confirmed on December 2, 2011. (*Id.*at 190-191).  Green acknowledges Dibbern remained in good academic standing. (*Id.* at 88).

129.   Admitted.  Dibbern asked for a meeting with someone at the school who could give her information about what was going on with her credits and ability to continue in the program. (305-306).

130.   Admitted to the extent that it was the first time Plaintiff was put on notice of any effort to consider her for dismissal from the program.

131.   Admitted but during the meeting Dibbern was told by Green that the decision to cut her from the program was a final decision and that there would be no further discussions or appeals. (Ex. 3, Dibbern Aff. at 26).

132.   Denied.   Dibbern met with Ray-Johnson and requested information about the appeal process but was essentially told there wasn't one. (Dibbern Aff. at 27-30).   Ray-Johnson told Dibbern that the department had a lot of leeway and that unless she could prove, with solid documentation, that she had been dismissed for some protected reason, there was no sense in appealing. (*Id.*)   Additionally, Ray-Johnson speculated to Dibbern that even if she did appeal she would still have to find an advisor, and even if she was able to do that, that she would likely be retaliated against in the department, isolated, and unable to get so much as a letter of recommendation. (*Id.*)

133.   Admitted.

134.   Denied. (137).

135.   Admitted.

136.   Admitted.

137.   Admitted.  Dibbern also denies the allegations in defendants footnote 25.  Dibbern was willing as early as 2010 to work with the Dean of Students on matters related to her harassment. (Ex. 6, CAPS Records).

138.   Admitted.

139.   Admitted.

140.   Admitted.

141.   Admitted.

142.   Admitted that the letter attached those materials but deny that Dibbern was familiar with them.

143.   Admitted.

144.   Admitted..

145.   Admitted.

146.   Admitted.

147.   Admitted that Plaintiff's counsel did write a letter to the U.S. Department of Education.   It was not primarily for the purpose of opening a complaint.  (Ex. 23, U.S. Department of Education Letter).

148.   Admitted.

149.   Admitted.

150.   Denied.

151.   Admitted.

**Plaintiff's Counter-Statement of Disputed and Undisputed Facts**

**Presenting  Genuine Issues for Trial**

152.   The University's own published reports and statements demonstrate that the system in place while Ms. Dibbern was a student effectively ignored or discouraged dozens of reports of sexual harassment or assault on an annual basis. The number of reported incidents of sexual misconduct by students increased from 2  in 2009 and 3 in 2010 to 68 in 2011 and 75 in 2012 after the policy changed in 2011. (*See e.g*., Ex. 24, *UM Works to Boost Awareness, Prevention of Sexual Assault Amid Federal Investigation*).

153.   Ms. Dibbern's educational experience from 2007 to 2011, was overwhelmingly shaped by these policies and practices.   (*See* Dibbern Dep. *passim*).

154.   Dibbern  graduated  with  an  undergraduate  degree  from  the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts in 2007 and with a grade point average of 4.6 out of 5.0. Following her graduation from MIT, Ms. Dibbern enrolled in a Ph.D. program in Materials Science and Engineering ("MSE") at the University of Michigan, in Ann Arbor, Michigan. Ms. Dibbern received a Rackham merit fellowship and her participation in the Ph.D. program  was  fully  funded.   She remained in good academic standing

32

throughout her time at the University.  Her transcript reflects excellent grades with the exception of delays, withdraws, and other effects associated with the hostile environment and sexual misconduct Dibbern suffered. (Ex. 44, Dibbern Academic Transcript).

155.  From Dibbern's first day as a Ph.D. student within the Materials Science and Engineering program and up through 2011, Ms. Dibbern experienced a hostile sexual environment in the form of demeaning comments about female engineers and about women in science. (323-332).[6]  She also experienced threats of rape from within her study group.  (338-341).  She was subjected to physical violence (338), she was stalked and assaulted in a lab in 2009. (289).  She was regularly subjected to other sexualized and unwelcome conduct in the lab (349-350).

156.  Plaintiff attempted to tell her first advisor, Defendant Tresa Pollack, of the harassment and threats she suffered but was told to get over it and get back to the lab. (175).

---

[6] For instance, soon after she began, Dibbern was told by her student colleagues: "real women aren't engineers," "engineering women are different—they're not normal . . . they aren't like real girls. Not normal at all. Even if they are around, no one considers them women," among others. (323-24). "You had it easy because you're a woman in science. You have to admit it. You're less qualified but still able to get in just because you're a girl. (324).  A second student stated: "Let's be honest, the girls in engineering aren't *real* girls—no guy would look at them that way so we need more real girls to study with, date—something to look at in class. Real girls. There's something wrong with the engineering girls." (326).

157.   In January 2009, Plaintiff made a report to the University's Department of Public Safety. (Ex. 25, DPS Report). At that time, Plaintiff sought a new advisor in an attempt to revive her Ph.D. program after a disastrous and sexually hostile start.  Defendant Rachel Goldman took Plaintiff on after being advised of her experience.  (289-290).

158.   The University has not disputed that the conduct occurred, and does not deny that the natural and expected impact of the conduct Dibbern experienced would be to limit and undermine Dibbern's ability to enjoy an access to education.  In particular, that, the harassment she endured would make it harder to complete her research, to interact with fellow students, and to participate in academic events, among other things.   (Ex. 4, Green at 58-62); (Ex. 12, Hilgendorf at 59).

159.   Dibbern told Goldman about the harassment she suffered in the previous years of the program as the cause of her delay in her program. (*Id.*; Ex. 26, Goldman Email March 26, 2012; Ex. 6, CAPS Records); (see also Ex. 2, Goldman at 90-91) (admitting she was told generally of harassment but not that it was sexual in nature).  Ultimately, Goldman would cite those same delays and struggles from the first years of the program as a justification for Dibbern's dismissal.

160.  Other witnesses and contemporaneous records also confirm that Ms.
Dibbern reported the assaults to her advisors (Ex. 27, Picard Deposition at 18-25),
that she was later engaged in trying to fix the environment in the College of
Engineering by seeking training on sexual assault awareness (Ex. 27, Picard at 78-
79; Ex. 18, Cooper at 70), and by collectively advocating for a union for herself
and other graduate student researchers in part to change the hostile culture. (Ex.
27, Picard at 120-121; Ex. 18, Cooper at 62-63).

161.  Like many other survivors, Dibbern was afraid and discouraged by
the University's response; and was suspicious and scared of the peer-on-peer
dispute resolution system available to students.  (Ex. 27, Picard at 120, 130-135;
Ex. 18, Cooper at 175-178).

## I.    Dibbern's Organizing Activity

162.  In addition to advocating for sexual assault survivors through the
campus Sexual Assault and Prevention and Awareness Center ("SAPAC"),
Jennifer would also go on to take part in Union leadership and organizing for the
rights of GSRAs. The organizing campaign was met with hostility by Rachel
Goldman, the advisor who ultimately triggered Ms. Dibbern's complete rejection
from the PhD program. (Ex. 27, Picard at 55-57).  Goldman was aware of Dibbern's
involvement in the Graduate Instructors' Union ("GEO") and later learned of

Dibbern's involvement in the Graduate Researcher ("GSRA") organizing campaign. Goldman made clear through direct comments to Dibbern her opposition to the unionization of GSRAs. (Ex. 3, Dibbern Aff. at 20- 23).

## II.  The University's Defective, Deficient and Non-Compliant Dispute Resolution Process

163.  At all relevant times, sexual harassment and assault complaints at the University were all funneled through the Office of Student Conflict Resolution ("OSCR").  Ms. Dibbern was specifically "encouraged to address the culture of sexual assault and harassment through OSCR, as a peer-to-peer issue." (Doc. 23 at ¶ 19).  OSCR is a crucial part of the University's efforts to remain compliant with Title IX.  All students who were subjected to sexual assault or harassment were encouraged to proceed through this campus-wide, uniform policy, including undergraduate and graduate students as well as students on all of the University's campuses. Ms. Dibbern, as a student at the University of Michigan, had only this avenue to remedy the sexually hostile environment she was subjected to. The effectiveness of this process directly speaks to Plaintiff's claims for why the sexual harassment she was subjected to was never remedied.

164.  The University has been advertising its own aggregate data since it changed its sexual misconduct policy in 2011. The number of reported incidents of

sexual misconduct by students went from 2 in 2009 and 3 in 2010 to 68 in 2011 and 75 in 2012 after the policy changed in 2011. (Ex. 28, *University Releases First Sexual Misconduct Report*, Michigan Daily, available *at http://www.michigandaily.com/news/sexual-assault-reports-increase*); *See also* Ex. 29, SAPAC Director Discusses New Policy with Regents, Posted on February 21, 2014).

165.  The numbers of reports have risen markedly since the University changed its policy in 2011, from single digits to dozens and now to over 100 reports (although many were deemed not within the scope of the policy). (*See e.g* Ex. 28, *University Releases First Sexual Misconduct Report*, Michigan Daily, available *at http://www.michigandaily.com/news/sexual-assault-reports-increase*).

166.  One former student testified that she talked with Holly Rider-Milkovich, the Director of SAPAC, about "how engineering had a lot of women who, you know, would go to SAPAC for help and support but, you know, weren't going to be going forward with any kind of official stuff" and that Ms. Rider-Milkovich indicated that "a pattern of people who would get involved with SAPAC because they had been mistreated in some way and were not willing to go forward." (Ex. 18, Cooper at 175-78).

167.   The University's publication for Clery Act Reporting Compliance, called the "Annual Security & Fire Safety Report," details some of these statistics. (Ex. 30). This report shows the number of reports made to SAPAC, the University's Sexual Assault Prevention and Awareness Center have stayed relatively stable. (*See* Ex. 30, 2009-2010 Annual Report; Ex. 31 2012-2013 Annual Report).

168.   OSCR Assistant Director Stacey Vander Velde confirms that at all times up to August of 2011, the assailant would be allowed to cross-examine a complainant, even in cases of sexual assault or sexual misconduct. (Ex. 10, Vander Velde at 14, 15). Moreover, discipline was contingent on the complainant proving an assault by "clear and convincing evidence"). (*Id*.; See generally Ex. 32, Q & A for the Accused Student). Vander Velde also acknowledges that it was very rare" that anybody reporting sexual misconduct on campus would elect to use the OSCR process. (Ex. 10, Vander Velde at 23).

169.   The defective system that existed until August 2011 discouraged reporting and tracking of campus sexual misconduct and primarily impacted women, who make up 80 to 90% of the victims of sexual misconduct on campus. (Ex. 10, Vander Velde at 23, 24). The reporting levels for sexual misconduct on campus is a subject of University summary each year in the OSCR annual report.

To understand the extent of underreporting caused by the old system, (Ex. 10, ValderVelde at 26-27), the fact finder need only review the OSCR annual Reports for the 2008-2009 academic year through the 2012-2013 academic to see the striking change. (*Id*.) (Ex. 33, OSCR Annual Reports 2008 - 2013).

170.   Until August 2011, the University's Title IX Coordinator exercised no oversight or jurisdiction over peer-on-peer sexual harassment. The Office of Institutional Equity did not accept, track or tally the volume of peer-on-peer sexual misconduct on campus. (Ex. 34, Walesby Dep at 23, 26-30) ("I clearly knew that was not my responsibility"). What's more, after taking responsibility for oversight beginning in 2011, the Title IX coordinator did not consider it to be part of his duties to look back and determine whether there were any disturbing trends in campus sexual misconduct. (Ex. 34, Walesby Dep. at 55-56).

## III.   Retaliation for Exercising First Amendment Rights

171.   During the summer and fall of 2011, Goldman was one of nine members of the Senate Advisory Committee for University Affairs ("SACUA"), the highest level representative group representing faculty interest. According to the University's own materials:

> The Senate Advisory Committee on University Affairs (SACUA) is the executive arm of the University Senate and of the Senate Assembly. SACUA meets weekly and consists of nine members of the

Senate Assembly elected by the Assembly for three-year terms. On behalf of the Assembly, SACUA advises and consults with the President, Provost, and the Executive Officers of the University on matters of University policy. SACUA also coordinates and initiates governance activities and serves as an instrument for implementing the actions of the University Senate and the Senate Assembly.

The Chair of SACUA is also the Chair of the Senate Assembly. In addition to a responsibility as leader of the faculty, the Chair of SACUA also meets regularly with the Executive Officers and serves as the faculty representative in their deliberations.

(SACUA Description, available at http://facultysenate.umich.edu/sacua/, last visited Nov. 29, 2015).

172.   No minutes are publicly available for any SACUA meeting in June, July, or August of 2011, although the minutes of regular meetings are kept and recorded for those months in other academic years (http://facultysenate.umich.edu/sacua/meeting-minutes/, last visited November 29, 2015).

173.   Throughout, the summer of 2011, SACUA members, including Rachel Goldman were actively involved in developing or disseminating faculty wide advocacy in opposition to the GSRA organizing campaign.  (*See e.g.* Ex. 16, SACUA email correspondence).

174.   SACUA leadership under the chairmanship of Kate Barald was advocating for a strong opposition to the organizing campaign. (*Id.* at 14106-109)

("The university administration and academic leadership are opposed to the unionization of GSRAs").

175.   Later drafts tempered the faculty messaging to state that "the university administration and academic leadership are deeply concerned…" (*Id.* at 14052).

176.   The Dean of the College of Engineering, wrote SACUA to encourage opposition, noting in particular that the issue is "especially important in Engineering, which is home to about 50% of the GSRAs on campus." (*Id.* at 14052)

177.   Goldman was corresponding with other faculty to track interest and turnout of engineering students in the organizing campaign informational sessions. (Ex. 35, Atzmon email July 19, 2011).  In particular, Goldman received an update about Jennifer Dibbern's attendance and participation in the informational meeting. *Id*.

178.   Rachel Goldman knew about Dibbern's role in GEO, the Teaching Assistants' Union, and had direct conversations with Dibbern about how the Research Assistant's organizing campaign would destroy research work at the University. (Ex. 18, Cooper at 67; Ex. 3, Dibbern Aff. at 22).

179.   Dibbern coordinated her union activities so as not to interfere with her research work and to align with flexible scheduling provided to other similarly situated students in Goldman's research group. (Ex. 18, Cooper at 68-69).

180.   When Goldman found out that Dibbern was actually involved in the research assistants ("GSRA") organizing campaign, Goldman demanded that Dibbern cease these activities and her activities with SAPAC. (Ex. 18, Cooper at 68-69) ("So then Professor Goldman sat her down and said, "You need to quit being involved with this union stuff and you need to quit SAPAC.");   (Ex. 3, Dibbern Aff. at 20-25).

181.   This was in contrast to the treatment of other MSE graduate students involved with extra curricular activities. Eric Zech, one similarly-situated male student in Goldman's research group, was regularly absent and participated in a travel soccer league that demanded practice or games five or six days a week. Zech was never asked to scale back his activities. (Ex. 19, Zech at 43, 69).

182.   August 8, 2011 was a particularly important date for the GSRA organizing campaign, as a hearing regarding the status of the campaign had been scheduled at the Michigan Employment Relations Committee ("MERC"), the State Agency charged with oversight and administrative decision-making over public employee Unions). (Ex. 2, Goldman at 141-143).

183.   On Friday August 5, 2011, Goldman met with Dibbern and had extensive questioning about the status of the Union, involvement.  (Ex. 3, Dibbern Aff. at 20-25).

184.   Goldman's own notes reflect that she met with her research group on Friday August 5, 2011 to discuss the Monday hearing.  (Ex. 36, August 3, 2011 Scheduling Email) (Goldman notes "discussed MERC").

185.   Goldman reiterated her demands that Dibbern cease her protected unionizing activity in a harsh August 8, 2011 email, requiring Dibbern to follow a day-to-day activity log known as the "biweekly goals sheet."  (Ex. 21, Goldman Email August 8, 2011).   ("…What did you do today" … "Again I ask, what did you do today"… "I realize you have many other things going on but an increased [sic] in your focus on research is urgently needed.  This will probably require you to decrease your involvement in non-research related activities"); (Ex. 37, biweekly goals sheet).

186.   Even though Dibbern had done what Goldman asked, within a week Goldman sent another email. This time explicitly threatening withdraw of Dibbern funding after the fall 2011 term.  (Ex. 38, Goldman email August 13, 2011) ("At this point I cannot commit to research funds beyond the fall term 2011 unless some extraordinary changes occur.").

187.   Goldman continues the march toward termination.   Each email modified the previous.  On or about Sept. 26, 2011, Dibbern met with Peter Green to discuss options for how to continue her PhD, during this meeting Green spoke to Dibbern about dropping the 990 class and taking other classes instead and finding another advisor.  (Ex. 4, Green at 101, 102).

188.   The next day, Goldman wrote Dibbern to notify her that she would have to take actions to drop her research class mid-term, and tuition for the term would be revoked, but that Dibbern would be converted into an hourly employee to work in Goldman's Lab at a rate 50% less than the GSRA pay.   (Ex. 39, Goldman email, September 27, 2011) ("…If you would like to be enrolled this term, I understand you could enroll in 1 credit of the seminar, MSE 890, for a cost of approximately $2540"); (Ex. 4 Green Dep. at 108, 109) (noting Goldman was cutting Dibbern but asked her to continue working on the lab for an hourly rate).

189.   Goldman also suggested that Dibbern could transfer to Professor Green's section and be graded by him if she was unable to find an advisor by the end of the year. Although Green was copied on the email, he did not let Dibbern know he would not do that.  (Ex. 4, Green at 118) (Q: So that would be just wrong? A: Yeah, absolutely…wasn't even plausible).

190.   The actions threatened by Rachel Goldman were unauthorized and in violation of Department's own policies and procedures.   University faculty and staff confirm that Goldman's proposals and threats are misleading and inconsistent with policy.  (Ex. 4, Green at 96); (Ex. 12, Hilgendorf at 86) ("A leave of absence was just an offer.  I don't know why professor Goldman, she words it harshly here, it comes across as demanding that she take a leave of absence.")

191.   Later, Dibbern asked for a meeting with Green to ask how she could be graded for her 990 class.  At the meeting on December 16, 2011, Dibbern was told for the first time that the College of Engineering had recommended academic dismissal to Rackham.  (Ex. 4, Green at 189).

192.   Up until this time no one had even mentioned to Dibbern the possibility of Academic dismissal was under consideration.  (Ex. 4, Green at 189). No written notice of the meeting had been provided.

193.   A termination letter draft by Peter Green claimed lack progress on thesis research as the reason for discontinuance. (Ex. 40, Termination letter, December 16, 2011). Green had never discussed her thesis with her.

194.   Ultimately, Dibbern found herself removed from Rackham with a "W" for withdraw on her transcript because Goldman and Green couldn't agree on a process.  (Ex. 12, Hilgendorf at 136).

195.   Undisclosed to Dibbern, the decision to terminate Dibbern was made two weeks earlier on December 1, 2011 in a meeting attended by Goldman and others from Rackham, College of Engineering, and Academic Human Resources. (Ex. 41, Wagner/Edmund December 2, 2011 Emails).

196.   Dibbern was not told the December 1, 2011 meeting was scheduled, nor was she notified of the outcome.  On December 2, 2011, notification was sent to Rackham graduate school that Jennifer Dibbern was to be discontinued (Ex. 41, Wagner/Edmund December 2, 2011 Emails) ("Will you please discontinue Ms. Jennifer Dibbern Materials Science and Engineering, from the PhD program effective today.")  Rackham administrator Denise Edmund wrote back to confirm the same day.   (Ex. 41 Wagner/Edmund email Dec. 2, 2011) (confirming disenrollment "effective today").[7]

197.   Green was not part of the meeting nor was he part of the decision to terminate. (Ex. 4, Green at 185, 188).  He denies even knowing when the decision was made. (*Id.* at 178).

198.  In the secret dismissal meeting on December 1, 2011, Rachel Goldman directly referenced Dibbern's extra-curricular activities and involvement

---

[7] Rackham administrator Denise Edmond sent a new email confirming that the Dibbern dismissal would be "effective today," after the December 16, 2011 meeting.  (Ex. 42, Edmund email December 16, 2011).

in Union organizing and SAPAC advocacy as a justification to terminate Dibbern from the Rackham Ph.D. program. (Ex. 43, Frumkin at 40).

199.   Goldman was at the meeting, where she urged discontinuing Dibbern from Rackham.   In particular, Goldman voiced her continued opposition to the GSRA organizing campaign and her belief that GSRA's should not be organizing:

> Q:   What did she tell you about her opinion of the organizing campaign?
>
> A:   In general, she said that she didn't think GSRAs, it was appropriate for GSRAs to organize.  She also said that there was – – it was one of the items that she listed as taking time away from Jennifer Dibbern's studies.
>
> Q:   What other items, if you recall, what other items did she list?
>
> A:   With respect to her studies?
>
> Q:   Yes.
>
> A:   There was a reference to another academic class and Reference to her involvement or work with SAPAC, which is a sexual assault and prevention organization that I believe is a part of the Student life organization at the University.

(Ex. 43, Frumkin at 39-40).

200.   MSE Department Chair Peter Green also admits that the meeting on December 1, 2011 violated Dibbern's procedural rights. (Ex. 4, Green at 199)

("Well, my understanding was that you can't do that…"); (Ex. 12, Hilgendorf at 87-88).

201. After news of Dibbern's termination became public, Goldman, Barald, and other faculty leaders involved with SACUA corresponded with and lobbied Goldman's students to make public statements against Dibbern. On Feb. 3, 2012, Barald emails SACUA suggesting a public response from Goldman's students would be the best way to undermine Dibbern's claims, which Goldman then immediately forwarded to her student Eric Zech. (Ex. 20, Zech/SACUA Email February 3, 2011.)

202. By February 7, 2011, Zech had responded to a Union advocacy piece by direct email (copying SACUA) and had sent out an Op-Ed to the Michigan Daily regarding Dibbern's academic performance and extracurricular activities. (Ex. 22, Zech Op-ed) (the piece directly acknowledged Dibbern's protected activity as a justification for the dismissal: "Ms. Dibbern was involved in other activities besides GEO, including SAPAC").

203. Thereafter, Barald also requested copies from Zech to disseminate the letter to the National publication Chronicle for Higher Education (CHE). (Ex. 20, Zech/SACUA emails Feb. 7, 2011).

Respectfully submitted,

BLANCHARD & WALKER PLLC


/s/ David M. Blanchard
David M. Blanchard (P67190)
221 N. Main Street
Suite 300
Ann Arbor, MI 48104
(734) 929 – 4313
Blanchard@bwlawonline.com

Dated: November 30, 2105


## CERTIFICATE OF SERVICE

I, herby certify that on November 30, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

Respectfully submitted,


BLANCHARD & WALKER, PLLC

/s/ David M. Blanchard
David M. Blanchard (P67190)
Attorney for Plaintiff
221 North Main Street, Suite 300
Ann Arbor, MI 48104
(734) 929-4313
blanchard@bwlawonline.com



Dated: November 30, 2015