## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JENNIFER DIBBERN                                      Case No.   12-cv-15632

             Plaintiff,

v.                                                   Hon.  Sean F. Cox

The UNIVERSITY OF MICHIGAN,
a Domestic Nonprofit Corporation,
The BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, a public
constitutional body corporate,
MARY SUE COLEMAN,
President of The University of Michigan,
an individual acting in her official capacity,
RACHEL S. GOLDMAN, in her individual
and official capacity, TRESA POLLOCK,
in her individual and official capacity, and
PETER GREEN in his individual and official capacity.

             Defendants.

---

David M. Blanchard (P67190)              Megan P. Norris (P39318)
BLANCHARD & WALKER, PLLC                 Brian M. Schwartz (P69018)
Attorneys for Plaintiff                  MILLER, CANFIELD, PADDOCK AND
221 N. Main Street                       STONE, PLC
Suite 300                                Attorneys for Defendants
Ann Arbor, MI 48104                      150 West Jefferson, Ste. 2500
(734) 929-4313                           Detroit, MI 48226
blanchard@bwlawonline.com                (313) 963-6420
                                         norris@millercanfield.com
                                         schwartzb@millercanfield.com

---

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ....................................................................ii

**CONTROLING OR MOST APPROPRIATE AUTHORITES** .............iv

**TABLE OF AUTHORITIES** ..........................................................vi

**COUNTER-STATEMENT OF ISSUES PRESENTED** ........................x

**OVERVIEW** .................................................................................1

**COUNTER-STATEMENT OF DISPUTED FACTS** .............................2

**SUMMARY OF KEY FACTS** .........................................................2

**LAW** .........................................................................................10

   **I.   Summary Judgment Standards** ......................................10

   **II.   Plaintiff's Retaliation Claims (Counts II, V, and VIII)**...............10

      1.   Plaintiff's First Amendment Retaliation Claim Should Not Be Dismissed....................................................................12

      2.   Plaintiff's Title IX and ELCRA Retaliation Claims Should Not Be Dismissed....................................................................17

   **III.   Plaintiff's Due Process Claim (Count IV)**...................................21

      1.   Substantive Due Process .................................................22

      2.   Procedural Due Process....................................................22

**IV.   Plaintiff's ELCRA Disparate Impact Claim (Count VII) .......... 25**

   1.   Plaintiff's Disparate Impact Claim Is Not Time-Barred ................. 26

   2.   Plaintiff Has Established a *Prima Facie* Case of Disparate Impact

   Sexual Discrimination ........................................................................ 27

**V.   Plaintiff's Sex Discrimination Claims (Count I and VI) .............. 29**

   1.   Plaintiff's Sex Discrimination Claims Are Timely ......................... 31

   2.   Defendants Had Actual Notice of the Discrimination and Their

   Failure to Act Constitutes Deliberate Indifference ................................ 34

**VI.   Plaintiff's Equal Protection Claim (Count III)............................ 36**

   1.   Plaintiff's Equal Protection Claim Is Not Time-Barred................. 36

   2.   Plaintiff Has Established a *Prima Facie* Equal Protection Violation

   37

**VII.   The Possibility of Prospective Injunctive Relief ........................ 37**

**VIII.   Defendants Are Not Protected by Qualified Immunity ........... 39**

   1.   Plaintiff's First Amendment Right Was Clearly Established.......... 40

   2.   Plaintiff's Right to Equal Protection Was Clearly Established....... 40

   3.   Plaintiff's Due Process Rights Were Clearly Established.............. 41

**IX.   RELIEF REQUESTED ................................................................. 42**

# CONTROLING OR MOST APPROPRIATE AUTHORITES

*Board of Curators of University of Missouri v. Horowitz*,

    435 U.S. 78, 98 S. Ct. 948 (1978) .................................................. 30, 31, 48

*Board of School Commissioners of City of Indianapolis v. Jacobs*,

    420 U.S. 128, 95 S. Ct. 848 (1975) ........................................................... 45

*Clemente v. Vaslo*, 679 F.3d 482 (6th Cir. 2012) ............................. 19, 23, 24

*Crawford v. Metro. Gov't of Nashville & Davidson County*,

    555 U.S. 271, 129 S. Ct. 846 (2009) ................................................... 26, 28

*Davis v. Monroe County Board of Ed.*,

    526 U.S. 629, 119 S. Ct. 1661 (1999) ........................................................ 37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

    528 U.S. 167, 120 S. Ct. 693 (2000) ......................................................... 46

*Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988) ...................................... 43

*Jackson v. Birmingham Bd. of Ed.*,

    544 U.S. 167, 125 S. Ct. 1497 (2005) ................................................. 26, 27

*Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003) ................... 30, 31, 32

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ............. 18, 19, 28

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)...................... 40

*Regents of University of Michigan v. Ewing*,

    474 U.S. 214, 106 S. Ct. 507 (1985) ................................................. passim

*Thomas v. Collins*, 323 U.S. 516, 65 S. Ct. 315 (1945) ......................... 20, 47

*Vance v. Spencer Cty Public School District*,

    231 F.3d 253 (6th Cir. 2000) ............................................................... 41, 43

## TABLE OF AUTHORITIES

### CASES

*Allen v. Highlands Hospital Corp.,* 545 F.3d 387 (6th Cir. 2008) ......... 34, 35

*Barrett v. Kirtland Community College,*

    245 Mich. App. 306 (2001) ................................................................. 18, 19

*Bell v Ohio State University*, 351 F.3d 240 (6th Cir. 2003) ........................ 29

*Bloch v. Ribar*, 156 F.3d 673 (1998) ............................................................. 47

*Board of Curators of University of Missouri v. Horowitz,*

    435 U.S. 78, 98 S. Ct. 948 (1978) ................................................. 30, 31, 48

*Board of School Commissioners of City of Indianapolis v. Jacobs*,

    420 U.S. 128, 95 S. Ct. 848 (1975) .......................................................... 45

*Booker v. Brown & Williamson Tobacco Co.*,

    879 F.2d 1304 (6th Cir. 1989) .................................................................. 26

*Chambers v. Trettco*, 463 Mich. 297 (2000) ................................................. 37

*Clemente v. Vaslo*, 679 F.3d 482 (6th Cir. 2012) ............................. 19, 23, 24

*Craig v. Boren*, 429 U.S. 190, 97 S. Ct. 451 (1976)..................................... 48

*Crawford v. Metro. Gov't of Nashville & Davidson County,*

    555 U.S. 271, 129 S. Ct. 846 (2009) ................................................... 26, 28

*Davis v. Monroe County Board of Ed.*,

    526 U.S. 629, 119 S. Ct. 1661 (1999) ...................................................... 37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

    528 U.S. 167, 120 S. Ct. 693 (2000) ........................................................ 46

*Galeski v. City of Dearborn*, 690 F. Supp. 2d 603 (E.D. Mich. 2010) ......... 39

*Garg v. Macomb County Community Mental Health Services*,

    472 Mich. 263 (2005) .......................................................................... 34, 40

*Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988) ..................................... 43

*Haynie v. State*, 468 Mich. 302 (2003) ........................................................ 39

*Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508 (2002) ................................ 47

*Jackson v. Birmingham Bd. of Ed.*,

    544 U.S. 167, 125 S. Ct. 1497 (2005) ................................................ 26, 27

*Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003) ................... 30, 31, 32

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ............ 18, 19, 28

*Lautermilch v. Findlay City Schs.*, 314 F.3d 271 (6th Cir. 2003) ............... 44

*Matthews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1975) ......................... 31

*Moore v. Kuka Welding Systems*, 171 F.3d 1073 (6th Cir. 1999) ............... 22

*Morrissey v. Brewer,* 408 U.S. 471, 92 S. Ct. 2593 (1972) ......................... 30

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ..................... 40

*Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009) ............... 41

*Regents of University of Michigan v. Ewing*,

    474 U.S. 214, 106 S. Ct. 507 (1985) ................................................. passim

*Reisman v. Regents of Wayne State Univ.*,

   188 Mich. App. 526 (1991)..........................................................32

*Roberson v. Occupational Health Centers of Am., Inc.*,

   220 Mich. App. 322 (1996).........................................................34

*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005) ...........................................47

*Satterfield v. State of Tenn.*, 295 F.3d 611 (6th Cir. 2002)...........................17

*Simmonds v. Genesee County*, 682 F.3d 438 (6th Cir. 2012).....................46

*Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999) .............................................37

*Stanley v. Trustees of the California State University*,

   433 F.3d 1129 (9th Cir. 2006)....................................................40

*Tearpock-Martini v. Borough of Shickshinny*,

   756 F.3d 232 (3rd Cir. 2014) .....................................................44

*Thomas v. Collins*, 323 U.S. 516, 65 S. Ct. 315 (1945) .........................20, 47

*Thomson v. Harmony*, 65 F.3d 1314 (6th Cir. 1995)...................................45

*Vance v. Spencer Cty Public School District*,

   231 F.3d 253 (6th Cir. 2000).................................................41, 43

*Vereecke v. Huron Valley School District*,

   609 F.3d 392 (6th Cir. 2010)......................................................19

*Wilson v. Garcia*, 471 U.S. 261, 105 S. Ct. 1938 (1985) .............................43

*Zwick v. Regents of the University of Michigan*,

2008 U.S. Dist. LEXIS 34472 (E.D. MI 2008) .................................. 31, 49

## STATUTES

42 U.S.C. §1983 ....................................................................... 18, 43, 46, 47

Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2201 *et seq.* .......... passim

Michigan Public Employment Relations Act, MCL 423.201 *et seq.* ........... 20

Title IX ................................................................................................ passim

Title VII ............................................................................................... 26, 39

## RULES

Fed. R. Civ. P. 56 ........................................................................................ 17

Fed. R. Evid. 702(a) .................................................................................... 35

## CONSTITUTIONAL PROVISIONS

First Amendment .......................................................................... 18, 19, 21

Fourteenth Amendment ...................................................................... 29, 44

## COUNTER-STATEMENT OF ISSUES PRESENTED

I.  Has Plaintiff produced evidence that would allow a reasonable jury to conclude that she was engaged in conduct protected under the First Amendment, Title IX, and ELCRA, that a casual connection exists between that conduct and the retaliatory adverse educational action, and that Defendants' stated reasons for the adverse action are pretext?

**Plaintiff asserts that the answer to this question is "Yes."**

II.  Has Plaintiff provided evidence that would allow a reasonable jury to conclude that Defendants violated her right to due process because the decision to dismiss Plaintiff from the College of Engineering was the opposite of "careful and deliberate" and constituted a "substantial departure from accepted academic norms"?

**Plaintiff asserts that the answer to this question is "Yes."**

III.  Are Plaintiff's claims in Counts I, III, VI, and VII timely?

  a.  Did Plaintiff suffer actionable sexual harassment after December 21, 2009?

  b.  Was Plaintiff denied equal protection under the University's anti-harassment and sexual harassment reporting polices after December 21, 2009?

  c.  Does the continuing violations doctrine apply to Plaintiff's sexual harassment claims brought under federal law (Counts I and III)?

**Plaintiff asserts that the answer to each of these questions is "Yes."**

IV.  Has Plaintiff provided evidence that would allow a reasonable jury to conclude that Defendants' policies and actions had an adverse disproportionate affect on females amount to intentional discrimination in violation of ELCRA and the Equal Protection clause of the Fourteenth Amendment?

**Plaintiff asserts that the answer to this question is "Yes."**

    V.    Has Plaintiff provided evidence that would allow a reasonable jury to conclude that she suffered sexual harassment that substantially interfered with her educational environment, in violation of Title IX and ELCRA?

**Plaintiff asserts that the answer to this question is "Yes."**

    VI.    Is Plaintiff's request for prospective injunctive relief moot because she is no longer enrolled as a student?

**Plaintiff asserts that the answer to this question is "No," except with respect to prospective injunctive relief related to the University's sexual harassment reporting policy.**

    VII.    Has Plaintiff demonstrated that her constitutional rights under the First Amendment and the Equal Protection and Due Process clauses of the Fourteenth Amendment were "clearly established" at the time those rights were violated by the Individual Defendants, such that those Defendants are not entitled to qualified immunity?

**Plaintiff asserts that the answer to this question is "Yes."**

**OVERVIEW**

The fundamental protection provided by Title IX, 20 U.S.C. §1681 *et seq.*, prohibits a student from being excluded from participation in, being denied the benefits of, or being subjected to discrimination in any educational program that receives federal financial assistance. Plaintiff Jennifer Dibbern suffered all three: exclusion, denial of benefits, and discrimination, all within the relevant limitations period. Rather than fulfilling their legal obligations, Defendants punished Plaintiff for being a woman, and for being harassed. Defendants then retaliated against Plaintiff for trying to protect herself from harassment and eliminate a hostile environment where the University had failed to do so.

Plaintiff's claims against Defendants are:

| | |
|---|---|
| Count I: | sex discrimination in violation of Title IX (sexual harassment) |
| Count II: | retaliation in violation of Title IX |
| Count III: | §1983 Equal Protection violation |
| Count IV: | §1983 Due Process violations |
| Count V: | §1983 First Amendment violation (retaliation) |
| Count VI: | sex discrimination in violation of ELCRA (disparate treatment and sexual harsassment) |
| Count VII: | sex discrimination in violation of ELCRA (disparate impact) |

1

Count VIII:          retaliation in violation of ELCRA

## **COUNTER-STATEMENT OF DISPUTED FACTS**

Plaintiff refers to her Counter-Statement of Disputed Facts, filed contemporaneously with this Reponse.

## **SUMMARY OF KEY FACTS**

In fall 2007, Plaintiff Jennifer Dibbern enrolled as a graduate student in the Materials Science and Engineering ("MSE") program in the College of Engineering ("COE") at the University of Michigan. Beginning almost immediately, Plaintiff was subjected to sexual harassment from her male peers in the MSE program – a hostile environment that continued throughout Plaintiff's time in the program, causing harm to Plaintiff's personal and professional life. Plaintiff responded to this harassment by seeking help from faculty in the COE, seeking psychological counseling, rearranging her academic coursework, and moving residences. Later, motivated by her experience as a victim, Plaintiff engaged in a union organizing campaign for graduate student research assistants ("GSRAs") as a means of changing University policy toward sexual harassment on campus. Throughout Plaintiff's time at the University, Defendants failed to take any steps to remediate the sexual harassment. Worse yet, Defendants kicked Plaintiff out

of the MSE program in December 2011, and they used the lasting effects of the sexual harassment in an attempt to justify their actions.

From Plaintiff's first day as a Ph.D. and up through 2011, Plaintiff experienced a hostile sexual environment in the form of demeaning comments about female engineers and women in the sciences. For example, Plaintiff's male peers told her that: "real women aren't engineers"; "engineering women are different—they're not normal"; "no one considers them women"; "You had it easy because you're a woman in science . . . You're less qualified but still able to get in just because you're a girl"; "the girls in engineering aren't *real* girls—no guy would look at them that way so we need more real girls to study with, date—something to look at in class." (Ex. 1, Dibbern at 323-324, 326).

The harassment did not just stop with insults. Plaintiff was regularly subjected to sexualized and unwelcomed conduct in the lab, and even experienced threats of rape from within her study group. (*Id.* at 338-341, 349-350).

After receiving the rape threat, Plaintiff met with a counselor at the University's Counseling and Psychological Services ("CAPS") office. The counselor advised Plaintiff to take a brief leave of absence and return to her parents' home in Iowa, which she did. (*Id.* at 184-186). When Plaintiff

returned to Michigan, her first advisor in the MSE program, Defendant Pollock, reacted appallingly, telling Plaintiff that she could not let the sexual harassment get in the way of her research. (*Id*. at 193). Plaintiff also rescheduled her personal affairs and MSE coursework in order to avoid her harassers. (*Id*. at 203-205). She reported to the University's Department of Public Safety ("DPS") stalking behavior from one of her harassers, Norman Meznarich. (Ex. 25, DPS Report). Plaintiff requested that DPS not contact Meznarich out of fear of retaliation from him and his friends. (Ex. 1, Dibbern at 367). Because of these concerns, Plaintiff was instructed to reach out to the University's Office of Institutional Equity ("OIE"), who advised Plaintiff that she could not be protected from retaliation. (*Id.* at 413-418).

On December 23, 2009, Pollock terminated Plaintiff's appointment for the upcoming winter 2010 semester after claiming that Plaintiff was "not serious" about finishing her research. (Defs. Ex. 33, Pollock Email Dec. 23, 2009). In justifying this rationale, Pollock used Plaintiff's harassment against her, citing her leave of absence and delayed coursework (as a result of rescheduling to avoid her harassers) as evidence of her non-commitment. (*Id*.)

Following her termination by Pollock, Plaintiff was left without a Ph.D. advisor. She reached out to Defendant Green, Chair of the MSE

4

Department, who referred her to Goldman, another MSE professor and Chair of the Graduate Program. (Ex. 1, Dibbern at 298-299) (Ex. 4, Green at 6). Plaintiff met with Goldman in January and February 2010 (Ex. 1, Dibbern at 276-278, 286-289). During the February meeting, Plaintiff discussed the harassment she had suffered during her first two years in the MSE program. (Ex. 1, Dibbern at 286-289) (Ex. 2, Goldman at 87, 91) (Ex. 12, Hilgendorf at 26-33).

Defendant Goldman took Plaintiff into her research group in February 2010. The change in advisors required Plaintiff to change her research focus, causing further setback in her timeline to become a doctoral candidate. (Ex. 3, Dibbern Affidavit at 2) (Ex. 4, Green at 36-37). Despite these setbacks, she began 2011 with a plan to complete her preliminary examination by the fall of that year. (Ex. 3, Dibbern Aff. at 2).

Unfortunately for Plaintiff, the sexually hostile environment persisted, as several of her harassers continued to have shared use of Goldman's lab space on Central Campus. (Ex. 1, Dibbern at 377). One of those harassers, Michael Warren, would subject Plaintiff to "respirator kisses" – he would force his face close to hers or grab her head to force their faces together. (*Id.* at 349-350).

Despite the continued harassment, Plaintiff made steady progress toward her Ph.D. candidacy. In June 2011, she met with Goldman to discuss an abstract she had prepared that had received favorable comments from the lab's former post-doctoral student mentor. (Ex. 3, Dibbern Aff. at 15). Plaintiff also received several awards for her work as a student instructor in the COE. (Ex. 1, Dibbern at 433-435).

During this time, Plaintiff also became involved in campus organizations. Motivated by her own experiences and frustrations with the University's response to her harassment, Plaintiff worked with the University's Sexual Assault Prevention and Awareness Center ("SAPAC") and the Graduate Employees Organization ("GEO") to develop and implement a comprehensive sexual harassment training program for graduate students. (Ex. 13, Rider-Milkovich at 14-18, 24-26). Plaintiff realized that GSRA unionization offered a potential means to incorporate the harassment training in a contract for all GSRAs. (Ex. 1, Dibbern at 271).

Goldman fiercely opposed the GSRA unionization effort. Throughout the summer of 2011, Goldman was actively involved in developing and disseminating faculty-wide advocacy in opposition to the GSRA organizing campaign. (See e.g. Ex. 16, SACUA Email Correspondence). Goldman also corresponded with other faculty to track interest and turnout of engineering

students in the organizing campaign's informational sessions. (Ex. 36, Atzmon Email July 19, 2011). In particular, Goldman received an update about Plaintiff's attendance and participation in the informational meeting. (*Id*.)

Goldman knew about Plaintiff's role in GEO, and had direct conversations with Dibbern about how the GSRA's organizing campaign would destroy research work at the University. (Ex. 18, Cooper at 67; Ex. 3, Dibbern Aff at 22-23). And when Goldman found out that Plaintiff was actually involved in the GSRA organizing campaign, Goldman demanded on August 8, 2011, that Plaintiff cease these activities and her activities with SAPAC. (Ex. 18, Cooper at 68-69) (Ex. 3, Dibbern Aff at 25). Goldman also demanded that Plaintiff track her day-to-day activity. (Ex. 37, Biweekly Goals Sheet); (Ex. 21, Goldman Email Aug. 8, 2011); (Ex. 1, Dibbern. at 383-384).

Goldman grew increasingly antagonistic toward Plaintiff throughout August and September of 2011. Within a week Goldman sent another email, this time explicitly threatening to withdraw Plaintiff's funding after the fall 2011 term. (Ex. 38, Goldman Email Aug. 13, 2011) ("At this point I cannot commit to research funds beyond the fall term 2011 unless some extraordinary changes occur."). Goldman made good on this threat in an

August 30, 2011 email in which she informed Plaintiff that would not receive research funding beyond the fall term. (Defs. Ex. 52, Goldman Email Aug. 30, 2011). Goldman also informed Plaintiff that she would be dropping her from a research class unless she could find a new advisor to grade her work. (Ex. 39, Goldman Email Sept. 27, 2011). These actions by Goldman were unauthorized and against Department policy. (Ex. 4, Green at 96); (Ex. 12, Hilgendorf at 86).

Plaintiff arranged for a meeting with Green on December 16, 2011. At that meeting, Plaintiff was informed for the first time that the COE had recommended her academic dismissal to the University. (Ex. 4, Green at 189) (Ex. 3, Dibbern Aff at 26). A termination letter drafted by Green cited lack of progress on thesis research as the reason for discontinuance. (Ex. 40, Termination Letter, Dec. 16, 2011).

Unbeknownst to Plaintiff, however, the decision to terminate was made at a December 1, 2011 meeting attended by Goldman and others from Rackham Graduate School, the College of Engineering, and the University's Academic Human Resources. (Ex. 41, Wagner/Edmund Emails Dec. 2, 2011). At the meeting, Goldman directly referenced Plaintiff's extra-curricular activities and involvement in union organizing and SAPAC advocacy as justifications to terminate Plaintiff from the Ph.D. program.

(Ex. 43, Frumkin at 40). Rackham confirmed Plaintiff's disenrollment the next day. (Ex. 41, Wagner/Edmund Emails Dec. 2, 2011). Plaintiff was never informed of the meeting, nor was she notified of the outcome until her meeting with Green on December 16.

For his part, Green denies being part of the December 1, 2011 meeting or being part of the decision to terminate. (Ex. 4, Green at 185, 188). He also admits that the secret meeting violated Plaintiff's procedural rights. (*Id.* at 199) ("Well, my understanding was that you can't do that…").

Defendants have attempted to characterize Plaintiff as a poor student, disinterested in her studies and lacking commitment. The reality, however, is that Plaintiff suffered numerous setbacks during her time in the MSE program. She faced harassment and discrimination from her male peers because she was a woman in a field dominated by men. Her complaints to faculty were dismissed. And when Plaintiff took affirmative steps to change the University's hostile sexual environment, she was kicked out of the MSE program.

# LAW

## I.   Summary Judgment Standards

If a reasonable jury could return a verdict for the plaintiff, then a genuine dispute of material fact exists and summary judgment may not be granted. *Satterfield v. State of Tenn.*, 295 F.3d 611, 615 (6th Cir. 2002); Fed. R. Civ. P. 56. In this case, Plaintiff has presented evidence of sexual discrimination, retaliation, and unequal treatment in violations of her rights under Title IX, ELCRA, and the First and Fourteenth Amendments of the United States Constitution. Defendants' motion for summary judgment should be denied.

## II.   Plaintiff's Retaliation Claims (Counts II, V, and VIII)

Plaintiff alleges she was retaliated against for complaining about sexual discrimination, organizing GSRAs to unionize, and advocating for a change in the University's sexual-harassment reporting policy. She brings claims for retaliation under three separate (but not mutually exclusive) theories: Title IX; ELCRA; and the First Amendment/§1983 (Counts II, VIII, and V, respectively).

The *prima facie* elements of a retaliation claim under Title IX and ELCRA are well-understood: Plaintiff must show (1) that she engaged in protected activity; (2) her exercise of such activity was known by a

Defendant; (3) that she suffered a materially adverse educational action; and (4) a causal connection exists between the protected activity and the adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (elements of a Title VII claim)[1]; *Barrett v. Kirtland Community College*, 245 Mich. App. 306, 315 (2001) (ELCRA). Under federal law the causation element is evaluated under a "but-for" standard, *Laster*, 746 F.3d at 730, whereas under Michigan law Plaintiff must demonstrate that the protected activity was a "significant factor" in the adverse educational action, *Barrett*, 245 Mich. App. at 315.

Similarly, the *prima facie* elements of a First Amendment retaliation claim are: (1) the plaintiff engaged in constitutionally protected conduct; (2) the defendant took an adverse action against the plaintiff that would deter an ordinary person from continuing to engage in that conduct; and (3) the protected conduct was a substantial or motivating factor in the adverse action. *Laster*, 746 F.3d at 733. The Sixth Circuit interprets "motivating factor" to mean "the but-for cause – without which the action being challenged simply would not have been taken." *Vereecke v. Huron Valley School District*, 609 F.3d 392, 400 (6th Cir. 2010). If Plaintiff presents a

---

[1] Plaintiff agrees with Defendants that a claim of retaliation under Title IX should be analyzed using the same legal framework as Title VII retaliation claims.

*prima facie* case, Defendants are nevertheless entitled to summary judgment if they can show by a preponderance of the evidence that they would have taken the same action anyway. *Clemente v. Vaslo*, 679 F.3d 482, 494 (6th Cir. 2012).

While retaliation claims under Title IX (and ELCRA) and the First Amendment are similar insofar as they both concern retaliation for protected conduct, they are distinct claims and failure to prove one does not necessitate dismissal of the other. *Laster*, 746 F.3d at 732.

### 1. Plaintiff's First Amendment Retaliation Claim Should Not Be Dismissed

A reasonable jury could find that Defendants dismissed Plaintiff from the COE because of Plaintiff's efforts directed at organizing GSRAs and advocating for a change in University sexual harassment policy, and that the Defendants' stated reasons for Plaintiff's dismissal is a pretext.

### a. Plaintiff's Conduct Is Protected Under The First Amendment

Defendants contend that the only First Amendment protected conduct Plaintiff engaged in was her efforts to change the University's sexual harassment policies. (Defs. Br. 39-40). This is simply untrue. Plaintiff's organizing activity and involvement with the GEO is quintessential protected conduct under the First Amendment regardless of the motivation.

*Thomas v. Collins*, 323 U.S. 516, 65 S. Ct. 315 (1945) (holding that state law requiring an organizer's card as prerequisite for union activity violates First Amendment rights of free speech and free assembly). Defendants do not claim otherwise. Rather, they argue that a distinction exists between Plaintiff's organizing and anti-harassment efforts.[2] (Defs. Br. 40 n 16). This "distinction" is immaterial for evaluating the protected conduct element of Plaintiffs' First Amendment claim, both in law and in fact. As Defendants apparently concede, the First Amendment protects the totality of Plaintiff's organizing and anti-harassment efforts, which was part-and-parcel to her efforts to change the University's sexual harassment policies. In any event, Plaintiff's personal motive for engaging in constitutionally protected activity is immaterial for purposes of evaluating her claim of retaliation.

### b.  A Causal Relationship Exists

Defendants contend that Plaintiff has not sufficiently proven causation. (Defs. Br. 26-28). This argument is meritless when one considers

---

[2] Defendants correctly point out that Plaintiff has not alleged a violation of the Michigan Public Employment Relations Act, MCL 423.201 *et seq.* (Defs. Br. 40 n 16). This is irrelevant, however, to whether Plaintiff can bring a First Amendment retaliation claim, especially in light of the fact that GSRAs are specifically excluded from the Act's definition of "public employee." See MCL 423.201(e)(*iii*).

the breadth of Plaintiff's constitutionally protected conduct, and the circumstances surrounding it.

Plaintiff has offered evidence that Goldman was aware of her involvement in organizing GSRAs to unionize. Goldman knew about Plaintiff's role in the GEO, and she had direct conversations with Plaintiff and others about how the GSRA's organizing campaign would destroy research work at the University. That knowledge, combined with Goldman's anti-union lobbying, her questioning Plaintiff whether she was involved in union efforts, and her August 8, 2011 email warning Plaintiff to cease involvement in "non-research related activities" demonstrates, at the very least, a genuine issue of material fact as to whether Plaintiff's protected conduct was a motivating factor for Defendants' disenrollment of Plaintiff.

This conclusion is reinforced by the temporal proximity between the protected conduct and the adverse action. See *Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999) (temporal proximity coupled with other evidence of retaliation can establish causal connection). While Plaintiff was not formally dismissed from the University until December 2011, her ultimate dismissal was the culmination of a series of escalating acts by Goldman, beginning with the August 8, 2011 email warning Plaintiff about her "non-research related activities." Goldman emailed Plaintiff the

very next day, August 9, further chastising Plaintiff for her perceived lack of communication. Several weeks later, on August 31, 2011, Goldman advised Plaintiff that she would cease receiving research funding after the fall term because of "insufficient changes to your demonstrated level of commitment." Goldman emailed Plaintiff several more times through the fall of 2011. Each email indicated an increased detachment between Goldman and Plaintiff.

And while Plaintiff's enrollment in the COE ended in December 2011, Goldman's conduct did not cease. On February 3, 2012, several months after Plaintiff's dismissal, Goldman forwarded an email to one of her research students, Eric Zech. That email concerned the GSRA unionization campaign, specifically mentioning Plaintiff and referencing her experiences working for Goldman. Less than a week later, on February 9, 2012, a Letter to the Editor was published in the Michigan Daily, the University's student run newspaper, in which Zech accused Plaintiff of lying, demeaned her research and professionalism, and asserted that Goldman had done nothing wrong. These post-dismissal events constitute further retaliation for exercising First Amendment rights.

Defendants also argue that even if Plaintiff's constitutionally protected conduct was a motivating factor in their actions, Defendants would

have made the same academic decision regardless because of Plaintiff's

failure to make adequate progression in her Ph.D. candidacy and her alleged

"lack of commitment." *See Clemente*, 679 F.3d at 494. In support of this

argument, Defendants refer to §III(C)(2) of their brief, which discusses

Plaintiff's procedural due process claim. (Defs. Br. 36-38, 42). This

argument confuses Plaintiff's due process and First Amendment claims. The

Supreme Court's discussion of deference owed to "faculty's professional

judgment" in *Regents of University of Michigan v. Ewing*, 474 U.S. 214,

225, 106 S. Ct. 507 (1985), fits comfortably in a case where state action is

alleged to be arbitrary (i.e., a due process violation). *Ewing* does *not* stand

for the proposition that Defendants offer—that university faculty can hide

behind the cloak of "professional judgment" to defend a retaliatory decision.

Were that the case, free speech would be a "right" in name only.

The rule is clear: to meet their burden of production, Defendants must

show by a preponderance of the evidence that they would have taken the

same action regardless of Plaintiff's protected activity. *Clemente*, 679 F.3d

at 494. Defendants have made no such showing. There is ample evidence

from which a jury could find that Defendants' stated reasons for dismissing

Plaintiff were pretext. Plaintiff was in good academic standing and had

recently received awards from the COE. Goldman directly referenced

Plaintiff's involvement in union organizing and SAPAC advocacy during the December 1, 2011 dismissal meeting. And unlike Plaintiff, other research students in Goldman's lab were never confronted about their extracurricular activities. Eric Zech, for example, testified that he played on a club soccer team that practiced three or four days a week and had games on the weekend and that he was never told to scale back his activities by Goldman.

Defendants also claim that Plaintiff cannot establish pretext because "Plaintiff made it abundantly clear through her own choices [to take courses outside of the COE] that she did not want to stay in the engineering program to pursue a doctoral degree." (Defs. Br. 29). This is an insulting characterization of the facts. Defendants were well aware of the reasons for Plaintiff's delayed progression toward her Ph.D. (i.e., the sexual harassment she suffered from her male peers). Furthermore, it was a requirement of the program to take at least course outside the COE.

Finally, Defendants' reliance on her delayed academic progress is a classic example of blaming the victim. As discussed *infra*, such punishment is sexual discrimination within the limitations period that violates Title IX and ELCRA (Counts I and VI).

## 2.  Plaintiff's Title IX and ELCRA Retaliation Claims Should Not Be Dismissed

A reasonable jury could find for Plaintiff on her claims of retaliation under Title IX and ELCRA for the same reasons as her First Amendment claim. Plaintiff was engaged in protected activity, that activity was the cause of Defendants' adverse decision, and the given reasons for Defendants' decisions are pretext.

### a. Plaintiff Engaged In Protected Conduct Under ELCRA and Title IX

Defendants offer a number of arguments against Counts II and VIII. First, Defendants claim that Plaintiff was not engaged in protected conduct under Title IX and ELCRA because Plaintiff never filed a formal complaint. (Defs. Br. 25-27). They are mistaken. In advocating for a change in the University's sexual assault reporting policy (as expressed by her involvement in SAPAC and GSRA organizing), Plaintiff was engaged in protected under both Title IX and ELCRA.

Plaintiff's conduct is plainly protected conduct under the "opposition clause" of Section 701(a) of ELCRA, MCL 37.2701(a), which protects from retaliation a person who in good faith opposes an apparently discriminatory practice. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989). While Michigan Courts have never specifically defined the term "opposed" as used in MCL 37.2701(a), the United States

Supreme Court has broadly interpreted the analogous provision in Title VII.

*See Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271, 129 S. Ct. 846 (2009).

The protected conduct analysis under Title IX is a relatively undeveloped area of law (as evidenced by Defendants' reliance on extra-jurisdictional district court decisions). But guidance can be found in the United States Supreme Court's decision in *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 125 S. Ct. 1497 (2005), which first recognized an implied retaliation cause of action under Title IX. The *Jackson* Court stated:

> Title IX was enacted in 1972, three years after our decision in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969). . . . [I]n *Sullivan* we interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition.
>
> Congress enacted Title IX just three years after *Sullivan* was decided, and accordingly that decision provides a valuable context for understanding the statute. As we recognized in *Cannon v. University of Chicago*, 441 U.S. 677, 699; 99 S. Ct. 1946 (1979)], "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [*Sullivan*] and that it expected its enactment [of Title IX] to be interpreted in conformity with [it]." . . . Retaliation for Jackson's advocacy of the rights of the girls' basketball team in this case is "discrimination" "on the basis of sex," just as retaliation for advocacy on behalf of a black lessee in *Sullivan* was discrimination on the basis of race.

544 U.S. at 176-177 (footnote omitted)(citations omitted).

19

Defendants' claim that Plaintiff's conduct is not protected fundamentally conflicts with the Court's discussion of Title IX retaliation claims in *Jackson*.[3] And as the facts of this case show, this argument defies common sense, too. In arguing that Plaintiff cannot claim protection from retaliation under Title IX because she never filed a formal complaint, Defendants rely on the very same anti-harassment policies that Plaintiff labored to change rather than to submit. As the Supreme Court stated in the context of a Title VII retaliation claim, "[n]othing in the statute's text or our precedent supports this catch-22." *Crawford*, 555 U.S. at 279 (footnote omitted). In this case, nothing in the text of Title IX or in case law supports an argument that Defendants can retaliate against a victim of harassment who actively opposes and works to change the University's flawed sexual harassment procedures and policies, but who chooses not to file a formal complaint of sexual harassment.

Moreover, it bears repeating that even if this Court adopts Defendants' narrow view of protected conduct under Title IX and ELCRA,

---

[3] Without belaboring the point, it is worth noting that *Jackson* took a very broad view of "protected conduct" under Title IX. As the Court explained, "[Title IX] is broadly worded; it does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint." *Jackson*, 544 U.S. at 179. In this sense, Plaintiff's advocacy on behalf of *all* victims of the University's discriminatory anti-harassment policies, and the retaliation she suffered because of it, well-aligns with *Jackson* Court's view of a retaliation claim under Title IX.

Plaintiff's conduct is unquestionably protected activity under the First Amendment. *See Laster*, 746 F.3d at 732 ("[T]he framework for analyzing a Title VII retaliation claim is distinct from the framework for analyzing a First Amendment retaliation claim.").

### b. A Causal Relationship Exists

Defendants' causation and pretext arguments with respect to Plaintiff's Title IX and ELCRA retaliation claims are essentially the same arguments offered against Plaintiff's First Amendment retaliation claim, and they fail for the same reasons. Plaintiff can show causation under both a "but for" (Title IX) and "significant factor" (ELCRA) standard. While Defendants correctly note that temporal proximity alone does not establish a causal connection (Defs. Br. 28), Plaintiff's proofs contain more than mere temporal proximity. Further, Defendants' attempt to draw a 20-month time span between Plaintiff's last complaint of sexual harassment and Defendants' first adverse action simply ignores all of Plaintiff's protected conduct in the interim of which Defendants were aware.

### III.   Plaintiff's Due Process Claim (Count IV)

The actions of Defendants in dismissing Plaintiff from the COE violated Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV.

## 1.  Substantive Due Process

The Sixth Circuit has held that a student has no substantive due process right in continued enrollment at a public university, absent an equal protection violation. *Bell v Ohio State University*, 351 F.3d 240, 251 (6th Cir. 2003). Thus, if this Court dismisses Plaintiff's Equal Protection claim (Count III), Plaintiff concedes that any *substantive* component to her due process claim necessarily fails. Nevertheless, the United States Supreme Court has discussed on several occasions the *procedural* due process rights to which a student is entitled prior to academic dismissal from a public university.

## 2.  Procedural Due Process

In *Ewing*, *supra*, the Court stated that an academic dismissal must not represent "a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." 474 U.S. at 225. And in *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 85, 98 S. Ct. 948 (1978), the Court stated that due process requires a "careful and deliberate" decision and "fully inform[ing] [the student] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." The Sixth Circuit has similarly stated that procedural

due process is satisfied "when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate[.]" *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003).

Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593 (1972). What process is due typically involves an analysis of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such an interest by the procedures used, and the fiscal and administrative burdens the procedural requirements would entail. *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893 (1975). Plaintiff recognizes that, in light of *Horowitz*, *Ewing*, and *Ku*, demonstrating a procedural due process claim in the context of an academic dismissal is a tall order. It is not, however, meant to be an impossible task.

In *Zwick v. Regents of the University of Michigan*, 2008 U.S. Dist. LEXIS 34472 (E.D. MI 2008), for example, the district court found that genuine issues of material fact surrounding the plaintiff's dismissal from the University of Michigan Dental School precluded summary judgment:

> Plaintiff's evidence similarly creates a question of fact as to whether the Academic Review Board's decision was the result of "careful deliberation" and "focused professional judgment." *Ku*, 322 F.3d at 438. Plaintiff has presented facts and testimony

that could establish bias (if not animus) on the part of Defendant Lantz. Plaintiff has further provided evidence of Defendant Lantz's prominent role in Plaintiff's dismissal and Defendant Lantz's activities on behalf of the Academic Review Board (e.g., that Defendant Lantz was tasked with sending Plaintiff the letter stating the faculty's concerns, and the letter was never sent to Plaintiff). . . .

Plaintiff's cumulative evidence . . . is sufficient to create a genuine issue of material fact as to both the information provided to Plaintiff and the careful deliberation of the Academic Review Board with regard to Plaintiff's dismissal. Plaintiff's due process claim therefore survives summary judgment. . . .

*Zwick*, 2008 U.S. Dist. LEXIS 34472 at *18-19.

Just as in *Zwick*, there is a genuine issue of material fact as to whether Defendants' decision to dismiss Plaintiff from the COE was "careful and deliberate," *Ku*, 322 F.3d at 438, and not "a substantial departure from accepted academic norms." *Ewing*, 474 U.S. at 225. Aside from the previously discussed evidence of retaliation (which by its nature is a departure from accepted academic norms, or so Plaintiff contends), there is evidence that the disenrollment decision was rushed, and made under unusual and pretextual circumstances. Plaintiff was never notified of the December 1, 2011 meeting where the decision was made, and it was several weeks until she was actually informed of the decision. Prior to the meeting, no one had ever discussed the possibility of academic dismissal. Defendant Green, the Department Chair, testified that he was not part of the meeting to

terminate and denied knowing when the decision was actually made. The failure to observe the university's own procedures and the secretive nature of the decision is further evidence that Plaintiff's due process rights were violated.

## IV.   Plaintiff's ELCRA Disparate Impact Claim (Count VII)

To establish a *prima facie* case of disparate impact sexual discrimination under ELCRA, Plaintiff must show that she was a member of a protected class and "a facially neutral [educational] practice burdens a protected class of persons more harshly than others." *Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 539 (1991).

Defendants argue that Plaintiff's disparate impact claim is time-barred because Plaintiff was aware of the University's policy as early as January 2009, more than 3 years before she filed suit on December 21, 2012. (Defs. Br. 5-6). Defendants also argue that the claim fails because Plaintiff cannot (1) identify a specific educational practice she is challenging; (2) demonstrate an adverse impact through statistical evidence; (3) and demonstrate that she was personally injured by the University's policy (Defs. Br. 22-25).

### 1.  Plaintiff's Disparate Impact Claim Is Not Time-Barred

Plaintiff disagrees with Defendants' assertion that her disparate impact claim is time-barred merely because Plaintiff was aware of the University's deficient complaint process as early as January 2009. This argument presupposes that the basis of Plaintiff's claims is the single instance when Plaintiff realized her dissatisfaction with the complaint process. This is incorrect. Because the policy's impact was felt after December 21, 2009 and into the limitations period, it is the continued existence of the discriminatory policy that is important. Every time Plaintiff was harassed while the discriminatory policy was in effect, including the post-December 21, 2009 "respirator kisses" incident, Plaintiff was injured anew. Thus, the Michigan Supreme Court's disavowal of the doctrine is not relevant to her claim. See *Garg v. Macomb County Community Mental Health Services*, 472 Mich. 263 (2005). While Plaintiff concedes that some pre-limitations injuries may not be compensable under *Garg*, the existence of some injury within the limitations is sufficient to survive summary judgment. Moreover, Plaintiff's final injury—her dismissal from the COE—occurred in December 2011, well within the limitations period.

## 2. Plaintiff Has Established a *Prima Facie* Case of Disparate Impact Sexual Discrimination

Plaintiff has in fact identified a specific educational practice she is challenging – the University's pre-2011 policy of requiring all students who file a complaint of sexual assault or harassment with the University's Office of Student Conflict Resolution (OSCR) to personally confront their assailants and harassers. Defendants stress the importance of the specific practice requirement (Defs. Br. 22-23), but they fail to explain why Plaintiff's articulation of University policy is too generalized. Moreover, the cases cited by Defendants are not on point. In *Roberson v. Occupational Health Centers of Am.*, Inc., 220 Mich. App. 322 (1996), the plaintiff's disparate impact claim failed not because she failed to identify a specific policy she was challenging, but because she could not demonstrate a disparate impact. *Id*. at 330. And in *Allen v. Highlands Hospital Corp.,* 545 F.3d 387 (6th Cir. 2008), the plaintiffs' claim failed because they did not identify an actual policy, but instead simply "alleged that [the defendant] desired to reduce costs associated with its highly paid workforce." *Id.* at 404. Plaintiff's claim does not suffer from either of the defects identified in *Roberson* or *Allen*.

Defendants next argue that Plaintiff's disparate impact claim fails because she has not presented testimony from a statistical expert. (Defs. Br.

23-24). This argument misrepresents the requirement of a *prima facie* disparate impact claim. Defendants offer no authority for the proposition that testimony from a statistical expert is mandatory.[4] And in this case, it cannot be legitimately debated that the policy did *not* have a disparate impact on female victims of sexual harassment. From a statistical standpoint, this is not a close case where testimony from a person with "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Stacy Vander Velde, the Associate Director of OSCR, testified that at least 80 to 85 percent of students who complain of sexual misconduct are female. And under the University's pre-2011 "complaint-driven" sexual harassment reporting policy, each year approximately less than five victims of sexual violence would elect to proceed through the OSCR complaint process. When the University switched to an investigative-model in 2011, Vander Velde describe the change in the volume of sexual harassment reports—from less than 5 in 2009 and 2010 to more than 50 in 2011 and 2012—as "striking."

---

[4] Plaintiff firmly believes that the statistical evidence in this case speaks for itself and that no expert testimony is necessary. However, if this Court agrees with Defendants that testimony from a statistical expert is required to establish a *prima facie* disparate impact claim under ELCRA, Plaintiff requests that the Court grant Plaintiff leave to obtain the necessary testimony rather than grant summary judgment to Defendants on this ground.

Defendants also claim that Plaintiff never suffered a personal injury because she never actually utilized the University's reporting policy. (Defs. Br. 24-25). Defendants simply misconstrue Plaintiff's disparate impact claim. Plaintiff is not claiming that she was personally injured as a result of having personally confronted her harassers in the University. Rather, Plaintiff's injury stems from the University's failure to implement an effective, non-discriminatory complaint process for victims of sexual harassment. The absence of an effective policy to remediate sexual harassment caused Plaintiff to endure further harassment from her fellow male students and suffer personal setback in her academic career, ultimately culminating in her dismissal from the University.

## V.   Plaintiff's Sex Discrimination Claims (Count I and VI)

Title IX prohibits sex discrimination in any educational program or activity that receives federal financial assistance. 20 U.S.C. §1681(a). The law is clear that sexual harassment may constitute sex discrimination under Title IX. *Davis v. Monroe County Board of Ed.*, 526 U.S. 629, 650, 119 S. Ct. 1661 (1999). Similarly, Michigan's ELCRA prohibits educational institutions from engaging in discrimination on the basis of sex. MCL 37.2401. Under ELCRA, discrimination because of sex includes sexual harassment. MCL 37.2103(i)(*iii*).

To establish a case of student-to-student harassment under Title IX, Plaintiff must demonstrate: (1) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (2) that the funding recipient had actual knowledge of the sexual harassment, and (3) that the funding recipient was deliberately indifferent to the harassment. *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (citing *Davis*, 526 U.S. at 651). The requirements of Plaintiff's claim under ELCRA are substantially similar. *Chambers v. Trettco*, 463 Mich. 297, 311 (2000).

Plaintiff has presented evidence of a pattern of sexual discrimination that was long-standing and persistent, and that denied Plaintiff the benefits of a number of educational opportunities, including her termination from the MSE program in December of 2011. Despite repeated complaints to all manner of employees of the University, nothing was ever done to help Plaintiff or to eliminate the pervasive hostile sexual environment. Instead, she was forced into self-help remedies, including scheduling classes outside her department, taking a leave of absence, attempting to avoid interaction with her peers, and moving multiple times for her own safety.

Defendants raise a number of technical arguments in support of their motion. Specifically, they argue that Counts I and VI should be dismissed

because Plaintiff: (1) has not alleged any actionable harassment within the three-year limitations period (Defs. Br. 11-12); (2) has not established that the University had actual notice of the harassment (Defs. Br. 12-15); and (3) cannot show that the University displayed deliberate indifference or failed to take remedial steps (Defs. Br. 15-20). Plaintiff respectively disagrees on each point.[5]

### 1.  Plaintiff's Sex Discrimination Claims Are Timely

To begin, Michael Warren's "respirator kisses" is actionable conduct within the three-year limitations period. Defendants portray this conduct as innocent because of the lack of physical contact and because it was something that other students regularly did to one another. (Defs. Br. 12). Neither fact renders the conduct non-sexual in nature, and Defendants' reliance on *Haynie v. State*, 468 Mich. 302 (2003) and *Galeski v. City of Dearborn*, 690 F. Supp. 2d 603 (E.D. Mich. 2010) is misplaced. (Defs. Br. 12).

---

[5] Defendants appear not to challenge the severity or pervasive nature of the sexual harassment. To the extent that they do, Plaintiff's records from the University's Counseling and Psychological Services ("CAPS") office reflect that the harassment Plaintiff suffered prompted her to seek counseling, caused her fear and anxiety, made it difficult for her to perform research in the lab or take exams while her harassers were present, and compelled her to move out of fear for her safety.

In *Haynie*, the Michigan Supreme Court merely held that discrimination based on the plaintiff's sex is not sexual harassment. 468 Mich. at 311 ("Pregnancy discrimination is sex discrimination, but it is not sexual harassment."). Nothing in *Haynie* stands for the proposition that an unwanted and unwelcome "respirator kiss" is harassment of a *non*-sexual nature. And the court in *Galeski* had no difficulty in dismissing the plaintiff's claim of sexual harassment because the plaintiff merely complained of "odd behavior" that "wasn't directly sexual harassment[.]" 690 F. Supp. 2d at 606. In the instant case, however, Plaintiff has alleged specific activity that has an overt sexual nature.

Further, Plaintiff is not limited to post-December 21, 2009 conduct. Plaintiff maintains that the sexual demeaning comments made by her male peers, the rape threat, and the stalking incident is all conduct that should be considered for purposes of her Title IX claim. As Defendants acknowledge, Title IX claims are routinely analyzed under the same framework as Title VII claims. And under Title VII, a hostile environment claim is:

> composed of a series of separate acts that collectively constitute one unlawful employment practice . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. **Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.**

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (emphasis added).[6] In this case, Plaintiff can point to other contributing acts by the University and its agents (such as demeaning comments, Defendant Pollock's firing of Plaintiff, and Plaintiff's eventual dismissal from the program in December 2011).

Finally, Defendants' focus on specific incidents of harassment occurring pre-December 21, 2009, misunderstands an important aspect of Plaintiff's sexual discrimination claims. Defendants did not simply fail to remediate the hostile sexual environment; they punished Plaintiff for being a victim of harassment when they dismissed her from the COE on supposed academic grounds despite full knowledge that virtually all of Plaintiff's academic delays and difficulties were attributable to being a victim of peer sexual harassment. Because this dismissal occurred within the 3-year limitations period, Plaintiff's injuries (and thus her claims under Counts I and VI) are timely.

---

[6] Defendants rightly note that the Michigan Supreme Court rejected the doctrine of "continuing violations" with respect to ELCRA. *Garg, supra*. Defendants also suggest that the continuing violations doctrine does not apply under Title IX. (Defs. Br. 7-8). While the Sixth Circuit has not ruled on the issue, other jurisdictions have had no difficulty in applying the doctrine to Title IX cases. *See Stanley v. Trustees of the California State University*, 433 F.3d 1129, 1136 (9th Cir. 2006) (applying framework of Title VII and citing *Morgan* in Title IX context).

## 2. Defendants Had Actual Notice of the Discrimination and Their Failure to Act Constitutes Deliberate Indifference

Defendants contend that Plaintiff cannot satisfy the "actual notice" and "deliberate indifference" requirements of her Title IX claim because Plaintiff refused to file a complaint of sexual harassment through the University's official channels and instead complained to her academic advisors, Defendants Pollock and Goldman, and filed a report with the University's Department of Public Safety. In essence, Defendants are attempting to use the University's failure to adopt appropriate anti-harassment standards and reporting policies under Title IX to avoid liability under the same. But "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Patterson v. Hudson Area Schools*, 551 F.3d 438, 446 (6th Cir. 2009), quoting *Vance v. Spencer Cty Public School District*, 231 F.3d 253, 261 (6th Cir. 2000). Thus, where a district is on notice that its existing policies and practices are insufficient to remedy ongoing harassment, it is required by law to implement different measures to address harassment; it cannot claim ignorance. In this case, the extremely low number of sexual harassment reports that were filed with OSCR every year under the pre-2011 policy was an obvious signal that the University's

34

procedures were ineffective. And while the failure to use anti-harassment training may not *per se* constitute a violation of Title IX, failure to train can be evidence of Defendants' deliberate indifference of its duty and thus support a claim for Title IX violation.

Finally, Defendants' own actions betray their claim that they did not act with deliberate indifference toward the sexual harassment Plaintiff suffered. When Plaintiff raised the sexual harassment problem with her advisors, they told her, in essence, to toughen up and dealt with it. Even assuming that Defendants Pollock and Goldman had no direct ability to take disciplinary action against Plaintiff's harassers, as Defendants claim, they exacerbated the harassment when they used its effects as justification to dismiss Plaintiff from the COE. Plaintiff's enrollment in the COE *is* something that Defendants Green and Goldman had control and authority over, and punishing Plaintiff for being the victim of sexual harassment constitutes, at a minimum, deliberate indifference toward sexual discrimination in violation of Title IX and ECLRA. *Vance*, 231 F.3d at 260 (describing "deliberate indifference" as a "clearly unreasonable [response] in light of the known circumstances, quoting *Davis*, 526 U.S. at 648).

## VI.    Plaintiff's Equal Protection Claim (Count III)

To prove a violation of 42 U.S.C. §1983 for denial of Equal Protection, Plaintiff must prove the existence of purposeful sexual discrimination based on her gender. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988).

Defendants argue that Plaintiff's Equal Protection claim is time-barred because the claim accrued prior to December 21, 2009. (Defs. Br. 5-6). Defendants also argue that Plaintiff has not shown that she was treated differently from her male peers, or that such treatment was intentional or purposeful. (Defs. Br. 31-32).

### 1.  Plaintiff's Equal Protection Claim Is Not Time-Barred

Plaintiff's Equal Protection claim is timely for the same reasons as her ELCRA disparate impact claim is timely. Further, although federal law provides no statute of limitations for actions brought under §1983, state law may provide a limitations period only "if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266-67, 105 S. Ct. 1938 (1985). This is an instance where application of Michigan's three-year statute of limitations would in fact be inconsistent with federal law or policy because of the strong federal interest in non-discriminatory educational environment in public universities. *See, e.g., Tearpock-Martini v. Borough*

*of Shickshinny*, 756 F.3d 232, 238-239 (3rd Cir. 2014) (holding that two-year statute of limitations was inapplicable when the plaintiff challenged an ongoing constitutional violation).

### 2.  Plaintiff Has Established a *Prima Facie* Equal Protection Violation

Defendants contend that Plaintiff's Equal Protection claim fails because she has not demonstrated that that similarly situated students were treated differently. (Defs. Br. 32).

Plaintiff's Equal Protection claim should be analyzed in the same fashion as her sexual discrimination claims under Title IX and ELCRA (Counts I and VI). *See Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003) (noting that the elements of an Equal Protection claim under §1983 are the same elements as a disparate treatment claim under Title VII). As discussed *supra*, the evidence Plaintiff has marshaled in support of her claims of sex discrimination also constitute a claim of sex discrimination grounded in the Equal Protection Clause of the Fourteenth Amendment, pursuant to §1983.

### VII.  The Possibility of Prospective Injunctive Relief

Defendants argue that, with respective to Plaintiffs' constitutional claims, any claim for prospective injunctive relief pursuant to *Ex Parte*

*Young* is moot. (Defs. Br. 30). Plaintiff concedes that prospective injunctive relief is moot *as that relief relates to the University's sexual harassment reporting policy* because Plaintiff is no longer enrolled at the COE. *See Board of School Commissioners of City of Indianapolis v. Jacobs*, 420 U.S. 128, 129, 95 S. Ct. 848 (1975). But to the extent that other prospective injunctive relief may be deemed appropriate, including the correction of Plaintiff's academic transcript to reflect the circumstances of her departure, Plaintiff disagrees that relief is moot. *See Thomson v. Harmony*, 65 F.3d 1314 (6th Cir. 1995) (*Ex parte Young* remedies for wrongfully terminated student include prospective reinstatement, future support, and expungement of negative entries from student's academic record). For example, the "Incomplete" and "Withdrawal" grades on Plaintiff's transcript are something that could negatively Plaintiff's future academic pursuits and are remediable.

Plaintiff strongly disagrees that prospective injunctive relief is moot simply because the University in 2011 adopted a new harassment reporting policy. First, Plaintiff is in no position to assess whether the new policy treats female students equally under the law. Second, a defendant's voluntary cessation of illegal practices is not in and of itself proper grounds to moot a case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

38

*(TOC), Inc.*, 528 U.S. 167, 181-182, 120 S. Ct. 693 (2000). While Plaintiff's current status as a non-student may narrow her potential remedies, Defendants' change of policy does not.

## VIII.    Defendants Are Not Protected by Qualified Immunity

The Individual Defendants are not entitled to qualified immunity for any of Plaintiff's constitutional claims brought under 42 U.S.C. §1983 (Counts III, IV, and V).

Qualified immunity protects a governmental official sued in their individual capacity from civil liability unless (1) the official violated a constitutional right; and (2) the constitutional right was clearly established such that a "reasonable official would understand that what he is doing violates that right." *Simmonds v. Genesee County*, 682 F.3d 438, 443 (6th Cir. 2012), quoting *Saucier v. Katz*, 533 U.S. 194, 202; 121 S. Ct. 2151 (2001).

The exact factual circumstances in a given case need not have been found to be a constitutional violation before a right can be "clearly established" for purposes of a qualified immunity analysis. Rather, "[w]hen a general constitutional principle is not tied to particularized facts, the principle can clearly establish law applicable in the future to different sets of detailed facts." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005)(internal

quotation omitted). The determinative issue is whether the official had "fair warning that his conduct deprived [the plaintiff] of a constitutional right." *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S. Ct. 2508 (2002)(internal quotation omitted).

In addressing the first element of the qualified immunity defense— whether Defendants violated a constitutional right—Plaintiff relies on her previous discussion of those violations, *supra*.

## 1. Plaintiff's First Amendment Right Was Clearly Established

When viewed in the light most favorable to Plaintiff, the evidence would allow a reasonable jury to conclude that Defendants Pollock, Green, and Goldman retaliated against Plaintiff for organizing GSRAs and advocating for a change in the University's sexual harassment policy. Such activities are clearly protected under the First Amendment, *Thomas*, *supra*, and Defendants do not claim otherwise. Further, it is a clearly established principle of constitutional law that a public official's retaliation against an individual for exercising First Amendment rights violates 42 U.S.C. §1983. *Bloch v. Ribar*, 156 F.3d 673, 682-683 (1998).

## 2. Plaintiff's Right to Equal Protection Was Clearly Established

Defendants are not entitled to qualified immunity as to Plaintiff's Equal Protection claim because at the time of the violation it was clearly

established that the Equal Protection Clause prohibited intentional gender discrimination unless it was substantially related to a legitimate governmental purpose. *Craig v. Boren*, 429 U.S. 190, 197, 97 S. Ct. 451 (1976). Defendants offer no legitimate government purpose for treating Plaintiff differently from her male peers and are thus not entitled to qualified immunity.

### 3. Plaintiff's Due Process Rights Were Clearly Established

In *Horowitz*, *supra*, the Supreme Court discussed the scope of a public university student's procedural due process right to continued enrollment. The *Horowitz* Court held that procedural due process requirements are satisfied so long as the student is "fully informed . . . of the faculty's dissatisfaction" and the decision to dismiss is "careful and deliberate." *Id*. at 84. And in *Ewing*, 474 U.S. at 227, the Court cautioned that a decision to dismiss a student for academic reasons must not be a "substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment." Based on this long-standing Supreme Court precedent, Plaintiff contends that Defendants violated Plaintiff's clearly established constitutional right to due process when they deprived Plaintiff of her continued enrolled at a public university for reasons having nothing to do with academics. *See also Zwick, supra*.

## IX.    RELIEF REQUESTED

For the reasons set forth above, Plaintiff requests an order denying

Defendants' Motion for Summary Judgment.

Respectfully submitted,
BLANCHARD & WALKER PLLC

_____
David M. Blanchard (P67190)
221 N. Main Street
Suite 300
Ann Arbor, MI 48104
(734) 929 – 4313
Blanchard@bwlawonline.com

## <u>CERTIFICATE OF SERVICE</u>

I, herby certify that on November 30, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

Respectfully submitted,


BLANCHARD & WALKER, PLLC

<u>/s/ David M. Blanchard</u>
David M. Blanchard (P67190)
Attorney for Plaintiff
221 North Main Street, Suite 300
Ann Arbor, MI 48104
(734) 929-4313
blanchard@bwlawonline.com



Dated: November 30, 2015