UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jennifer Dibbern,

      Plaintiff,

v.                                                    Case No.  12-15632

University of Michigan, *et al.*                      Sean F. Cox
                                                      United States District Court Judge

      Defendants.

_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

After she was dismissed from a graduate engineering program at the University of

Michigan, Plaintiff filed this action against the University, its President, its Board of Regents,

and three engineering professors.  Plaintiff's Second Amended Complaint asserts nine separate

counts against Defendants but Plaintiff recently voluntarily dismissed Count IX.  The matter is

before the Court on Defendants' Motion for Summary Judgment.  The parties have extensively

briefed the issues and the Court heard oral argument on May 12, 2016.  As explained below, the

Court shall GRANT THE MOTION IN PART AND DENY IT IN PART.  The Court shall

GRANT the motion to the extent that the Court shall grant summary judgment in favor of

Defendants with respect to Counts I, III, IV, VI, VII.  The Court shall also grant summary

judgment in favor of Defendants as to the portions of Plaintiff's retaliation counts (Counts II, V,

and VIII) that are based upon Defendant Pollock's termination of Plaintiff's research position and

ceasing to be her advisor.  The motion is DENIED as to the remaining portions of Counts II, V,

1

and VIII.

## BACKGROUND

Plaintiff Jennifer Dibbern ("Plaintiff" or "Dibbern") filed this action against Defendants

on December 21, 2012, based on federal-question jurisdiction.  Plaintiff asserts claims against the

following Defendants: 1) the University of Michigan ("the University"); 2) The Board of Regents

of the University of Michigan ("the Board of Regents"); 3) Mary Sue Coleman ("Coleman"); 4)

Rachel Goldman; 5) Tresa Pollock; and 6) Peter Green.

**Plaintiff's Claims**

The operative complaint is Plaintiff's "Second Amended Complaint" (D.E. No. 23),

which asserts the following claims:

- Count I: "Title IX, Sex Discrimination and Sexually Hostile Educational Environment," asserted against the University and the Board of Regents;

- Count II: "Title IX: Retaliation for Reporting, Opposing, and Attempting to Remedy a Sexually Hostile Environment in the College of Engineering," asserted against the University and the Board of Regents;

- Count III: "Equal Protection: 42 U.S.C. § 1983", asserted against the "Individual Defendants in their official capacity" pursuant to *Ex Parte Young*;

- Count IV: "Due Process Violations: 42 U.S.C. § 1983", asserted against all Defendants;

- Count V: "First Amendment Freedom of Speech Retaliation: 42 USC 1983", asserted against the "Individual Defendants in their individual capacity" and against them in their official capacity pursuant to *Ex Parte Young;*

- Count VI: "Michigan State Law Elliott-Larsen Civil Rights Act: Sex Discrimination/Disparate Treatment/Hostile Work Environment," asserted against all Defendants;

- Count VII: "ELCRA Sex Discrimination/Disparate Impact," asserted against all Defendants;

2

•      Count VIII: "ELCRA Retaliation," asserted against all Defendants; and

•      Count IX: "Invasion of Privacy," asserted against the Individual Defendants

Plaintiff recently agreed, however, to dismiss Count IX. (*See* Docket Entry No. 128). As such, there are eight counts that remain in this action.

Following the close of discovery, Defendants filed a Motion for Summary Judgment. (D.E. No. 115).

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 30 at 2-3).

In compliance with this Court's guidelines, in support of their Motions for Summary Judgment, Defendants filed a "Statement of Material Facts Not In Dispute" (Docket Entry No. 113) ("Defs.' Stmt.). In response to that submission, Plaintiff filed a "Counter-Statement of Disputed Facts" (D.E. No. 121) (Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiff*, the non-moving party.

Plaintiff's claims stem from the time period during which she was a graduate student at the University of Michigan ("the University"). Defendant Coleman was the University's President. The remaining individual Defendants (Pollock, Goldman, and Green) were professors at the University in the College of Engineering during the relevant time periods.

Plaintiff graduated from MIT with a Bachelor of Science and Engineering degree in materials and metallurgy in 2007. (Pl.'s Dep. at 73).

**Plaintiff's Enrollment and MSE's Ph.D Requirements**

In the fall of 2007, Plaintiff enrolled as a graduate student in the Materials Science and Engineering ("MSE") program in the College of Engineering ("COE") at the University. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 1).

Plaintiff received a copy of the MSE Resource Guide, on September 10, 2009, which contained information about the expectations of the Ph.D program. (*See* Pl.'s Dep. at 137; Exs. 11 & 12 to Defs.' Motion).

Although Plaintiff was in the Ph.D program, she was not a Ph.D "candidate," as she was first required to complete various steps, including taking qualifying exams referred to as "preliminaries." (Defs.' Stmt. & Pl.'s Stmt. at ¶ 3). Specifically, "students seeking Ph.D candidacy must successfully pass the Oral Exam within two years of their initial enrollment in the MSE department" and students must also complete the written exam within two years of initial enrollment. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 4).

Plaintiff did not schedule or take her preliminary exams during her four and a half years

in the Ph.D program at the University and she never prepared a dissertation proposal. (Defs.'
Stmt. & Pl.'s Stmt. at ¶ 6). Plaintiff cannot identify any other student in the MSE who spent four
and a half years in the program and did not complete their preliminary examinations. (Pl.'s Dep.
at 270; Defs.' Stmt. & Pl.'s Stmt. at ¶ 7).

**2007**

Professor Tresa Pollack ("Pollack") was Plaintiff's first advisor in the program. (Pl.'s
Stmt. at ¶ 156).

Shortly after Plaintiff arrived on campus in the fall of 2007, she began working in
Pollock's laboratory and was funded by Pollock. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 1). Plaintiff
had a "50% appointment" with Professor Pollock, which is a full-time appointment consisting of
half classes, half research until classes are completed and then is 100% research, and provided
Plaintiff with full tuition, health insurance, and a stipend. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 9).
Plaintiff was aware that she was expected to work 20 hours per week in the lab for her 50%
appointment. (Defs.' Ex. 24).

Plaintiff claims that, shortly after she began as a student at the University in 2007, she
experienced demeaning comments being made about female engineers by male students. "For
instance, soon after she began, Dibbern was told by her student colleagues: 'real women
aren't engineers,' 'engineering women are different—they're not normal . . . they aren't like real
girls. Not normal at all. Even if they are around, no one considers them women,' among others.
(323-24). 'You had it easy because you're a woman in science. You have to admit it. You're less
qualified but still able to get in just because you're a girl. (324). A second student stated: 'Let's
be honest, the girls in engineering aren't *real* girls—no guy would look at them that way so we

5

need more real girls to study with, date—something to look at in class. Real girls. There's

something wrong with the engineering girls.' (326)."  (Pl.'s Stmt. at 33 n.6) (citing Pl.'s Dep. Tr.;

*see also* Defs.' Ex. 15[1] at Dibbern001508).

Plaintiff testified that she spoke to Pollock about her concerns in November of 2007.

(Pl.'s Dep. at 189-90).  Plaintiff testified:

> Q.     And what did you tell her?
> A.     I described that – she asked how things were going in the program and
>        how was I liking it, and I said that I wanted to meet with her because I was
>        encountering challenges and I wanted her support and I explained to her
>        some of what I was experiencing.
> Q.     What did you tell her?
> A.     I told her that there were men in the program who were making very
>        inappropriate comments.
> Q.     Did you say what the comments were?
> A.     I believe I gave her an example.
> Q.     What example do you think you gave her?
> A.     I don't recall.
> Q.     What else did you tell her?
> A.     I explained that I was finding this very difficult and was asking for her
>        help.
> Q.     What help did you want?
> A.     I was asking for advice.
> Q.     Okay.
> A.     How to move forward. I wanted the behavior to stop but I wanted her to
>        help in whatever way she could.
> Q.     Did you name who the people were?
> A.     Not that I recall right now.
> Q.     Did you tell her that they weren't in her lab?
> A.     I said they were men in the department.  I don't believe she asked or I
>        specified further.

(Pl.'s Dep. at 190-91).

**2008**

In the winter term of 2008, one of the classes Plaintiff took, "ANTHRARC 254" an

---

[1]Defs.' Ex. 15 is a timeline prepared by Plaintiff. (Pl.'s Dep. at 51-53).

Anthropology class regarding Aztecs, Mayans, and Incas, was outside of the College of Engineering.  (Des.' Ex. 22).

The MSE Resource Guide states that one of the requirements for MSE graduate students is that they take "two courses (cognates) outside of the [Material Science and Engineering] dept. These cognate courses (each of two hours minimum) must be in a technical area, and are usually satisfied at the graduate level (400 level courses can also satisfy cognate requirements.)" (Pl.'s Ex. 7 at 37).

Plaintiff alleges that she was threatened with rape twice, once in April of 2008 and again in the summer of 2008.

Plaintiff alleges that in April of 2008, two male students threatened to rape her during a conversation.  (Defs.' Stmt. at 20; Pl.'s Stmt. at 20).  Plaintiff contacted both the University's Sexual Assault Prevention and Awareness Center ("SAPAC"), and Rachel Crutchfield from the University's Counseling and Psychological Services ("CAPS") regarding this matter.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 21).

All communications with both SAPAC and CAPS are confidential unless the student authorizes release of the information.  (*Id*. at 22).  Plaintiff sought Crutchfield's assistance in getting two of her final exams postponed.  Plaintiff asked that Crutchfield "be vague" about the personal reasons why Plaintiff needed to postpone her exams, and Crutchfield did so. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 24).  Plaintiff admits that she never told those two professors, Amit Ghosh or Max Stein, that she had been harassed or threatened.  (*Id*. at ¶ 26).

Plaintiff was allowed to reschedule her exams and, a few days after the incident, left Ann Arbor and returned to Iowa, where she stayed with her parents for a few weeks. (Defs.' Stmt. &

7

Pl.'s Stmt. at ¶ 27-28).  Plaintiff did not tell Pollock that she was taking time off.  (*Id.* at ¶ 29).

Plaintiff returned to Ann Arbor in May of 2008, at which time Crutchfield provided Plaintiff with information regarding the University's "zero tolerance" policy regarding sexual harassment, the policy set forth in the University's Standard Practice Guide, the Office of Institutional Equity, and various other avenues for reporting sexual harassment.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 30; *see also* Defs. Ex. 20).

Plaintiff admits that Pollock had several conversations with her about not spending sufficient time in the lab working on research.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 32).  On May 15, 2008, Pollock sent Plaintiff an email, stating:

> Once again for weeks I have been expecting to see you in the laboratory, but have not, in spite of leaving notes on your desk.  I must admit that I am disappointed that you have rarely been in the Gerstacker Building since your arrival at UM and that you have not yet engaged in your research.  I will remind you that the terms of your GSRA appointment commit you to 20 hours of research per week during the academic year and full time attention to your research in the summer.
>
> I realize that students often have complicated personal issues to deal with. However, you have given me no indication of any unusual circumstances.  I need you to let me know whether you plan to be here this summer as soon as possible. As you know, we have commitments to our research sponsors and I need to know whether you are planning to continue with your research.

(Defs.' Ex. 23).  In response to that email, Plaintiff stated, "I sincerely apologize for my absence from the lab and for not speaking with you earlier.  It will not happen again."  (*Id.*).

**2008**

Plaintiff testified that a student named Denis slapped her on one occasion in 2008.  (Pl.'s Stmt. at ¶ 155; Pl.'s Dep. at 337-338).

Plaintiff testified that on May 19, 2008, she told Pollock that the harassment had gotten worse and that "the men harassing me had threatened to rape me" but that Pollock cut Plaintiff

8

off mid-sentence and said, "Jennifer, these things sometimes happen. We just have to get over it, and get back to life." (Pl.'s Dep. at 198-99; Pl.'s Afft. at ¶ 9). In responding to the pending motion, however, Plaintiff now states that "[a]t the May 19, 2008 meeting, [she] followed the advice of CAPS and SAPAC and once again told Pollock about her ongoing harassment and the types of comments her harassers were making but was cut off before she could discuss the rape threats." (Pl.'s Stmt. at ¶ 36).

Plaintiff testified that on one other occasion in 2008, sometime after the May 19, 2008 meeting, she discussed an alternate schedule with Pollock because Plaintiff did not want to be alone in lab at night. (Pl.'s Dep. at 230-31).

Plaintiff alleges that she was threatened with rape by students in her study group in the summer of 2008, and directs the Court to pages 338 to 341 of her deposition transcript wherein she described the rape threat. (Pl.'s Dep. at 338-41).

During the first week of the Fall 2008 term, in September of 2008, Pollock emailed Plaintiff to schedule a research meeting. Plaintiff responded, "This week is a bit hectic for me with the start of the term. Would there be a time next week that would be convenient for you?" (Defs.' Ex. 28). Pollock expressed dismay that Plaintiff could not spare 30 minutes for the research meeting, but accommodated Plaintiff. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 42). Pollock also told Plaintiff that "[i]n addition to a discussion of your research, I would like you to prepare a detailed research plan (goals, activities, timing) for this semester." (*Id*.).

**2009**

During the 2009 Winter Semester, Plaintiff continued to take courses outside MSE, taking a course on Environmental Sustainability and a 200-level Spanish course. (Defs.' Stmt. &

9

Pl.'s Stmt. at ¶ 43; see also Defs.' Ex. 22).

In January of 2009, Plaintiff reported to the University's Campus Security that a student named Norman Meznarich was stalking her and that she was considering whether she wanted to file a police report.  (*See* Defs.' Sealed Ex. 25; *see also* Pl.'s Dep. at 66).  At that time, Plaintiff reported to the University's Department of Campus Safety that a student that she had been friends with since August of 2007, Meznarich, had confessed his love for her in the fall semester of 2008 even though she had a boyfriend.  She reported that since that time, he had behaved slightly inappropriately by continuing to ask her out, call her, and leave her gifts, even after she asked him not to do that.  Plaintiff reported to Campus Safety that, on one occasion, Meznarich showed up at the building where Plaintiff had been working and grabbed Plaintiff by the arm and starting hugging her, but she was able to get away from him.  Plaintiff reported that he had since continued to call and email her, even after she asked him not to contact her.  The report states that Plaintiff "advised she wanted to file a police report for stalking and assault but wanted to talk things over with her parents before contact with Meznarich was made" and that "No contact with Meznarich has been made at this point at the request of Dibbern."  (*Id.*).

DPS provided Plaintiff with a victim's rights form, directing her to a variety of available University resources, including the Office of Student Conflict Resolution ("OSCR") and the Office of Institutional Equity ("OIE").  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 45).  At Plaintiff's request, DPS did not contact Meznarich.  (*Id.* at ¶ 46).

Plaintiff did not tell Pollock about the stalking by Meznarich.  (*Id.* at ¶ 47).  Although Plaintiff still encountered Meznarich, because he was a student in the department, she did not experience any incidents concerning him after her report to the DPS.  (Pl.'s Dep. at 235).

10

Plaintiff testified that in the summer of 2009, Pollock advised her and her fellow students that Pollock had accepted a position at the University of California, Santa Barbara ("UC"), and would be leaving the University.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 57; Pl.'s Dep. at 228-229).  Pollock stated that her goal was to be fully transitioned to UC by the end of the year.  (*Id*. at 230).

Pollock then met with students, one-on-one, to discuss how the change would impact each of her students and their future plans, including Plaintiff.  (*Id*. at 229-30; *see also* Def.'s Ex. 15[2] at Dibbern001509).  Pollock discussed that an option would be for Plaintiff to finish her degree at UC and offered to fly Plaintiff out to visit UC.  (Pl.'s Dep. at 230).  That is, Pollock offered to have Plaintiff transferred to UC and remain Pollock's graduate student.  At this time, Pollock already knew that Plaintiff had previously complained about student-on-student harassment.  (Pl.'s Dep. at 236).

In the fall of 2009, Plaintiff told Pollock that she did not want to go with her to UC and told Pollock that she wanted to just complete a masters degree.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 58).  Pollock told Plaintiff that she would be happy to write Plaintiff a letter of recommendation.  (Pl.'s Dep. at 237; Defs.' Ex. 15 at Dibbern001509).  Pollock and Plaintiff then put together a plan for Plaintiff to complete her masters degree at the University by April of 2010.  (*Id.*; Pl.'s Dep. at 237-38).  At that time, Pollock was willing to fund Plaintiff during the winter 2010 term.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 60).

During the Fall 2009 Term, Plaintiff took a course of International Environmental Policy & Law in the School of Natural Resources, and studied for and took the Law School Admission Test ("LSAT").  (Def.'s Stmt. & Pl.'s Stmt. at ¶ 61).

---

[2]Defs.' Ex. 15 is a timeline prepared by Plaintiff. (Pl.'s Dep. at 51-53).

As of December 2009, Plaintiff had not scheduled the preliminary exams necessary to obtain a Ph.D., nor did she complete a master's degree by April 2010.  (Def.'s Stmt. & Pl.'s Stmt. at ¶ 69).

In December 2009, Pollock again emailed Plaintiff about her lack of research progress. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 62).   Plaintiff responded that she had been coming into the lab less frequently because she had been studying for the LSAT.  (*Id*. at ¶ 63).  Pollock then responded with the following:

> Jennifer,
>
> I hope things go well on your LSAT.  However, I should let you know that I am concerned about you finishing a MS degree.  You will need to invest substantially more effort in your research next semester than you have in any semester past to finish oxidation, creep and compression experiments, accompanying analysis and writing of your thesis.  There will only be enough funding to cover you through winter semester.  The six semesters of support that we have provided should be more than enough to finish a MS degree.  I will be here through Jan 8 and back again Jan 27th so you can set up a meeting with me whenever you wish.

(Defs.' Ex. 31).

Despite Pollock having expressed the above concerns, Plaintiff applied for and obtained a 10 hour/week temporary job for the Winter Term with a University of Michigan Law School professor.  (Def.'s Stmt. & Pl.'s Stmt. at ¶ 65; Defs.' Ex. 32; Defs. Ex. 32).   Plaintiff did not inform Pollock that she intended to work in the Law School at the same time she was being paid to be engaged in full-time research in MSE.  (Def.'s Stmt.& Pl.'s Stmt. at  at ¶ 66).

But Pollock learned about it through a colleague at the University who sent her an email. On December 22, 2009, Plaintiff received an e-mail from Pollock.  (Defs.' Ex. 32).  Pollock began the exchange with Plaintiff by forwarding an email that had been sent to her by a colleague at the University, advising Pollock about another potential appointment Plaintiff may be taking

on and asking Pollock if she were aware of that appointment.  In the message sent to Plaintiff,

Pollock stated:

> Dear Jennifer,
>
> I am extremely disappointed to see that you are seeking an alternate appointment after our discussion last week about what will be required for you to finish your MS degree.  Unfortunately I will not be able to provide any support for you next semester.
>
> Please consider this a formal request for you to return all materials and supplies relevant to your research.  Please leave them on your desk before the end of the year.
>
> Good luck with your SNRE appointment and with your law school applications.
>
> Sincerely
>
> Tresa

(Defs.' Ex. 32 at Dibbern000867-68).  Plaintiff responded to the e-mail on December 22, 2009,

stating:

> Professor Pollock,
>
> I just called your office in the hopes that we might talk.  I feel there has been a misunderstanding.  When I sought this appointment, I only looked to it as a way to supplement my income through activities that would take place in my free time.  I considered carefully my commitments to research next term and felt that this would not conflict or interfere.  If, however, you feel that I should not participate, given the research load, in any additional activities next term, I would be more than happy to withdraw my application from SNRE.  My research with you is my priority above everything else.  I would really appreciate the chance to discuss this with you.  I am available by phone at (319) 471-3215.  Is there a time and number which it would be most convenient for me to reach you?

(*Id*.).

The next day, on December 23, 2009, Pollock sent Plaintiff another email (Defs.' Ex. 33)

that stated:

Jennifer,

I see that I have missed calls from you; I am vacationing with family for the next few days.

I think I should explain my decision to you in more detail.
First, we always expect research MS degrees to take no more than 4 semesters plus one summer. You have had an extra summer plus an extra semester already. You have spent less time in the laboratory than any student I have ever supported in my 20 years as an academic. You have been enrolled in a large number of non-MSE courses and according to recent emails were too busy with law courses to meet with me. In spite of all of that I was willing to support you for one semester with your promise of investing far more time than you previously have on research. The fact that you accepted a 25% appointment from another dept without even discussing this with me indicates that you are not serious about finishing your research. I cannot justify supporting you full time with funds from Boeing when you are spending most of your time on other things. I am very sorry to arrive at this conclusion.

Tresa

(Defs.' Ex. 33).

On December 26, 2009, Pollock forwarded the December 22, 2009 email exchange

between her and Plaintiff to a colleague, Professor Rachel Goldman, and copying Peter Green

and Renee Hilgendorf, stating:

Rachel,

FYI, I am forwarding a copy of a message I sent to Jennifer Dibbern to you so that the graduate committee is informed of the situation with this student. I have decided not [to] support Jennifer Dibbern for another semester of research MS. She is far from completing the research requirements, even though she has had five semesters and two summers of support. Last semester she was busy with law classes and studying for the LSAT. She has spent less time on her research than any student I have ever supported. Finally (the last straw), I discovered last week that she has recently accepted a 25% appointment with SNRE (see message below), without consulting me and in spite of another recent frank discussion with her about how hard she would need to work to complete the requirements for a research MS. Unfortunately I can no longer justify supporting her full time on a research project from Boeing. In spite of how long she has been here, I don't even think she has enough credits for a coursework MS; she will need to figure out

14

what to do next.

Thanks,
Tresa

(Defs.' Ex. 34).

**2010**

In January of 2010, Plaintiff sought a new advisor, in an attempt to revive her Ph.D

program.  (Defs.' Ex. 15 & Pl.'s Stmt. at ¶ 157).

At the beginning of the Winter 2010 semester, Plaintiff contacted Professor Peter Green

("Green"), Chair of the MSE Department, regarding her need for a new advisor.  (Def.'s Stmt. &

Pl.'s Stmt. at ¶ 70).  Green referred Plaintiff to Professor Rachel Goldman ("Goldman"), Chair of

the Graduate Program.  Plaintiff did not mention any harassment to Green and Green was not

aware of any alleged sexual harassment until this lawsuit was filed.

Plaintiff met with Goldman in January 2010 to discuss potential advisors and Plaintiff did

not discuss any harassment at that meeting.  (Def.'s Stmt. & Pl.'s Stmt. at ¶ 71-75). Goldman

took Plaintiff on after being advised by Plaintiff that Plaintiff had previously reported harassment

to Pollock. (*Id*.).

In a meeting with Goldman and Renee Hilgendorf, MSE's graduate program coordinator,

in mid-February of 2010, in response to a question regarding the withdrawals on her transcript,

Plaintiff referenced harassment that had occurred during her first two years in the program.

(Def.'s Stmt. & Pl.'s Stmt. at ¶ 75; Pl.'s Dep. at 289-290; Defs. Ex. 15).  Plaintiff testified as

follows concerning that meeting:

> Q.     Okay.  What do you remember telling Dr. Goldman and Renee
>        Hilgendorf? What do you remember saying about the harassment?
> A.     I remember saying that there were men in the department and asked if they

were faculty or students, and I clarified for them that they were students who since I had arrived had been harassing me, that they had threatened to rape me, and that even after that I continued and I'd been assaulted in my office by the stalker.

Q.      Do you remember telling them anything else about the harassment in that meeting?

A.      I remember that I explained to them why I had the Ws and the leave, because right before the exams was when they had described in detail. And I said that they had described in detail and – how they would rape me and that it would take place at the department, colloquia and a number of other ways.

        They asked if I had told Dr. Pollock, and I said that I had.  I said that I reached out to her on multiple occasions.  I – they asked if I reached out to anyone else, and I said that I had talked with folks at SAPAC and CAPS to do safety planning, that it was required that I move.

        I know that Renee expressed that she was horrified, she said, because she had a daughter, and they said so these were students in the department, and I said, yes, these are students in the department. They said in our department, and I said, yes, in our department.

(Pl.'s Dep. at 289-90).[3]  Plaintiff did not tell Goldman or Hilgendorf the names of the students who had harassed her.  (Pl.'s Dep. at 290-300; Goldman's Dep. at 91, 96-97, 101-02, 114-15; Hilgendorf's Dep. at 26-28).

Following the meeting with Goldman and Hilgendorf, Plaintiff's funding was secured for the entire winter 2010 semester.  (Def.'s Stmt. & Pl.'s Stmt. at ¶ 80).

After that meeting, Plaintiff never told Goldman, Hilgendorf, or anyone else at the University that she experienced any further harassment.  (Def.'s Stmt. & Pl.'s Stmt. at ¶ 79).

Plaintiff began working in Goldman's lab around late February of 2010.  (Defs.' Ex. 15 at 2).  In the "Summary of Key Facts" section of her response (Pl.'s Br. at 3), Plaintiff states that she was subjected to unwelcome conduct in the lab that was of a sexual nature and directs the

---

[3]Both Goldman and Hilgendorf testified that while Plaintiff stated she had been harassed, Plaintiff did not tell them the harassment was sexual in nature or provide any details.

Court to pages 349-50 of her deposition, wherein she described having been subjected to

"respirator kisses" from Michael Warren as follows:

> A.   Sure.  So molecular epitaxy is equipment that operates – this is somewhat
> necessary – operates at high vacuum, and so when you – if something
> breaks in the machine, part of the reason why it takes a while to fix things,
> because you have to vent the system and then clean it out.  But a lot of
> what – it's a self-contained environment, so a lot of what goes on in there
> is it's okay when you're working in there normally to not have respirators
> on, but when you're cleaning it, you have to wear a bunny suit and a
> respirator.
>
> Q.   Okay.
> A.   And so we'd be wearing a bunny suit, which is – are you familiar with
> what that is?
> Q.   Yes.
> A.   – and then a respirator that we had fitted to filter particulates.
> Q.   Okay.
> A.   And so he would – it's like – it took different forms. He'd come up from
> behind you and, like, try to reach around, and he would try to push his
> respirator into your respirator.
> Q.   So you'd be sort of mask to mask –
> A.   Uh-hu.
> Q.   – is that correct?
> A.   Mask to mask or he would do masks to cheek or he would try to like, grab
> your head and, like, force you mask to mask.
> Q.   And what would you do when he did this?
> A.   It happened numerous times.  Some of the responses I gave were no, like,
> don't do that, stop it, knock it off, what do you think you're doing.
> Q.   And this continued throughout winter 2010?
> A.   Yeah.
> Q.   Did anybody else see it?
> A.   It's possible.

(Pl.'s Dep. at 349-50).  Thus, Plaintiff does not know if Goldman ever saw that conduct.  (*Id*. at

350-51).  Plaintiff did not complain to anyone in the College of Engineering about Warren.  (*Id*.).

    In August of 2010, Plaintiff discussed with Goldman and Hilgendorf, via e-mail, the need

to file a petition so that Plaintiff could avoid being placed on academic probation because she

had not achieved candidacy within three calendar years after first enrolling in the doctoral

program at the University.  (Defs.' Ex. 37).  In that e-mail, Plaintiff noted that her plan was to take her preliminary exams in the Spring of 2011.  (*Id.*).

In the Fall of 2010, Plaintiff began volunteering for SAPAC.  (Pl.'s Stmt. at ¶ 55; Pl.'s Dep. at 262).  Plaintiff told Goldman that she was volunteering for SAPAC.  (Pl.'s Dep. at 262).  Plaintiff testified that Goldman responded okay at first but after that Goldman referenced SAPAC at times during conversations: "It would be in conversations where we would discuss meeting on a weekend and, unlike other students in the group who would have outside activities, like traveling, sports teams, et cetera, she would say I know you have that SAPAC thing in kind of a negative tone."  (Pl.'s Dep. at 263).

In the fall of 2010, Plaintiff received two outstanding student instructor awards, in connection with a course taught by George Winarski, a lecturer in MSE.  (Pl.'s Dep. at 433-435).  Plaintiff testified that one of those awards was an award from the COE for best student instructor.  (*Id.* at 435-36).  Goldman presented Plaintiff with one of those awards at a ceremony.  (Pl.'s Stmt. at ¶ 91; Goldman Dep. at 155).

There was no post-doctoral student in Goldman's lab after the Fall 2010 semester.

At some point after October of 2010, Plaintiff met with Holly Rider-Milkovich of SAPAC to discuss a training program about sexual assault prevention for the College of Engineering that Plaintiff wished to help develop.  (Rider-Milkovich Dep. at 14-16).  At some point, Rider-Milkovich and Plaintiff presented their ideas to "a number of administrators," names she could not recall, to present their ideas.  (*Id.* at 24-25).  The program they had worked on, however, was not implemented because there was another effort under way in the College of Engineering, called "Expect Respect Program."  (*Id.* at 25-26).   Plaintiff has not presented any

18

evidence to show that Pollock, Goldman, or Green, were ever aware of those efforts.

**2011**

Plaintiff did not take her preliminary exams in the Spring of 2011 or the Fall term of 2011. (Defs.'s Stmt. & Pl.'s Stmt. at ¶ 90; Pl.'s Dep. at 342-43).

Goldman testified that in early 2011 she began getting concerned with Plaintiff's performance in the lab. (Goldman Dep. at 190-194).

During this time period, it is undisputed that Plaintiff had some conflicts with other students in Goldman's lab, Eric and Emily. (*See, e.g.* Pl.'s Ex. 14 & Def.'s Ex. 38). An email exchange regarding some conflicts occurred on April 11, 2011. Goldman testified that she sent that email after "many months of complaints by the other students about what was going on in the lab." (Goldman Dep. at 162).

Plaintiff states that the nomination and election process for GEO Officers was occurring around this same time. (Pl.'s Stmt. at ¶ 92).

Plaintiff became Treasurer of the GEO on April 14, 2011. (Pl.'s Affidavit at ¶ 14). None of the other students in Goldman's research lab were involved in union organizing activities. (*Id.* at 16).

Plaintiff asserts that she and Goldman "spoke on several occasions about the union organizing efforts and she expressed her belief that graduate students were being fooled or tricked by the union in some way." (Pl.'s Affidavit at ¶ 19).

In the Spring of 2011, Goldman expressed to Plaintiff that "she believed unionization would interfere with student/mentor relationships." Plaintiff's Affidavit states that "[t]his specific conversation occurred on a Saturday morning when she had asked me to come in early

for a work-related discussion that ended up being an hour long meeting solely about the union's efforts and my feelings about it."  (Pl.'s Affidavit at ¶ 20).

On July 19, 2011, Goldman sent an email to Michael Atzmon regarding a Geo forum that had been held.  (Pl.'s Ex. 35).  Goldman asked if any "MSE students" had expressed concerns, to which he replied "[t]he only question by an MSE student I recognized (Jennifer Dibbern) was about expected long term gains, to which GEO gave the standard answer that unionized workers have higher pay."  (*Id*.).

Plaintiff's Affidavit states that at a meeting that occurred on August 5, 2011, "that was supposed to be about research in her office, [Goldman] told me about a student she had heard of who was involved in the union effort and expressed her disbelief that the student could be so stupid to be involved.  She then directly questioned me about whether I or any members of her group were sympathetic to or involved in the union efforts.  She additionally expressed that she thought the union would destroy higher education as we knew it and that if the union got its way our top tier graduate program would be destroyed."  (Pl.'s Aff. at ¶ 22).  Plaintiff's Affidavit further states:

> 22.     She also told me that she had spoke to a student in the department who was vocally anti-union about the upcoming MERC meeting on Monday.  She referenced conversations she had with a friend in the general counsel's office about the meeting and the union efforts generally.  While I was sitting in her relatively small office, she began to pull details about the MERC hearing up on her relatively large computer screen.  As she looked, she directly asked me if I knew who the union officers were.  Although I was treasurer of GEO at that time, I did not answer her.  As I left her office she said she was going to go online and try to find out who the officers were.

(Pl.'s Aff. at ¶ 23).

On August 8, 2011, Goldman sent Plaintiff an email that began by stating: "I am

concerned about your focus and would like you to start making detailed plans for each day using the biweekly goals sheet.  Please let me know if you have access to a copy of it or if you would like me to send it to you.  I would like to see a filled out version of it by the end of the day on Tuesday."  (Defs.' Ex. 42).  Goldman's email then listed concerns with the progress of an abstract that Plaintiff was working on, her research progress, and her communications with her lab colleagues.  The email ending with Goldman stating: "With the planning using the biweekly goals sheet, I am hoping to help you accelerate your progress . . . I realize you have many other things going on but an increase in your focus on research is urgently needed.  This will probably require you to decrease your involvement in non-research related activities."  (*Id*.).

Plaintiff testified that she had conversations with Goldman after that email, wherein Plaintiff asked Goldman what she meant by non-research activities.  (Pl.'s Dep. at 382-83).  Plaintiff testified that in one such conversation, Plaintiff asked Goldman if she was "talking about GEO, and she said, look, Jennifer, you need to fill out your goals sheet." (Pl.'s Dep. at 382-384).

Plaintiff's Affidavit states that after a MERC meeting August[4] 8, 2011, many of her conversations with "Goldman began to focus on my extracurricular activities.  When I asked for clarification about what she meant because I had stopped essentially all activities except for GEO, she told me, 'I don't need to spell it out for you.'" (Pl.'s Aff. at ¶ 25).

Other students working in Goldman's lab participated in non-research activities.  For example, Eric Zech testified that he played club soccer and that involved practices three or four

---

[4]Plaintiff's Affidavit states the meeting was on the "8th" without specifying the month and year.  But its appears from Plaintiff's Stmt. that this meeting was the meeting on August 8, 2011. (*See* Pl.'s Stmt. at ¶ 98).

times a week and a game or two on the weekends. (Zech Dep. at 43). Zech testified that

Goldman never asked him to scale back any of his extracurricular activities. (*Id*. at 69). Plaintiff

claims that Goldman treated her differently than other students, like Zech. (Pl.'s Dep. at 267).

But Plaintiff also testified that she was not aware of the amount of time that other students spent

in the lab or their progress in the degree programs. (Pl.'s Dep. at 267-270).

Plaintiff testified that she stopped volunteering at SAPAC in the winter of 2011 term.

(Pl.'s Dep. at 374). Plaintiff testified that she "tried to further reduce hours, commitment,

wearing buttons, anything that was associated with SAPAC in response to what Professor

Goldman was saying." (*Id*. at 374). Plaintiff testified, however, that Goldman did not tell her to

stop participating in SAPAC:

> Q.  All right. Dr. Goldman never told you specifically you have to stop
>     participating in SAPAC, did she?
> A.  Again, Dr. Goldman and I had conversations about the comments that I
>     mentioned to you which conveyed an attitude to me.
> . . .
> Q.  Ms. Dibbern, I'm not asking who conveyed what to you. I'm asking did
>     Dr. Goldman tell you stop participating in SAPAC?
> A.  In those words, not that I recall.

(Pl.'s Dep. at 375).

On August 9, 2011, Goldman sent Plaintiff an email expressing that she was unhappy

with Plaintiff's communication with lab mates, and stating that "[m]oving forward, to facilitate

communication with other group members, especially during the weekday/daytime hours, please

do your research activities in the laboratories or common areas such as offices." (Defs.' Ex. 43

& 44). The next day Goldman sent Plaintiff another email asking her to "confirm that you have

received this message and that you understand the issues and plan for moving forward." (Defs.'

Ex. 47). Plaintiff replied that same day, stating "Professor Goldman, I received your email and

22

understand that you would like me to be more readily accessible by conducting research activities during daytime/weekday hours in the laboratories or common area like the offices." (*Id.*).

On August 13, 2011, Goldman sent Plaintiff an email stating: "This letter is a follow-up to multiple e-mail exchanges and personal conversations in my office. These discussions have led me to realize that there are some serious issues which need to be documented. Of particular concern is your level of commitment to doing thesis research in my group, as evidenced by your limited progress and your limited demonstration of interest in meaningful communication with the graduate students in my group. At this point, I cannot commit to research funds beyond the Fall term 2011 unless some extraordinary changes occur." (Defs.' Ex. 49). Plaintiff responded, "I am confirming that I received this email." (*Id.*).

In an email to Plaintiff on August 25, 2011, Goldman asked Plaintiff if there were any updates to her abstract. (Defs.' Ex. 50). When Plaintiff had not responded by the next day, Goldman again asked her to respond. Plaintiff responded, discussing the abstract, on August 26, 2011. Goldman replied a few hours later stating, "this abstract seems to be almost identical to the old one, please indicate what has changed." (*Id.*). On August 29, 2011 – three days later – Goldman sent another email to Plaintiff stating "I have not heard from you. Please respond." (*Id.*).

On August 30, 2011, a week before the start of the Fall term, Goldman sent Plaintiff an email stating: "As I mentioned in our discussion earlier today, more than 2 weeks have passed since I wrote the message below, and there [has] been insufficient changes to your demonstrated level of commitment to doing thesis research in my group to warrant continuation. Therefore, I will not be able to commit research funds beyond the Fall 2011 term." (Defs.' Ex. 52).

23

During his deposition, Green testified that he had some misgivings about how Goldman handled her termination of Plaintiff from her research group, explaining that Goldman had not done "anything wrong per se, but the optics of it looked bad" the way Goldman had Plaintiff leave the group abruptly.  (Green Dep. at 71-72). Green explained: "We aren't in the habit of saying good-bye in the middle of the semester, I'm not going to support you anymore.  I mean, it does happen, but usually the students are able to find a new advisor and the funding continues, so somebody picks it up one way or another.  And that's what that was about, I didn't like the way it was done."  (*Id*.).

On September 12, 2011, Plaintiff began a part-time job with the American Federation of Teachers Michigan union ("AFT").  (Pl.'s Stmt. at ¶ 109; Defs.' Ex. 53).

On September 16, 2011, Goldman sent Plaintiff an email, on which she copied Green and Hilgendorf.  That email was actually an email thread of the August 9, 2011 thread, that left off with Plaintiff saying she agreed to the plan.  Goldman's September 16, 2011 addition to that email thread stated:

> Jennifer: More than a month ago, we discussed your participation in the lab, including your agreement to perform research activities in the laboratories or office areas during normal "working" hours.  You also agreed to let us know (both myself and those you work with) when you will not be in the lab due to another commitment related to your GSI mentorship or other activities.  These two expectations are typical for graduate students doing research in experimental research groups.
> We have not reached a cross-road wherein it seems that I am no longer able to provide you with research mentorship.  Please let me know how you would like to proceed.
>
> For example, perhaps you would rather make a request to have a more substantial GSI mentorship position?

(Defs.' Ex. 54).

24

Having received no response from Plaintiff, on September 22, 2011, Goldman sent Plaintiff an outline of a path to a master's degree and informed Plaintiff that if she still wanted to pursue a Ph.D., she would need to find a new advisor.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 111; Defs.' Ex. 55).

On September 26, 2011, Plaintiff and her mother met with Darlene Ray-Johnson and discussed the leave-of-absence policy and information regarding tuition funding.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 113).

That same day, Plaintiff and her mother had an impromptu meeting with Green and advised him that Goldman was trying to remove Plaintiff from her research group.  Green discussed Plaintiff searching for a new advisor and dropping Goldman's research class.  Neither Plaintiff nor her mother referenced any sexual harassment during that meeting.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 114-116).

On September 27, 2011, Goldman sent Plaintiff a detailed email summarizing the events of the past few years and informing Plaintiff that because her dissertation research would no longer be supervised by her, Plaintiff would have to drop Goldman's section of the research class.  Goldman advised that if Plaintiff was able to locate a new advisor, she could switch to another section.  Goldman confirmed that although she no longer had a research appointment, Plaintiff would continue to be paid the same amount with a stipend for benefits, asked Plaintiff to respond with her plans, and offered to discuss the matter.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 117-119).  Goldman concluded the email by stating: "Please respond to this message indicating that you understand the options, and please let us know your plans for this semester (i.e., will you find a new dissertation advisor or take the tuition-free stipend approach?)  You are certainly free

to discuss this matter with me, Professor Green, or Associate Dean Gallimore but I am afraid my decision here is final." (Defs.' Ex. 58).

On September 28, 2011, Plaintiff confirmed that she received Goldman's message. She also stated that she was "in the process of seeking out additional information, so, I cannot respond to you with a decision. I want to clarify issues around what it means to be enrolled for only 1 unit, how that may influence whether I remain in good standing as a graduate student, and whether it would impede my path to a degree." (Defs.' Ex. 59). Hilgendorf, who had been copied on the email thread, responded the next day that she wanted to clarify a few things:

> The continuous enrollment policy was implemented a year ago, last fall 2010 term. Also, enrollment of 1 credit is sufficient to maintain Ph.D student status, it does not determine "good standing" as you indicate in your e-mail below. Good academic standing is determined by making satisfactory progress toward completion of degree requirements, demonstrating the ability to succeed in the degree program and having a cumulative grade point average of 5.00 (B) or better.
>
> Rackham's Academic Policies can be found here if you are seeking more information: http://www.rackham.umich.edu/policies/academic policies/
>
> Let me know if I can help with anything else.

(Defs.' Ex. 59).

On October 13, 2011, Goldman emailed Plaintiff with information regarding the source of Plaintiff's funding, reiterating information about Plaintiff's ability to obtain her master's degree or search for a new advisor (including that the department would assist in the search), again advising that Plaintiff would need to transfer her research course registration, and asking that Plaintiff return her notebooks and other lab items. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 122).

On October 18, 2011, after Plaintiff had not responded after five days, Goldman sent Plaintiff another email. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 123).

26

On November 17, 2011, Plaintiff began working for the AFT as a full-time employee. (Defs.' Ex. 62).

Although Plaintiff was not doing research in any lab, was not working as a teaching assistant, and in fact had taken an outside full-time job, Plaintiff continued to receive funding for the Fall 2001 term.  (Defs.' Stmt. & Pl.'s Stmt. at 125).

Plaintiff contends that a "secret" meeting took place on December 1, 2011, that Goldman attended along with Jeffrey Frumkin of the Academic Human Resource Office.  (*See* Pl.'s Stmt. at 196-198).  Frumkin testified:

> Q.    Do you ever recall having a conversation with Professor Goldman regarding her opinion of the organizing campaign?
> A.    Yes.
> Q.    When was that?
> A.    That would have been at the December meeting.
> Q.    What did she tell you about her opinion of the organizing campaign?
> A.    In general, she said that she didn't think GSRAs, it was appropriate for GSRAs to organize.  She also said that there was – it was one of the items that she listed as taking time away from Jennifer Dibbern's studies.
> Q.    What other items, if you recall, what other items did she list?
> A.    With respect to her studies?
> Q.    Yes.
> A.    There was a reference to another academic class and reference to her involvement or work with SAPAC, which is a sexual assault and prevention organization that I believe is a part of the Student Life organization of the University.

(Frumkin Dep. at 39-40).  Green testified that he was aware of a December 1, 2011 meeting before it occurred but that he did not attend it.  (Green Dep. at 185).  Green further appears to have testified that someone at that December 1, 2011 meeting decided to terminate Plaintiff from the program.  (*Id*. at 188).

On December 2, 2011, Elizabeth Wagner, Office of the Associate Dean for Research and Graduate Education sent an email to Denise Edmund, and copying several people including

Hilgendorf, Green, and Ray-Johnson, stating: "Will you please discontinue Ms. Jennifer Dibbern [student number], Materials Science and Engineering, from the Ph.D program effective today?" (Pl.'s Ex. 41). Edmund responded that same day that Plaintiff had been discontinued from the program that day. (*Id*.).

On December 13, 2011, the last day of classes for the semester, Plaintiff requested that she be transferred into Green's research section to receive a grade in MSE 990.[5] (Defs.' Stmt. at ¶ 126; Pl.'s Stmt. at ¶ 126). Plaintiff testified that she told Green that Goldman had told her that if she did not find another advisor that Green would grade her research units. Green told Plaintiff that he did not know anything about what she was talking about. Plaintiff testified that she offered to show Green an email from Goldman about the issue but Green did not want to see it. Plaintiff testified that Green told her that he could not grade Plaintiff's research class because he had not seen her do any research work. (Pl.'s Dep. at 302-03).

Green told Plaintiff that it was too late to change sections on the last day of classes and that he could not give Plaintiff a grade in MSE 990 when Plaintiff had not been doing research and he had not seen her do work. (*Id*.; Green Dep. at 167, 192-93).

Defendants' Motion asserts that Green made the decision to recommend that Plaintiff be dismissed from the program. (*See* Defs.' Stmt. at ¶ 128). But as Plaintiff notes in her Statement, there is conflicting evidence as to who made the decision to dismiss Plaintiff from the program and when it was made. Green's testimony includes:

---

[5]Green explained that 990 class was akin to an independent study class with Goldman and doing research in Goldman's group. (Green Dep. at 72-73). Thus, once Plaintiff was no longer doing research with Goldman, the only way she could complete the course would be to re-register for the class with a new advisor, who would oversee her research. (*Id*. at 72-74).

Q.     You were involved in kicking Ms. Dibbern out of the Engineering Ph.D program, right?

A.     Yes, ultimately as a department chair, I had to write a letter. . .

. . . .

Q.     So you weren't part of any committee to recommend academic dismissal to Rackham?

A.     I didn't make the decision and I wasn't at a meeting where the decision was made.

Q.     Well somebody asked you to communicate that to Rackham or to her or –

A.     I'm the department chair, so by definition it's my responsibility. And at the time I was absolutely convinced and totally in agreement that this is what made sense. There is no other way to look at it.  I had no other way of looking at it, period.  It was a very honorable decision. At least in my mind.  And I can't see any other ways you could have looked at it.

. . . .

Q.     Is it possible that it was already decided that she was going to be dismissed by the 9th of November?

A.     I don't know.

. . . .

Q.     Well, there was a meeting on December 1st, but you don't know what the topic was, right?

A.     I wasn't part of that meeting, that's right, I don't know what was discussed in detail.

Q.     Somebody else – you weren't part of that and somebody else, you suspect, at least, somebody else decided to dismiss her from the program?

A.     Well, that would be the conclusion.

Q.     And that was on December 2nd and Ms. Dibbern wasn't provided any notice of this at the time at all, was she?

A.     I don't know.  I don't know.

(Green Dep. at 29, 159,178).

On December 16, 2011, Plaintiff brought five GEO representatives with her to a meeting with Green, Hilgendorf, Student Advocacy Manager Angie Farreerhi and Project Manager for COE Research and Graduate Education Elizabeth Wagner.  At that meeting, Plaintiff was advised that it had been recommended that Rackham discontinue Plaintiff from the Ph.D program because of lack of research progress.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 129-30).  Plaintiff testified that it was a tense meeting and that Green told her "he was discontinuing me from the

program, that his decision was final and there would be no discussion or meetings further about it." (Pl.'s Dep. at 310).

On December 16, 2011, Green sent Plaintiff a letter that stated: "I regret to inform you that due to your lack of progress on your thesis research, we are recommending that the Rackham Graduate School discontinue your enrollment in the Materials Science and Engineering Program. As we discussed in our meeting in September, and again today, you have enough credits to leave the program with a Master's degree in Materials Science and Engineering." (Defs.' Ex. 65). The letter advised Plaintiff to contact University officials by December 20, 2011 if Plaintiff wished to obtain a master's degree. The letter also informed Plaintiff "If you wish to appeal this decision, please contact Ms. Darlene Ray-Johnson at Rackham Graduate School." (*Id.*).

During her March 18, 2014 deposition, Plaintiff testified that she could not recall if she discussed the appeals process with Darlene Ray-Johnson. (Pl.'s Dep. at 410-11).

In any event, Plaintiff did not file an appeal of her dismissal. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 133).

On or about January 18, 2012, Plaintiff held a news conference regarding her dismissal, where she was accompanied by GEO leader Samantha Montgomery. In that news conference, Plaintiff proclaimed "she was . . . unjustly fired from her position on Aug. 30 for talking openly about her support for GSRA unionization" but did not refer to sexual harassment or retaliation related to reporting allegations of sexual harassment. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 151; Defs.' Ex. 77).

On February 3, 2012, Goldman forwarded an e-mail to Zech, with a subject line of GSRA Campaign & Student Intimidation. (Ex. 20 to Pl.'s Br.). The e-mail Goldman forwarded was

from a professor in the University's School of Social Work and it appears to suggest some kind of public response from students and references "I think the best possible respondents are students (the students who are/were in Rachel's group), whose letter was very powerful." (*Id.*).

On February 9, 2012, the Michigan Daily published a letter to the editor written by Eric Zech, a student that Plaintiff had worked with in Goldman's lab. (Pl.'s Ex. 20). It was titled, "Letter to the Editor: Jennifer Dibbern's claims are factually inaccurate" and it began by stating: "My name is Eric Zech, and I'm a GSRA working in Engineering Prof. Goldman's research group at the University. I am writing this letter in response to the current issue regarding Jennifer Dibbern and her claim that she was wrongfully terminated from her position as GSRA based on unionization efforts." Zech's letter stated, among other things, that "[t]he allegations Ms. Dibbern is making against the University and Goldman are completely false and should not be passed along as fact. It's wrong that she is making false claims and is gaining support from many people based on no factual evidence." (*Id.*). It ended by saying: "I am writing this letter on my own accord to help inform you or the facts, because I believe in standing up for the truth. Thank you for taking time to read this letter and I sincerely hope it helps shed truth on the situation." (*Id.*).

In response to communications that Plaintiff had with a University Regent, Provost Philip Hanlon arranged a meeting with Plaintiff. On February 13, 2012, Plaintiff met with Provost Hanlon, Associate General Counsel Christine Gerdes, outside counsel David Fink, SAPAC Director Holly Rider-Milkovich, two representatives from the GEO and a representative from the AFT. At the outset of the meeting, Plaintiff stated that: 1) she did not want the University to pursue any investigation; and 2) she would not participate in an investigation if one were started.

31

During the meeting, Plaintiff described three incidents of harassment from the 2007-2008 academic year.  (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 135-138).

Plaintiff admits that, during the February 13, 2012 meeting, she did not discuss any incidents that occurred after December 2009, did not disclose the names of the pre-limitations alleged harassers, and did not provide any specifics regarding the alleged harassment.  When asked what Plaintiff envisioned as "next steps", Plaintiff stated that she would send an email with suggestions, but neither Plaintiff nor her union representatives ever did so.  (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 139-140).

Following the meeting, Plaintiff received a letter from OSCR providing information about available resources and University procedures.  The letter attached the Survivors of Sexual Assault Handbook, the Statement of Student Rights and Responsibilities, the sexual harassment procedure.  Plaintiff did not file a complaint after receiving this information. (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 141-143).

On May 3, 2012, Kathleen Donohoe, Associate Director, HR Strategy, Planning and Policy emailed Plaintiff and requested a meeting to investigate the allegations.  Plaintiff, through her attorney, declined.  (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 144-45).

Plaintiff filed this lawsuit on December 21, 2012.  In addition, on June 18, 2013, Plaintiff's counsel filed a complaint with the U.S. Department of Education.  The Department of Education rejected Plaintiff's complaint because the allegations were untimely.  (Defs.' Stmt. & Pl.'s Stmt. at  ¶¶ 146-148).

### STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

## ANALYSIS

**I.     Statute-Of-Limitations Challenges to Pre-December 21, 2009 Claims Asserted In Counts I, III, VI, and VII.**

In this action, Plaintiff asserts claims under: 1) Title IX (Counts I & II); 2) § 1983 (Counts III, IV, & V); and 3) Michigan's ELCRA (Counts VI, VII & VIII). It is undisputed that a three-year statute of limitation applies to each of those claims in this action and this Court has previously stated so. 11/18/13 Opinion & Order at 12; *see also* Mich. Comp. Laws § 600.5805(10); *Garg v. Macomb Cnty. Mental Health Svs.*, 472 Mich. 263, 284 (2005). Federal law governs when the statute of limitations begins to run. Generally, the statute limitations

33

begins to run when the plaintiff knew or through the exercise of reasonable diligence should have known of the injury that forms the basis of her action. *Sharpe v. Cureton*, 319 F.3d 259, 255 (6th Cir. 2003).

Plaintiff filed this action on December 21, 2012. In the pending motion, Defendants contend that events occurring prior to December 21, 2009, are therefore outside of the limitations period.

Defendants ask the Court to dismiss all "pre-December 21, 2009 claims" asserted in Count I, Count III, Count VI, and Count VII. (Defs.' Br. at 5). Defendants' motion asserts that the continuing violations doctrine does not apply to state-law claims or to Title IX claims. Defendants state that the other four remaining Counts (Counts II, IV, V, and VIII) do not assert claims based on pre-December 21, 2009 events. (*Id.* at n.1). Thus, Defendants do not make statute-of-limitations arguments as to those counts.

### A.      Count VI

Defendants assert that because Michigan law does not recognize the continuing violations doctrine, any claims of sexual discrimination or harassment that are based on events that are alleged to have occurred prior to December 21, 2009 are time-barred. They note that the only alleged sexual harassment that Plaintiff has alleged after that date is Plaintiff having received "respirator kisses" from Michigan Warren.

In her response brief, Plaintiff acknowledges that the "Michigan Supreme Court rejected the doctrine of 'continuing violations' with respect to ELCRA." (Pl.'s Br. at 33 n.6).

Plaintiff then argues that "Michael Warren's 'respirator kisses' is actionable conduct within the three-year limitations period." (Pl.'s Br. at 31). Plaintiff does not identify any other

alleged sexual harassment that occurred after December 21, 2009.  But Defendants do not argue

that a claim based on the respirator kisses is time-barred.  Rather, they argue that conduct is not

actionable for other reasons that will be addressed later.

The Court concludes that Plaintiff cannot pursue Count VI claims based on any alleged

actions that occurred prior to December 21, 2009.

### B.     Count VII

In Count VII, Plaintiff asserts that the "University's maintenance of non-compliant

policies" has "a disparate impact on female students" in violation of Michigan's ELCRA.

(Compl. at 41).

Defendants contend that claim, which is also subject to a three-year statute of limitation,

is time-barred:

> The policies at issue were in place from the time of Plaintiff's arrival at the
> University through August 2011. It is not clear that Plaintiff ever read the policies,
> but she alleges that she had communications with the University regarding the
> complaint process in January 2009 and concluded she "had no real or effective
> recourse" at that time (Dkt#23, ¶67). Plaintiff does not allege that any new non-
> compliant policy was adopted within the limitations period. Since the act of
> adopting a policy that had a disparate impact took place prior to December 21,
> 2009, and Plaintiff was aware of her dissatisfaction with the policy as of January
> 2009, Count VII is barred by the statute of limitations.

(Defs.' Br. at 5-6).

In response, Plaintiff argues that her disparate impact claim under the ELCRA is not

time-barred "the policy's impact was felt after December 21, 2009 and into the limitations

period" and "it is the continued existence of the discriminatory policy that is important.  Every

time Plaintiff was harassed while the discriminatory policy was in effect, including the post-

December 21, 2009 "respirator kisses" incident, Plaintiff was injured anew."  (Pl.'s Br. at 26).

The Court agrees that argument must be rejected for the reason concisely explained by

Defendants:

> Plaintiff argues that her ELCRA disparate impact claim (Count VII) is timely
> because "the policy's impact was felt" after 12/21/09. It is undisputed that the
> "continuing violations" doctrine does not apply to state law claims. Plaintiff must
> show an unlawful act within the limitations period. Plaintiff's disparate impact
> claim turns on the legality of the policy, and no new non-compliant policy was
> adopted during the limitations period, nor was the policy ever applied to Plaintiff
> during the limitations period, as Plaintiff never pursued a complaint under the old
> (or new) policy.

(Defs.' Reply Br. at 2). The Court shall dismiss Count VII as time-barred.[6]

### C.   Counts I and Count III (To The Extent It Also Alleges Hostile Educational Environment In Violation Of Title IX).

Defendants note that the continuing violations doctrine does not apply to claims involving

discrete acts, including claims of discrimination and retaliation. (Defs.' Br. at 7) (citing *National

R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002)).

Defendants then state that what remains for consideration by the Court here is whether

the continuing violations doctrine applies to Plaintiff's federal claims for hostile work

environment, which appear[7] to be brought under Count I and Count III. Defendants contend that

the continuing violations doctrine should not be applied because the Sixth Circuit has never

extended the doctrine to Title IX claims. (Defs.' Br. at 7-8). They further assert that even if the

doctrine were applied, it still would not render events occurring prior to December 21, 2009

---

[6]Given that ruling, this Court need not address Defendants' alternative arguments as to
why this claim fails, such as Plaintiff's failure to support her claim with a relevant statistical
analysis.

[7]As discussed at the May 12, 2016 hearing, despite its title, Plaintiff's "Equal Protection
Count" is actually a duplicate claim that Plaintiff was subjected to a hostile educational
environment in violation of Title IX.

timely under the circumstances presented here. (Defs.' Br. at 8-10).

Plaintiff, on the other hand, contends that the continuing violations doctrine should be applied to her Title IX claims (Pl.'s Br. at x and 32-33). But Plaintiff herself notes that the Sixth Circuit has not ever extended the doctrine to Title IX claims (Pl.'s Br. at 33 n.6).

The Sixth Circuit has explained that "Courts have been extremely reluctant to apply" the continuing violations doctrine "outside of the context of Title VII." *LRL Properties v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1105 n.3 (6th Cir. 1995). There are no Title VII claims in this action and the Sixth Circuit has never before applied the continuing violations doctrine to Title IX claims. This Court concludes that the continuing violations doctrine does not apply and, therefore, any Title IX claims asserted in Counts I or III that are based upon pre-December 21, 2009 incidents are time-barred.

## II. Challenges To Plaintiff's Student-On-Student Sexual Harassment Claims (Counts I and VI)

Defendants challenge Plaintiff's sexual harassment claims on several grounds. Defendants note that in Counts I and VI Plaintiff alleges that she was discriminated against on the basis of her sex in violation of Title IX and Michigan's ELCRA because she experienced sexual harassment that created a hostile educational environment.

Student-on-student harassment – which is the form of harassment alleged by Plaintiff – can create cause of action under Title IX "in certain limited circumstances." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). Both parties agree that in order to establish a case of student-on-student harassment under Title IX, the plaintiff must demonstrate: 1) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school;

2) that the funding recipient had actual knowledge of the sexual harassment; and 3) that the funding recipient was deliberately indifferent to the harassment. (Defs.' Br. at 10 & Pl.'s Br. at 30) (citing *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999)).

Plaintiff acknowledges that the "requirements of Plaintiff's claim under ELCRA are substantially similar." (Pl.'s Br. at 30). That is, Plaintiff must prove: 1) that she belonged to a protected group; 2) that she was subjected to communication or conduct on the basis of sex; 3) that she was subjected to unwelcome sexual conduct or communication; 4) that the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with plaintiff's educational opportunities or created an intimidating, hostile, or offensive educational environment; and 5) respondeat superior. *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 489 (6th Cir. 2006).

Defendants contend that they are entitled to summary judgment with respect to these two counts on several bases: 1) Plaintiff cannot establish a hostile environment during the relevant period (Defs.' Br. at 11-12); 2) Plaintiff cannot establish that the University had notice of harassment which would allow the University to act (*Id*. at 12-15); 3) Plaintiff cannot establish that the University was deliberately indifferent or failed to take adequate remedial action (*Id*. at 15-20); and 4) there is no basis for imposing liability against the individual Defendants with respect to these two counts (*Id*. at 20-22).

The Court shall dismiss Counts I and VI because Plaintiff cannot establish that she suffered severe and pervasive harassment after December 21, 2009.

The standard is an objective one – whether the alleged sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the

38

educational opportunities or benefits provided by the school.

The only post-December 21, 2009 conduct of an alleged sexual nature that Plaintiff

identifies is Plaintiff having experienced Michael Warren's "respirator kisses." In the "Summary

of Key Facts" section of her response (Pl.'s Br. at 3), Plaintiff states that she was subjected to

unwelcome conduct in the lab that was of a sexual nature and directs the Court to pages 349-50

of her deposition, wherein she described the "respirator kisses" from Michael Warren as follows:

> A.  Sure. So molecular epitaxy is equipment that operates – this is somewhat necessary – operates at high vacuum, and so when you – if something breaks in the machine, part of the reason why it takes a while to fix things, because you have to vent the system and then clean it out. But a lot of what – it's a self-contained environment, so a lot of what goes on in there is it's okay when you're working in there normally to not have respirators on, but when you're cleaning it, you have to wear a bunny suit and a respirator.
> Q.  Okay.
> A.  And so we'd be wearing a bunny suit, which is – are you familiar with what that is?
> Q.  Yes.
> A.  – and then a respirator that we had fitted to filter particulates.
> Q.  Okay.
> A.  And so he would – it's like – it took different forms. He'd come up from behind you and, like, try to reach around, and he would try to push his respirator into your respirator.
> Q.  So you'd be sort of mask to mask –
> A.  Uh-hu.
> Q.  – is that correct?
> A.  Mask to mask or he would do masks to cheek or he would try to like, grab your head and, like, force you mask to mask.
> Q.  And what would you do when he did this?
> A.  It happened numerous times. Some of the responses I gave were no, like, don't do that, stop it, knock it off, what do you think you're doing.
> Q.  And this continued throughout winter 2010?
> A.  Yeah.
> Q.  Did anybody else see it?
> A.  It's possible.

(Pl.'s Dep. at 349-50). Plaintiff testified that she does not know if Dr. Pollock or Dr. Goldman

ever saw that conduct.

Although not included in Plaintiff's brief, the Court notes that Plaintiff also testified that, on one occasion, Dr. Goldman held a group meeting in a small space and Michael Warren sat in the seat next to Plaintiff, and started to put his head on Plaintiff's shoulder, but Plaintiff pushed him off.  (Pl.'s Dep. at 351).  Plaintiff also testified that, on one occasion after November of 2009, she was walking down the hall when she passed two students, John and Denis.  Plaintiff testified that Denis "said bat shit crazy, and John said yeah and laughed."  (Pl.'s Dep. at 243-44).

The Court concludes that the conduct alleged by Plaintiff after December 21, 2009 is not sufficiently severe or pervasive enough to support a claim.  The Court shall grant summary judgment in Defendants' favor with respect to Counts I and VI. [8]

## III.   Challenges To Plaintiff's Retaliation Claims (Counts II, V, and VIII)

In Counts II and VIII, Plaintiff alleges that she was retaliated against after having engaged in protected activity under Title IX[9] and the ELCRA.  In Count V, Plaintiff asserts a First Amendment retaliation claim.

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on a retaliation claim.   Here, however, Plaintiff has not come forward with any direct[10] evidence of retaliation.  Rather, she seeks to proceed under the circumstantial

---

[8]Given this ruling, the Court need not analyze Defendants' additional challenges to these counts.

[9]The parties agree that a "claim of retaliation under Title IX should be analyzed using the same legal framework as Title VI retaliation claims.  (See Pl.'s Br. at 11).

[10]Plaintiff's brief does not assert that any direct evidence of retaliation exists.  During oral argument, Plaintiff's Counsel attempted to characterize Frumkin's deposition testimony as

evidence approach.

"Retaliation claims supported by circumstantial evidence are examined using the burden-shifting framework" established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013).

Once a plaintiff establishes such a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If the defendant articulates such a reason, then the Plaintiff has the burden of showing that the articulated reason is in reality a pretext to mask discrimination. *Id.* At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination. *Id.*

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove illegal retaliation via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

---

"direct evidence" of retaliation. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). While Frumkin's testimony may be considered circumstantial evidence of retaliation, it is not direct evidence.

The parties agree as to the general standards for determining whether a plaintiff can establish a prima facie case of retaliation under Title IX and the ELCRA. (Defs.' Br. at 25-26; Pl.'s Br. at 10-11). To establish a prima face case of retaliation, Plaintiff must show: 1) that she engaged in protected activity; 2) that was known by a defendant; 3) that she suffered a materially adverse educational action; and 4) there is a causal connection between the protected activity and the adverse action. (*Id.*). It is also undisputed that for purposes of Plaintiff's retaliation claim under Title IX, Plaintiff must establish "but for" causation. For purposes of her retaliation claim under the ELCRA Plaintiff must show the protected activity was a "significant factor." (*Id.*).

The parties likewise agree that to establish a prima facie First Amendment retaliation claim, Plaintiff must demonstrate that: 1) she engaged in "constitutionally protected conduct;" 2) Defendant took an adverse action against her that would deter an ordinary person from continuing to engage in that conduct; 3) the protected conduct was a substantial or motivating factor in the adverse action. (Defs.' Br. at 39; Pl.'s Br. at 11).

In Counts II, V, and VIII of Plaintiff's Second Amended Complaint, Plaintiff alleged that she suffered a number of adverse actions, including:  1) being dropped by her first academic advisor, Pollock, on December 23, 2009; 2) being dropped by her second advisor, Goldman; 3) being terminated from the program; 4) being "publicly denigrated by other graduate students who were acting, based on information and belief, at the aid and encouragement of engineering faculty;" and 5) having "educational information publicly disclosed and shared in a violation of federal law, common law privacy rights, and with the direct and foreseeable purpose of inflicting emotional distress." (Compl. at 35-36, 39, & 43).

In response to this Court's April 29, 2016, Order, Plaintiff clarified for the Court which

42

adverse actions she intends to pursue if her retaliation claims proceed to trial: 1) Pollock having terminated Plaintiff's research position on December 23, 2009; 2) Goldman having terminated Plaintiff's research position; 3) Plaintiff's dismissal from the Ph.D. program in December of 2011; and 4) the alleged "smear campaign," being publicly denigrated by other graduate students, who were acting upon encouragement of engineering faculty. (*See* Docket Entry Nos. 134 & 136).

### A.   Pollock Terminating Plaintiff's Research Position On December 23, 2009

At the May 12, 2016 hearing, Plaintiff's Counsel acknowledged[11] that the only protected activity that could support a retaliation claim concerning Pollock terminating Plaintiff's research position was Plaintiff's reports of sexual harassment to Pollock.

According to Plaintiff's testimony, Plaintiff made a rather vague report about harassment to Pollock in November of 2007. In addition, Plaintiff testified that in May of 2008, she told Pollock that the harassment had gotten worse and that "the men harassing me had threatened to rape me" but that Pollock cut Plaintiff off mid-sentence and said, "Jennifer, these things sometimes happen. We just have to get over it, and get back to life." (Pl.'s Dep. at 198-99; Pl.'s Aff. at ¶ 9). In responding to the pending motion, Plaintiff now states that "[a]t the May 19, 2008 meeting, [she] followed the advice of CAPS and SAPAC and once again told Pollock about her

---

[11]Even if Plaintiff had not so acknowledged, the Court notes that the January 2009 report of stalking to campus police cannot constitute protected activity as to this claim because there is no evidence that Pollock was ever aware of that report. Moreover, the Court fails to see how Plaintiff's stalking report to Campus Security could be considered protected activity under either the ELCRA or Title IX. Plaintiff did not make a complaint of an ELCRA violation, nor did she complain about sex discrimination under Title IX. Rather, Plaintiff expressed that she may want to make a police report about alleged criminal conduct, stalking and assault. Finally, Plaintiff's alleged work with SAPAC and the union could not constitute protected activity as to this adverse action because that conduct occurred years *after* this adverse action.

ongoing harassment and the types of comments her harassers were making but was cut off before she could discuss the rape threats." (Pl.'s Stmt. at ¶ 36). Thus, construing the facts in the light most favorable to Plaintiff, Pollock did not take seriously or "blew off" Plaintiff's reports of sexual harassment by other students.

Notably, however, *after* the reports of harassment to Pollock, in the summer of 2009, Pollock offered to take Plaintiff with her to UC so that Plaintiff could continue on as her student. When Plaintiff declined Pollock's offer, Pollock then offered to write Plaintiff a letter of recommendation.

And Plaintiff did not terminate Plaintiff's research funding until December 23, 2009 – *more than a year and a half after* Plaintiff made her second and last complaint about sexual harassment to Pollock. Plaintiff cannot establish a causal connection by that extended temporal proximity and Plaintiff has not directed the Court to any other evidence that could establish a causal connection between Plaintiff having reported harassment to Pollock in November 2007/May 2008 and Plaintiff having terminated Plaintiff's research position in December 23, 2009.

The Court concludes that Plaintiff cannot establish a prima facie case of retaliation as to Pollock's termination of Plaintiff's research position. The Court will therefore grant summary judgment in favor of Defendants as to those portions of Plaintiff's retaliation counts that assert a claim based on Pollock having terminated Plaintiff's research position.

**B.     "Smear Campaign" (Being Publicly Denigrated By Other Students, Who Were Acting Upon Encouragement Of Engineering Faculty)**

Although Plaintiff's Second Amended Complaint asserted retaliation claims based upon the alleged adverse action of a "smear campaign" (ie., being publicly denigrated by other

44

graduate students, who were acting upon encouragement of engineering faculty), Defendants'
Motion for Summary Judgment did not include any challenges specific to that claim, or analysis
as to that claim.

Plaintiff's papers make clear that she still intends to pursue retaliation claims based upon
that alleged adverse action.

Defendants have not established that they are entitled to summary judgment with respect
to those portions of Plaintiff's retaliation counts that assert a claim based upon this alleged
adverse action.

### C.    Goldman Terminating Plaintiff's Research Position And Plaintiff's Dismissal From The University's Ph.D Program

Defendants do not dispute that Plaintiff's alleged complaints about student-on-student
harassment made to Pollock, Goldman, and Hilgendorf constitute protected activity for purposes
of Plaintiff's retaliation claims under the ELCRA and Title IX.

Defendants also concede that Plaintiff's efforts to change the University's anti-
harassment policy constitutes activity protected by the First Amendment.  (Defs.' Reply Br. at
10).

But Plaintiff also contends that her conduct and speech in connection with union
organizing is protected conduct with respect to her First Amendment Retaliation claim.  In their
Reply Brief, "Defendants deny that Plaintiff has adequately pled that she was retaliated against
for general union activities (See Dkt#23, ¶¶32, 132, 155)."  (Defs.' Reply Br. at 10).

The Court disagrees, as Plaintiff's First Amendment Retaliation Count itself includes the
following allegation:

155.    ***Retaliatory actions were motivated in all or in part by Plaintiff's speech***

45

> *to* address and remedy systemic failures to comply with state and federal
> law, ***including but not limited to***, Plaintiff's actions to report and address
> individual harassment, ***Plaintiff's actions to organize graduate student
> instructors and graduate student research assistants to negotiate
> collectively on the terms and conditions of employment***, and Plaintiff's
> advocacy to promote training and other policy changes designed to bring
> the University within compliance with state and federal law.

(Compl. at ¶ 55) (emphasis added).  Accordingly, for purposes of Plaintiff's First Amendment

Retaliation Count, the Court concludes that her protected activity includes Plaintiff's advocating

for victims of sexual assault through SAPAC, her efforts to change the University's anti-

harassment policy, and her union-organizing activity.

The Court concludes that, construing the evidence in the light most favorable to Plaintiff,

it appears[12] that Plaintiff can establish a prima facie case of retaliation as to the adverse actions of

having been terminated from her research position with Goldman in August/September of 2011

and having been dismissed from the University's Ph.D program in December of 2011.

Construing the evidence in the light most favorable to Plaintiff, Plaintiff has sufficient evidence

to show a causal connection between her protected activity and Goldman's decision to terminate

her research position and recommend her dismissal from the program.  For example, Goldman

---

[12]At the May 12, 2011 hearing, Counsel for Defendants made an argument that was *not*
included in their Motion for Summary Judgment – that Plaintiff cannot pursue a First
Amendment retaliation claim based on her union-organizing activity at issue in this case because
such conduct should not be considered a matter of public concern. The Court recognizes that
there are certain nuances in the law as to first amendment retaliation claims when the plaintiff is
a public employee.  *See Devlin v. Kalm,* 531 F. A'ppx 697, 704 (6th Cir. 2013)*; City of Elyria*,
502 F.3d 484, 492 (6th Cir. 2007).  But because this challenge was not included in Defendants'
motion, neither party briefed the issue.  As such, the Court declines to make any rulings on the
issue in connection with the pending motion.

knew of Plaintiff's union-organizing activity and expressed disapproval of the union on several occasions. Goldman's warning letters to Plaintiff are very close in time to events concerning Plaintiff's union-organizing activity. Goldman told Plaintiff to stop her activities outside of research, but did not tell others to do that. And Goldman referenced Plaintiff's union-organizing activities and SAPAC work in a meeting wherein some kind of decision to terminate Plaintiff from the program was made.

The Court further concludes that much of this same type of evidence could also be used to show that Defendants' stated reasons for these adverse actions (poor lab performance and failure to make sufficient progress toward her degree) are a pretext for illegal retaliation.

Accordingly, Defendants have not established that they are entitled to summary judgment as those portions of Plaintiff's retaliation counts that are based upon the adverse actions of having been terminated from her research position with Goldman and having been dismissed from the Ph.D program.

## VI.   Challenges To Plaintiff's Remaining Constitutional Claims (Counts III & IV)

Defendants' motion also challenges both of Plaintiff's remaining Constitutional claims (Counts III and IV).

### A.   Equal Protection Claim (Counts III)

In Count III, Plaintiff asserts an "Equal Protection" claim under 42 U.S.C. § 1983. On page 31 of their brief, Defendants note that in Count III, Plaintiff does not contain any specific allegation of sex discrimination. Rather, Count III alleges that "Plaintiff is a female and a former graduate student and employee of the University, a state institution bound by the Constitution to provide equal protection of the laws." (Compl. at 36). It then alleges that "[t]he conduct of

47

students and faculty condoned and fostered by the University was intentional and was sufficiently severe or pervasive as to interfere unreasonably in Plaintiffs' educational activities." (*Id*.).  Thus, Defendants understandably treated this count as a duplicate of her Title IX hostile work environment claim.  As discussed in prior sections of this Opinion & Order, to the extent this count is a duplicate of count based on student-on-student sexual harassment, Defendants are entitled to summary judgment.

Out of caution, Defendants also assert that to the extent that Count III is purporting to assert a traditional equal protection claim (ie., that the University violated Plaintiff's right to equal protection by treating a similarly-situated male student better), the claim also fails. (Defs.' Br. at 31-32).

The Court agrees.

Both parties agree that to prove an equal protection violation, Plaintiff must prove the same elements as required for a disparate treatment claim under Title VII.  (Defs.' s Br. at 31; Pl.'s Br. at 37). That is, Plaintiff must show that she was treated differently than similarly-situated male graduate students/research employees.  *Dixon v. University of Toledo*, 702 F.3d 269, 278-79 (6th Cir. 2012); *Singfield v. Akron Metro. Housing Auth*., 389 F.3d 555, 566-67 (6th Cir. 2004).

Here, Plaintiff's equal protection claim fails because Plaintiff does not: 1) allege that males complaining of harassment were treated differently; 2) allege that males with comparable lab performance (e.g., lack of research progress, failure to respond to e-mails on a timely basis) were treated differently; or 3) allege that males who had not become Ph.D, candidates after four and a half years were treated differently.  Nor has Plaintiff presented the Court with any such

evidence in response to Defendants' properly-supported Motion for Summary Judgment. As result, Defendants are entitled to summary judgment with respect to Count III. *Bell v. Ohio State Univ.*, 351 F.3d 240, 252 (6th Cir. 2003).

### B.      Due Process Claim (Count IV)

In Count IV, Plaintiff asserts a due process violation claim under 28 U.S.C. § 1983. Plaintiff contends that "[t]he actions of Defendants in dismissing Plaintiff from the COE violated Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV."  (Pl.'s Br. at 21).

Although not specified in her Complaint, it appears from Plaintiff's brief that she asserts both a substantive and procedural due process claim.  (*Id.* at 21-22).

### 1.      Substantive Due Process

In her brief, Plaintiff acknowledges that the "Sixth Circuit has held that a student has no substantive due process right in continued enrollment at a public university, absent an equal protection violation." (Pl.'s Br. at 22) (citing *Bell,* 351 F.3d at 251).  "[I]f this Court dismisses Plaintiff's Equal Protection claim (Count III), Plaintiff concedes that any substantive component to her due process claim necessarily fails."  (*Id.*).

As explained above, the Court concludes that Plaintiff's Equal Protection claim fails.  As a result, Defendants are entitled to summary judgment with respect to that portion of Count IV that asserts a substantive due process claim.  *Bell, supra*; *Rogers v. Tennessee Bd. of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008); *McGee v. Schoolcraft Cmty. College*, 167 F. App'x 429, 436-37 (6th Cir. 2006).

2.      **Procedural Due Process**

The Court must then consider whether Plaintiff can proceed with that portion of Count IV

that asserts a procedural due process claim.   As explained by the Sixth Circuit in *McGee*:

> Prevailing on a procedural due process claim requires first establishing the
> existence of a constitutionally protected life, liberty or property interest. *Bd. of
> Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
> The fact that Plaintiff has not demonstrated such an interest in the context of her
> substantive due process claim does not necessarily doom her procedural claim as
> well. Although establishing a protectable interest is a common element of both
> kinds of due process claims, "[t]he interests protected by substantive due process
> are of course much narrower than those protected by procedural due process." *Bell
> v. Ohio State University*, 351 F.3d 240, 249–50 (6th Cir. 2003). *The issue of
> whether a student's interest in continued enrollment at a post-secondary
> institution is protected by procedural due process has not been resolved.*

*McGee,* 167 F. App'x at 437 (emphasis added).  The Sixth Circuit explained that was because

courts often avoid the issue by assuming for the sake of argument that such an interest exists.

*See, e.g., Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84–85, 98 S.Ct. 948, 55

L.Ed.2d 124 (1978); *Bell,* 351 F.3d at 249."  *Id.*  The Sixth Circuit then followed that same

approach in *McGee* and assumed, without deciding, that such an interest exists.  The court then

affirmed the district court's grant of summary judgment as the facts construed in Plaintiff's favor

did not establish a violation of due process.  *Id*.

This Court has previously noted that "neither the Sixth Circuit Court of Appeals nor the

Supreme Court of the United States has recognized a protected interest in continuing education."

*Porubsky v. Macomb Comty. College*, 2012 WL 2803765 at * 11 (E.D. Mich. 2012).

Given the lack of authority[13] supporting a student's interest in continued enrollment at a

---

[13]In addition, given the lack of authority on that issue, the individual Defendants would
also be entitled to qualified immunity as to the Due Process Count because Plaintiff cannot

post-secondary institution as being protected by procedural due process, the Court concludes that Defendants are entitled to summary judgment as to Plaintiff's procedural due process claim.

Moreover, even if this Court were to assume without deciding that such a right exists, Defendants would still be entitled to summary judgment on this claim. Plaintiff herself concedes that demonstrating a procedural due process claim in the context of a academic dismissal "is a tall order" (Pl.'s Br. at 23) and Defendants' brief sets forth a persuasive argument as to why this claim would also fail on the merits if a protected interest existed. (Defs.' Br. at 36-38).

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

The motion is GRANTED to the extent that the Court grants summary judgment in favor of Defendants with respect to Counts I, III, IV, VI, VII. The Court also grants summary judgment in favor of Defendants as to the portions of Plaintiff's retaliation counts (Counts II, V, and VIII) that are based upon Defendant Pollock's termination of Plaintiff's research position and ceasing to be her advisor. The motion is DENIED as to the remaining portions of Counts II, V, and VIII.

IT IS SO ORDERED.

<div style="margin-left:40%">

S/Sean F. Cox_____
Sean F. Cox
United States District Judge

</div>

Dated: May 18, 2016

---

establish she had a "clearly established" constitutional right to continued enrollment at the University. *See Varlesi v. Wayne State Univ.*, 909 F. Supp.2d 827, 861 (E.D. Mich. 2012).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jennifer Dibbern,

      Plaintiff,

v.                                                    Case No.  12-15632

University of Michigan, *et al.*                      Sean F. Cox
                                                      United States District Court Judge

      Defendants.

_____/

PROOF OF SERVICE

      I hereby certify that a copy of the foregoing document was served upon counsel of record

on May 18, 2016, by electronic and/or ordinary mail.

                          S/Jennifer McCoy_____
                          Case Manager